No. 23-1926

---

IN THE

# United States Court of Appeals

## FOR THE THIRD CIRCUIT

◆◆◆

COUNTY OF ALLEGHENY,

*Appellant,*

—against—

JEFFREY KENGERSKI,

*Appellee.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

---

**APPELLANT'S BRIEF**

COUNTY OF ALLEGHENY

---

Virginia Spencer Scott
Assistant County Solicitor
Pa. I.D. #61647

Frances M. Liebenguth
Assistant County Solicitor
Pa. I.D. #314845

ALLEGHENY COUNTY LAW DEPARTMENT
300 Fort Pitt Commons
445 Fort Pitt Boulevard
Pittsburgh, PA 15219
Tel.: (412) 350-1173

*Counsel for Appellant*

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................... I

TABLE OF AUTHORITIES ..................................................................................... I

STATEMENT OF JURISDICTION ........................................................................ 1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ....................................... 2

STATEMENT OF RELATED CASES AND PROCEEDINGS ................................. 3

STATEMENT OF THE FACTS ............................................................................... 3

RULINGS PRESENTED FOR REVIEW ................................................................. 9

PROCEDURAL HISTORY ..................................................................................... 10

SUMMARY OF THE ARGUMENT ........................................................................ 11

STANDARD AND SCOPE OF REVIEW ................................................................ 13

ARGUMENT ......................................................................................................... 14

   A.   ALLEGHENY COUNTY ENTITLED TO JNOV ON CAUSATION ........................ 14

       1.   *McDonnell Douglas Prima Facie Burden – Causation* ........................ 14
       2.   *Allegheny County's Legitimate Reason Burden – Is Conceded* ............ 14
       3.   *Kengerski's Ultimate Burden – Pretext & But-For Causation* ............. 15
       4.   *No Inconsistences, Incoherences, or Contradictions in Termination* ...... 19
          a.   The reason for termination has been consistent ............................ 19
          b.   The reason for the termination is coherent and plausible ................ 20
          c.   Kengerski Has No Comparators to Show Pretext ........................... 26
          d.   No Intervening Antagonism or Animosity by Harper ..................... 29
          e.   A Single July 2015 Discipline Cannot Be Antagonism .................. 32

   B.   ERROR IN ADMITTING COMPARATOR EVIDENCE .................................... 34

       1.   *Comparator Evidence* ...................................................................... 34
          a.   Robert Bytner .......................................................................... 37
          b.   Robyn McCall .......................................................................... 38

c.    Joseph Demore ...................................................................... 38

d.    Corrections Officer Hendrick ................................................ 40

2.    *Investigation Process of Others* ................................................ 41

C.    ERROR IN ADMITTING EVIDENCE NOT KNOWN BY THE DECISION-MAKER ........................... 43

1.    *Issues with Andrew Coulter* ....................................................... 46

2.    *Statement from Robyn McCall* ..................................................... 48

3.    *Problems with Other Officers* .................................................... 48

D.    ERROR IN ADMITTING EVIDENCE RE: FAILURE TO PROMOTE CLAIM ........................... 49

CONCLUSION ........................................................................ 52

CERTIFICATION OF BAR MEMBERSHIP .................................................. 53

CERTIFICATION OF COMPLIANCE TO RULE 32(A)(7) ..................................... 54

CERTIFICATION OF SERVICE .......................................................... 55

# TABLE OF AUTHORITIES

<u>Cases</u>

*Abramson v. William Paterson Coll. of N.J., 260 F.3d 265 (3d Cir. 2001)* ............. *41*

*Ambrose v. Township of Robinson, 303 F.3d 488 (3d Cir. 2002)* ........................... *43*

*Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)* ............................................ *16*

*Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326 (3d Cir. 1995)* ....................... *42*

*Canada v. Samuel Grossi & Sons, Inc, 49 F.4ᵗʰ 340 (3d Cir. 2022)* ........................ *22*

*Capps v. Mondelez Glob., LLC, 847 F.3d 144 (3d Cir. 2017)* ......................... *20, 42*

*Carvalho-Grevious v. Delaware State University, 851 F.3d 249 (3d Cir. 2017)*. *15, 16*

*Daniels v. School Dist. of Phila., 776 F.3d 181 (3d Cir. 2015.)* .............. *16, 18, 25, 29*

*Doty v. Sewall, 908 F.2d 1053 (1st Cir.1990)* ......................................................... *46*

*EEOC v. City of Long Branch, 866 F.3d 93 (3d Cir. 2017)* ..................................... *13*

*Estate of Oliva ex rel. McHugh v. New Jersey, 604 F.3d 788 (3d Cir. 2010)* ........... *26*

*Farrell v. Planters Lifesavers Co., 206 F.3d 271 (3d Cir. 2000)* ......................... *16, 29*

*Fitzgerald v. Nat'l R.R., 2024 WL 771711 (Feb. 26, 2024, 3d Cir.)* ............. *27, 34, 36*

*Fuentes v. Perskie, 32 F.3d 759 (3d Cir. 1994)* ....................................................... *17*

*Fuentes, 32 F.3d at 764* ................................................................................ *22, 25, 29*

*Geddis v. Univ. of Delaware, 40 Fed.Appx. 650 (3d Cir. 2002)* ............................. *42*

*Hirst v. Inverness Hotel Corp., 544 F.3d 221 (3d Cir. 2008)* ................................... *46*

*Holifield v. Reno, 115 F.3d 1555 (11th Cir. 1997)* ................................................... *27*

*Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101(3d Cir. 1997) ........................... 25

*LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217 (3d Cir. 2007) ..... 16, 30

*Manel v. M &Q Packaging Corp.*, 706 F.3d 157 (3d Cir. 2013)................................ 27

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973 ........................................ 14

*Miller v. Thomas Jefferson Univ. Hosp.*, 565 F. App'x 88 (3d Cir. 2014) ......... 18, 30

*Money v. Provident Mut. Life Ins. Co.*, 189 Fed.Appx. 114 (3d Cir. 2006) ............ 41

*Montgomery County v. Microvote Corp.*, 320 F.3d 440 (3d Cir. 2003) ................. 13

*Moore v. City of Philadelphia*, 461 F.3d 331 (3d Cir. 2006) ........................ 14, 15, 35

*Moore v. Shineski*, 487 Fed. App'x 697 (3d. Cir. 2012 .............................................. 35

*Nelson v. Upsala Coll.*, 51 F.3d 383 (3d Cir. 1995).................................................. 14

*Opsatnick v. Norfolk S. Corp.*, 335 Fed. Appx. 220 (3d Cir. 2009) ............ 27, 35, 36

*Reeves v. Sanderson Plumbing Product Inc.* 530 U.S. 133 (2000)........................... 14

*Reives v. Ill. State Police*, 29 F.4th 887 (7th Cir. 2022) ............................................ 36

*Robinson v. Giant Eagle*, 2024 WL 747237 (3d Cir. Feb. 23, 2024) . 18, 20, 21,22,28

*Scruggs v. Carrier Corp.*, 688 F.3d 821 (7th Cir. 2012) ............................................ 42

*Sprint/United Mgmt. Co. v. Mendelsohn*, 128 S.Ct. 1140 (2008)........................... 35

*Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981) ...................... 15

*Tyler v. SEPTA, , 2002 WL 31965896 (E.D.Pa. Nov. 8, 2002)............................... 36

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517(2013) ................................ 15

*Viera v. Life Ins. Co. of N. America*, 642 F.3d 407 (3d Cir. 2011).......................... 13

*Wilcher v. Postmaster Gen.*, 441 F. App'x 879 (3d Cir. 2011) ................................. 35

*Williamson v. Consol. Rail Corp.*, 926 F.2d 1344(3d Cir. 1991) ........................... 13

*Young v. City of Phila. Police Dep't*, 2016 WL 3101283 (3d Cir. June 3, 2016) .... 32

Statutes

*28 U.S.C. § 1291* ........................................................................................ 1

*28 U.S.C. § 1331* ........................................................................................ 1

*42 U.S.C. § 2000e* ..................................................................................... 1

Rules

*F.R.E. 401* ................................................................................. 35, 36,41, 46

*Fed. R. Evid. 403* ....................................................................... 35, 36, 41,46

# STATEMENT OF JURISDICTION

A.    *The basis for the district court's subject-matter jurisdiction:*

The United States District Court for the Western District of Pennsylvania had subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331[1] because the dispute arises out of claims implicating the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*.

B.    *The basis for the court of appeal's jurisdiction:*

The United States Court of Appeals for the Third Circuit has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

C.    *The filing dates establishing the timeliness of the appeal:*

On April 25, 2023, the District Court entered an order of civil judgment in favor of Plaintiff [Appellee].  (App. 0009.)   That order was placed on the District Court's docket that same day.  (App. 0035.)  Appellant filed a notice of appeal on May 19, 2023.  The appeal was within the thirty-day appeal period set forth in FED. R. APP. P. 4(a)(1)(A) .

D.    *Assertion of finality:*

The entry of judgment on the docket was a final appealable decision.

---

[1] Throughout this BRIEF, all citations of authority are hyperlinked to Westlaw.com.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.    Did the District Court err as a matter of law when it allowed this case to proceed to a jury when there was no more than a scintilla of evidence to support Plaintiff/Appellee's *McDonnell Douglas* pretext argument?

2.    Alternatively, did the District Court abuse its discretion when it permitted this case to be decided by a jury, when its decision rested upon an errant conclusion of law or an improper application of law to fact?

3.    Did the District Court err as a matter of law (or alternatively abuse its discretion) when it ruled that the jury could consider as comparators actors who were not similarly situated to Mr. Kengerski and/or did not engage in substantially similar conduct?

4.    Did the District Court err as a matter of law (or alternatively abuse its discretion) when it ruled that a jury could consider facts not known by the decision-maker?

5.    Did the District Court err as a matter of law (or alternatively abuse its discretion) when it permitted the Plaintiff/Appellee to present evidence to present evidence of the dismissed failure to promote claim?

## STATEMENT OF RELATED CASES AND PROCEEDINGS

There are no related cases or proceedings pending.

## STATEMENT OF THE FACTS

### A. Policies

Mr. Kengerski was a training officer at the Jail.  (App. 0805-0806[2]; 0833.)  He was familiar with Jail policies and trained others on Allegheny County's policy prohibiting discrimination, harassment, and retaliation. (App. 0906-0907.)   That policy (which tracks Title VII) has a mandatory timely reporting requirement of any possible violation. (App. 0932.) Mr. Kengerski knew that discrimination and harassment were prohibited, and he had to report possible violations "right away." (App. 0931-0932; 1207-1211.)

As a Captain, Mr. Kengerski was a part of management, and the sergeants and corrections officers were subordinate to him. (App. 1226.) The Jail established written policy requires subordinates to follow a superior's orders.   (App. 0910; 1201.)   Placing false or inaccurate information in a report, or ordering a subordinate to falsify a report, is a zero-tolerance policy violation.  (App. 0912-0913; 1229.) Mr. Kengerski knew he had to follow that policy and knew that violation could result in

---

[2] Throughout this Brief, all citations to the Appendix are hyperlinked to the Third Circuit docket.

termination. (App. 0911-0912; 1229.) Mr. Kengerski admitted that the policy on falsifying reports for which he was charged with violating required that he be immediately removed from the building and that no other policy violation required this. (App. 0912-0918; 1229.)

Mr. Kengerski's disclosing to a subordinate that the subordinate was the subject of a sexual harassment investigation violated established written policy, which stated violators could be immediately fired. (App. 1210.) Mr. Kengerski agreed that he was charged with violating this policy, knew this policy, and knew that violation was subject to immediate termination, "without other warning." (App. 0929-0931.)

### B. Mr. Kengerski's Termination

Mr. Kengerski was terminated in November 2015, because he told two subordinate officers, Alyssia Tucker and Michael Brown to lie in reports, and for disclosing to a subordinate officer (Michael Brown), that he was the subject of a sexual harassment investigation. (App. 1246; 1249; 1251; 1252; 1253; 1255.) Warden Harper, the decision-maker, reviewed all reports submitted in connection to Mr. Kengerski's policy violations. (App. 0821-0822; 0827.) Warden Harper also viewed video for corroborating or refuting information. (App. 0808; 0827.) Warden Harper reviewed reports by Cadet Tucker and Sgt. Brown who stated that Mr. Kengerski had told them to provide false information in reports (or in Sgt. Brown's case "if asked"). (App. 1253.) Additionally, Sgt. Brown reported that Mr. Kengerski disclosed to him

4

that Sgt. Brown was the subject of a sexual harassment investigation.  (App. 1253.) Warden Harper also reviewed the report of another sergeant (Coulter) that corroborated what Cadet Tucker and Sgt. Brown told him.  (App. 1252.)

Upon consideration of all reports and evidence, Warden Harper made a credibility determination.  (App. 0719; 0821.)  The Warden found officers Tucker and Brown to be more credible because they had no motive to lie. (App. 0720.) The Warden found Officer Alyssia Tucker to be more credible because she was an at-will brand new probationary officer with no union representation. (App. 0719; 0807-0808.) Warden Harper found that she had no motive to lie about a senior captain giving her directions to put false information in a report.  (App. 0719.) Warden Harper found that Mr. Kengerski did have motive to lie and cover up because he knew he would be facing discipline for not making a timely report of sexual harassment.  (App. 0720; 0808.)

Warden Harper decided to terminate Mr. Kengerski in consultation with the Law Department and the County Manger. (App. 0727-0728.) Mr. Kengerski participated in a post-termination hearing where he was given the opportunity to respond to the allegations against him. (App. 0718.)  The law department, Deputy County Manager, and Warden Harper determined that Mr. Kengerski did not provide information at the post-termination hearing to overturn the termination decision.  (App. 0720-0721.)

### C. Buddy Day Suspension

In July of 2015 Mr. Kengerski received a five-day suspension for failure to work in exchange for buddy days for which he had already received pay. (App. 1237.) The buddy day system is a system that was set up for employees to trade shifts with each other. (App. 0481.) Officer A works for officer B in exchange for officer B agreeing that they will work for Officer A within four months. (App. 0508-0509.) Officer A would still be paid on the day they do not work, because of the promise that their "buddy" is going to work for them at a later date. (App. 0509.) As such, the buddy day system falls apart if the officers do not work those days within the four- month window. (App. 0509.) Only corrections officers, in accordance with their collective bargaining agreement, had a written buddy day policy in place. (App. 0783.) The entire jail was audited to determine violations of the buddy day system. (App. 0788.) Mr. Kengerski was found to be the most egregious violator with eleven days he did not pay back. (App. 0787-0788.) Other captains and sergeants were suspended for buddy day violations because of the audit. (App. 0788.)

Buddy days were tracked through the deputy wardens, not Warden Harper. (App. 0787; 0857.) Warden Harper was not involved in the disciplinary process concerning Mr. Kengerski's buddy day violation. Warden Harper did not attend the hearing held for Mr. Kengerski on the buddy day violation. (App. 0786; 0788.) There

was a panel that interviewed Mr. Kengerski pertaining to the buddy days that Warden Harper was not a part of.  (App. 0786-0788.) The panel made the determination to suspend Mr. Kengerski for the egregious buddy day violation.  (App. 0786-0788.) The only involvement Warden Harper had in Mr. Kengerski's buddy day discipline was approving the recommendation of the panel. (App. 0788.)

Mr. Kengerski appealed his five-day buddy day suspension to the personnel board, a separate independent body from Allegheny County. (App. 0950.)  At the personnel board hearing, Mr. Kengerski was able to present witnesses and arguments as to why he believed the five-day suspension was invalid. (App. 0951.) The personnel board upheld the five-day suspension. (App. 0955.)

### D. Robyn McCall

Robyn McCall held the rank of Major while Mr. Kengerski was a Captain. (App. 1236.) Robyn McCall's alleged misconduct set forth in Mr. Kengerski's April 29, 2015 letter.  (App. 1232-1233.)  After this incident was reported, Robyn McCall did not remain employed with the County. (App. 0773; 1236.)    Warden Harper recommended McCall be terminated. (App. 0773-0774; 0814.) Robyn McCall was placed on leave based on direction from the County manager's office and the law department and ultimately resigned employment. (App. 0773; 1236.)

### E.  Robert Bytner

Robert Bytner was a Major accused and terminated over allegations of sexual harassment.  (App. 0692-0693.)  Robert Bytner's sexual harassment allegations were referred to County human resources and the County law department for investigation. (App. 0697-0698; 0822.)  Mr. Bytner received discipline as a result. (App. 0697-0698.) After the initial allegation, Mr. Bytner was demoted from Major to Captain. (App. 0697-0698.)  While Mr. Bytner was serving as a Captain he was accused of sexual harassment.  (App. 0822.)  This was referred to human resources and the county law department for investigation. (App. 0822.)  Mr. Bytner was terminated and received a post termination hearing. (App. 0692-0693.)

### F.  Joseph Demore

Joseph Demore was a Captain at the time he was accused by corrections officer Hendrick of excessive use of force against an inmate and writing a report for the officer. (App. 0823.)  The excessive use of force allegation was reported to and investigated by the Allegheny County Police and the FBI – not internally by the jail. (App. 0823.) Joseph Demore did not receive discipline because the excessive use of force allegation was deemed unfounded by the entities that investigated the allegation. (App. 0498-0499.)

### G. The April 2015 Letter

On April 29, 2015, seven months prior to his termination, Mr. Kengerski submitted a letter (the "Letter") to Warden Harper. (App. 1232-1233.) The Letter was a complaint about Major Robyn McCall with regards to harassment and inappropriate racial text messages recounting events over a year before. (App. 1232-1233.)

Mr. Kengerski claims that his termination in November of 2015 was in retaliation for submitting this Letter, and not for the violation of two zero-tolerance policies.

## RULINGS PRESENTED FOR REVIEW

Allegheny County appeals the Lower Court's denial of Summary Judgment. (WDPa. ECF No. 107); the denial of Rule 50 motion for judgment as a matter of law (App. 1005-013; 1058—062); and entry of Amended Judgment in a Civil Action entered on April 25, 2023. (WDPa. ECF No. 261).

## PROCEDURAL HISTORY

Appellee/Plaintiff Kengerski filed suit in the U.S. District Court for the Western District of Pennsylvania.  Appellee/Plaintiff filed an amended complaint following a motion to dismiss. At the close of discovery Appellant/Defendant Allegheny County moved for summary judgment.  After briefing, the District Court granted summary judgment in favor of Appellant/Defendant. Appellee/Plaintiff filed a notice of appeal. The Third Circuit vacated the judgment of the District Court and remanded for further proceedings.  Appellant/Defendant moved for summary judgment on the issue of *McDonnell Douglas* causation/pretext.  The District Court denied the motion.  The case proceeded to a jury trial.  Appellant/Defendant made a Rule 50 motion at the close of Appellee/Plaintiff's case and renewed it at the conclusion of trial. (App. 1005-013; 1058–062.)  The jury found in favor of Appellee/Plaintiff. Appellant/Defendant Allegheny County filed a notice of appeal.

## SUMMARY OF THE ARGUMENT

As a matter of law, the record is insufficient to sustain a verdict in favor of Appellee. The *McDonnell Douglas* analysis requires that Mr. Kengerski had to have sufficient evidence to create a question of fact of there being a causal link between his being fired in November 2015, and his protected activity seven months earlier.

There was no temporal proximity between the two events. Nor, was there an on-going pattern of hostility, animus, or discipline between Warden Harper (the decision-maker who fired Mr. Kengerski) and Mr. Kengerski, such that a reasonable jury could find that any hostility, animus, or discipline was connected to Mr. Kengerski's protected activity.

There was not sufficient evidence to cast doubt on the legitimacy of the reasons Allegheny County gave for firing Mr. Kengerski. Allegheny County was consistent in its reasons for firing Mr. Kengerski. He violated two written zero tolerance policies that were clear and known to him. He admitted that violation of these policies would subject anyone to discipline, including discharge. JNOV is warranted. In the alternative, the record supports that the verdict cannot stand on the weight of the evidence and a new trial should be granted.

The trial in this matter was to be narrowly focused. It is a single count of Title VII retaliation with Warden Harper as the solo decisionmaker. The District Court

committed several errors of law pertaining to the admission of evidence at trial that as a matter of law, was inadmissible and had no relevance to this case.

The entry of judgment by the District Court should be reversed.

## STANDARD AND SCOPE OF REVIEW

This Court will "exercise plenary review [also called *de novo* review] over an order denying a motion for judgment as a matter of law and apply the same standard as the District Court." *Montgomery County v. Microvote Corp.*, 320 F.3d 440, 445 (3d Cir. 2003). A motion for judgment of law should be granted if, after giving the nonmovant "the advantage of every fair and reasonable inference, there is insufficient evidence from which a reasonable jury could find liability." *Id.*, (internal citations omitted). In a *de novo* review, no deference is given and no presumption of correctness of the lower court's review or the jury's decision. *Viera v. Life Ins. Co. of N. America*, 642 F.3d 407, 413-14 (3d Cir. 2011).

This Court will apply an abuse of discretion standard when reviewing the admissibility of evidence presented at the District Court. "Abuse of discretion occurs when the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *EEOC v. City of Long Branch*, 866 F.3d 93, 98 (3d Cir. 2017).

A new trial is warranted when the "verdict is against the weight of the evidence" and the "record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1453 (3d Cir. 1991).

# ARGUMENT

**A.    Allegheny County Entitled to JNOV on Causation**

### 1.  McDonnell Douglas *Prima Facie* Burden – Causation

In this Title VII retaliation case the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) framework applies.  Mr. Kengerski must first prove his *prima facie* burden by showing:

1)  he engaged in activity protected by Title VII;
2)  his employer took adverse employment action against him[3]; and,
3)  there was a causal connection between the two.

*Moore v. City of Philadelphia*, 461 F.3d 331, 340–41 (3d Cir. 2006) *quoting Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995).

The third prong of Mr. Kengerski's *prima facie* burden requires that he prove a causal connection between his claimed protected activity and the adverse action. *Moore*, 461 F.3d at 340–41.

### 2.  Allegheny County's Legitimate Reason Burden – Is Conceded

If Mr. Kengerski proves his *prima facie* burden, Allegheny County must then produce evidence that Mr. Kengerski's termination was for a legitimate non-discriminatory reason.  *Reeves v. Sanderson Plumbing Product Inc.* 530 U.S. 133, 142 (2000).  At trial, Mr. Kengerski conceded Allegheny County met this burden.

---

[3] Allegheny County concedes the first and second prongs.

Once this burden is satisfied, the presumption raised by the *prima facie* case is rebutted. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 256 (1981).

### 3. Kengerski's Ultimate Burden – Pretext & But-For Causation

The "ultimate burden" of proving causation then rests with Mr. Kengerski to establish by a "preponderance of the evidence" that the reasons offered by Allegheny County were not its true reasons but were pretext for discrimination. Mr. Kengerski must prove that "retaliatory animus" for his April 2015 Letter was the real cause, "the 'but-for' cause," of his termination seven months later. *Carvalho-Grevious,* 851 F.3d at 258-259; *Univ. of Tex. Sw. Med. Ctr. v. Nassar,* 133 S.Ct. 2517, 2534 (2013). (A "plaintiff making a retaliation claim under § 2000e–3 must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer."); *Moore,* 461 F.3d at 342 (3d Cir. 2006) (To survive summary judgment, employee "must produce some evidence from which a jury could reasonably reach these conclusions.).

When this Court conducts a *McDonnell Douglas* review it is not confined to a rigid analysis of prongs. Evidence (or lack thereof) reviewed at *prima facie* remains a consideration thereafter. "Although an examination of the employer's proffered legitimate reason for the adverse action is frequently delayed until the second and third parts of the familiar *McDonnell Douglas* burden-shifting framework in pretext cases, 'evidence supporting the prima facie case is often helpful in the pretext stage and

nothing about the *McDonnell Douglas* formula requires us to ration the evidence between one stage or the other.' *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 234 (3d Cir. 2007) quoting *Farrell*, 206 F.3d at 286. This is an important point now given this case has already been tried to verdict, yet the entirety of the *McDonnell Douglas* analysis still applies to this Court's review of the case.

Causation can be established by "temporal proximity" if it is "unusually suggestive." *Daniels v. School Dist. of Phila.*, 776 F.3d 181, 196 (3d Cir. 2015) quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000).[4] Because there is no temporal proximity here, Mr. Kengerski can only use the "circumstances as a whole" doctrine to try to establish causation. This requires he prove through facts in the record that there was a continual pattern of antagonism, animosity, or discipline by Warden Harper that is suggestive of retaliation, (*Daniels*, 776 F.3d at 196) and that Mr. Kengerski's writing the Letter was the *likely reason* for his termination. *Carvalho-Grevious v. Delaware State University*, 851 F.3d 249, 253 (3d Cir. 2017). Mr. Kengerski must present more than some evidence to support his position. "'The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *LeBoon v. Lancaster Jewish Community Center Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007) quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

---

[4] Mr. Kengerski has never asserted there is temporal proximity.

The Third Circuit has developed a body of law, summarized below in three cases, that articulates the sufficiency of evidence necessary to allow the question of causation to go to a jury. On the following pages, Allegheny County will review the record in our case and hold it up to the standard set forth in that body of law. This review will show that the evidence Mr. Kengerski presented fails to meet that standard.

*The Fuentes Standard:*

In *Fuentes v. Perskie*, this Court held that to establish causation:

> the employee [must] demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'

*Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994)* (emphasis original) (internal citations omitted).

*The Daniels Standard:*

In *Daniels v. School Dist.*, this Court held that to establish causation the employee must demonstrate:

1. inconsistences in the reasons the employer gives for its adverse action;

2. intervening antagonism, animosity, or discipline by the decision-maker or other evidence suggesting that the decision-maker had a retaliatory animus when he fired the employee.

*Daniels v. School Dist. of Phila.*, 776 F.3d 181, 196 (3d Cir. 2015). The "antagonism, animosity, or discipline" must be on-going and part of a fact-supported continual pattern of actions by the decision-maker that is suggestive of retaliation. *Id.*

### The Robinson Standard:

Most recently, in *Robinson v. Giant Eagle,* this Court held that to establish causation the employee needs to "paint[ ] the [employer's articulated reasons] as:

1.  weak, implausible, contradictory, or incoherent; or,

2.   show the jury that "the employer treated other, similarly situated persons not of [their] protected class more favorably."

*Robinson v. Giant Eagle,* --- F.4th ----, No. 23-1804, 2024 WL 747237, at *2 (3d Cir. Feb. 23, 2024).

To summarize the above, this Court has articulated that, the "two main factors in finding the causal link necessary for retaliation are, 'timing and evidence of ongoing antagonism.'" *Miller v. Thomas Jefferson Univ. Hosp.,* 565 F. App'x 88, 91 (3d Cir. 2014) (quoting *Miller v. Thomas Jefferson Univ. Hosp.,* 565 F. App'x 88, 91 (3d Cir. 2014).

Applying the above standards adopted by the Third Circuit to the record established at trial in our case, with the evidence viewed in a light most favorable to Mr. Kengerski, the verdict cannot stand, and Allegheny County is entitled to Judgment *Non-Obstante Veredicto* (JNOV). Allegheny County is entitled to judgment as a

matter of law on causation.  However, in the alternative, if this Court does not grant JNOV, then Allegheny County is entitled to a new trial, given the errors in admission of evidence cited in this Brief.

### 4. No Inconsistences, Incoherences, or Contradictions in Termination

#### a. *The reason for termination has been consistent*

Where the employer has given inconsistent, incoherent, or contradictory reasons for its adverse employment decision, this Court has held this is a basis for a jury to reasonably find pretext.  *Fuentes, Daniels,* and *Robinson.*

In our case, though, Allegheny County has been consistent and coherent from November 2015 through the conclusion of the jury trial eight years later as to why Mr. Kengerski was fired.  This was documented at the time (see the reasons for discharge set forth in Mr. Kengerski's Post-Termination Hearing Notice dated December 8, 2015 (App. 1255) and throughout the Warden Harper's testimony dated October 5, 2022. (App. 0719-0720; 0723; 0807-0808; 0817.)  Mr. Kengerski was fired for 1) Ordering two subordinate officers to lie on written reports (or provide false information if asked), and 2) Disclosing to someone that they were the subject of an on-going internal sexual harassment investigation.  No contradictory evidence exists in the record.

Consistent with *Fuentes, Daniels,* and *Robinson*, no rational factfinder could find any inconsistency, incoherence, or contradiction in Allegheny County's justification for firing Mr. Kengerski.  Thus, in keeping with precedent of this Court

no rational jury could find the legitimate non-discriminatory reason put forth by Allegheny County was pretextual.

### b.  The reason for the termination is coherent and plausible

When an employer has a company policy that sets forth that an employee can be fired if the policy is violated, and the employer relies upon that policy to justify the employee's termination, this is sufficient to rule - as a matter of law - in favor of the employer. *Robertson v. Giant Eagle*, No. 23-1804, 2024 WL 747237, *2 (3d Cir. Feb. 23, 2024). *See also Capps v. Mondelez Global, LLC*, 847 F.3d 114, 152 (3d Cir. 2017). Allegheny County fired Mr. Kengerski because he violated two written zero tolerance policies. (App. 1196-1206; 1227-1229.) Each policy set forth that violation of the policy was subject to termination. (App. 1205; 1229.)

As a matter of law, it is coherent and plausible that when Warden Harper found Mr. Kengerski violated these policies that Mr. Kengerski would be terminated. *Robinson v. Giant Eagle*, --- F.3d ---, No. 23-1804, 2024 WL 747237, *3 (Feb. 23, 2024, 3d Cir.). Where an employer follows its own written policies and those policies call for the action the employer took, this is the absence of pretext – as a matter of law – such that the case cannot proceed to a jury. *Id.*

*Robinson* is squarely on point with the present case. In *Robinson*, the plaintiffs were two employees of Giant Eagle who were fired from their jobs. They claimed their discharge was based upon their race and they filed a lawsuit under Title VII. The

employer put forth that each employee was fired, "because they violated the company's harassment and/or retaliation policies." *Robinson*, 2024 WL 747237, *2. Giant Eagle's investigation before making the decisions to fire the plaintiffs – which this Court found could not be pretext - bears similarities to the investigation Warden Harper conducted before firing Mr. Kengerski. Giant Eagle's decision-maker documented interviews with the eyewitnesses, just as Warden Harper obtained reports from Sgt. Brown and Cadet Tucker, the only eyewitnesses to Mr. Kengerski's misconduct. (App. 1251, 1253.) Giant Eagle's decision-maker reviewed video of the incident, just as Warden Harper reviewed all the available video of events involving Mr. Kengerski. (App. 0808; 0827-0828.) Furthermore, Giant Eagle had a policy that the identity of people who reported misconduct was to be kept confidential. One of the *Robinson* plaintiffs violated this policy when he attempted to find out who reported him and when he was warned that this was an improper inquiry, he continued to try to find out. *Robinson*, 2024 WL 747237, *2 and fn 3. Similarly, Mr. Kengerski violated Allegheny County's policy when he disclosed to Sgt. Brown that Sgt. Brown was being investigated for sexual harassment. (App. 1253.)

The *Robinson* court looked at this "record as a whole" and found that Giant Eagle had clear policies in place that provided for discharge if the policies were violated. Giant Eagle determined that the plaintiffs violated those polices. It was not relevant whether Giant Eagle's determination was accurate. "The question before us

... is whether the evidence would allow a reasonable jury to "'disbelieve [Giant Eagle's] articulated legitimate reasons" or "believe that an invidious discriminatory reason was more likely than not a ... determinative cause of [Giant Eagle's], actions.'" *Robinson, 2024 WL 747237, \*3* quoting *Canada v. Samuel Grossi & Sons, Inc,* 49 F.4ᵗʰ 340, 349 (3d Cir. 2022) (quoting *Fuentes,* 32 F.3d at 764). This Court ruled as a matter of law, that the *Robinson* case was precluded from going to a jury.

In our case, the policies that Mr. Kengerski violated were well known to him. (App. 1196-1206; 1207-1211; 1227-1229.)   They were in writing and easily understandable.  (App. 1196; 1207; 1227.) They existed well before Mr. Kengerski violated them. (App. 1196; 1207; 1227.) The policies clearly set forth that violation of each policy, separately (let alone jointly), could result in immediate termination.  (App. 1196; 1207; 1227.)  Mr. Kengerski agrees that anyone who violated either one of these policies would be subject to termination.  (App. 0912-0914; 0928-0930.)

Given the above-stated standard and the facts of this case, it would be impossible for any reasonable factfinder to conclude that Allegheny County's stated reasons for firing Mr. Kengerski were incoherent or implausible.  It would defy logic, common sense, and sound judgment.  Thus, consistent with precedent of this Court no rational jury could find Mr. Kengerski's discharge, which was consistent with clear and well-known policies, was pretextual.

The "plausibility" of Mr. Kengerski being terminated for his conduct is further supported by the record. *See* Statement of Facts *supra*, discussing Mr. Kengerski's documented misconduct. Thus, Mr. Kengerski's telling two subordinate officers to put false information in a report (or to provide false information if asked) and compromising the integrity of a sexual harassment investigation by disclosing to the alleged perpetrator that they are being investigated, are serious breaches of conduct and strike at the heart of the integrity, honesty, and responsibility Allegheny County must have from its Jail command staff. The fact that Allegheny County takes these policies seriously is evidenced by the fact that they are zero tolerance. This is further evidenced by the fact that the policy related to false information in reports is not only zero tolerance, is unique among Allegheny County Jail polices because it alone provides that the moment someone is thought to have violated this policy – before any investigation has been completed, before the violator has had a chance to respond - the violator is to be, immediately relied of duty and sent home until his/her formal disciplinary hearing is conducted." (App. 1229.) Mr. Kengerski's actions demonstrate that he was more interested in protecting himself from possible discipline for failing to timely report Officer Tucker's sexual harassment allegation, than being a role model, leader, or honest person.

Moreover, Mr. Kengerski's disclosing to Sgt. Brown that Sgt. Brown was the subject of a sexual harassment investigation is a violation of written Allegheny County

policy.  (App. 0929-0930; 1210.)  The applicable policy provides that anyone who violated it could be immediately fired. (App. 1210.)  Mr. Kengerski knew this policy, and he also knew that if he was found to have violated it, he could be terminated immediately, "without other warning."  (App. 0929.)

In concluding that Mr. Kengerski violated two County policies, Warden Harper reviewed reports by Cadet Tucker and Sgt. Brown who stated that Mr. Kengerski had told them to provide false information in reports (or in Sgt. Brown's case "if asked"). Additionally, Sgt. Brown reported that Mr. Kengerski disclosed to him that Sgt. Brown was the subject of a sexual harassment investigation.  (App. 1253.)  Warden Harper also viewed video to find corroborating or refuting information to what had been provided to him in the written reports.  (App. 0808; 0827-0828.)  Warden Harper reviewed video from the Allegheny County Jail cameras, which along with the information in the reports informed his credibility decisions.   (App. 0827.)  Warden Harper also reviewed the report of another sergeant (Coulter) that corroborated what Cadet Tucker and Sgt. Brown told him.  (App. 1252.)

Warden Harper reviewed the facts presented to him and made a business decision that Cadet Tucker and Sgt. Brown were more credible, and that they did not have a motive to fabricate their reports.  (App. 0719-0720.)  Whereas, Mr. Kengerski did have a motive to "get those officers to falsify their reports."  (App. 0720; 0723; 0807; 0818.) Mr. Kengerski knew that he was going to be disciplined if Cadet Tucker

and/or Sgt. Brown submitted honest reports. (App. 0723.) Cadet Tucker, for example, was a new officer, employed at the Jail for less than a year. (App. 0719.) Warden Harper did not find any motive for her to provide a false report to benefit or hurt anyone, especially since she was so new at the Jail. (App. 0808.) This record makes sense and is reasonable. It rationally supports Warden Harper's decision to fire Mr. Kengerski for his misconduct. No part of that decision relates back to Mr. Kengerski's April 2015 letter.

It is important to state that it does not matter if the information Warden Harper relied upon was wrong or mistaken. *Fuentes*, 32 F.3d at 765. He is permitted to find Cadet Tucker and Sgt. Brown more credible, and Mr. Kengerski less so. *Daniels v. School Dist. of Phila.*, 776 F.3d 181, (3d Cir. 2015.)

> To discredit the employer's proffered reason... the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.

*Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108-09 (3d Cir. 1997).

In *Daniels*, *supra*, in an effort to establish pretext, plaintiff Daniels argued that the employer demonstrated retaliatory motive because it concluded Daniels was able to return to full duty status despite her doctors' recommendations that she was unable to return. *Daniels*, 776 F.3d at 199. The court rejected this as a basis for pretext. The employer gave a reasonable explanation as to why it did not rely upon Daniels'

doctors' recommendation and instead relied upon the employer's hired doctor's recommendation.  *Id.  See also* [Estate of Oliva ex rel. McHugh v. New Jersey, 604 F.3d 788, 801 (3d Cir. 2010)](#) (Employee plaintiff could not survive pretext stage in a § 1981 retaliation case with claim that the employer engaged in pretext by deciding to adopt the recommendation of a doctor retained by the employer and disregard the reports of the treating physicians.  The decision-maker believed that, "treating physicians often act as patient advocates and are thus not objective."  Grant of summary judgment affirmed.).

As *Daniels* and *McHugh* hold, where an employer's explanation for its employment decision makes sense, is logical, and is supported by the record, it would be error to allow the case to go to jury.  In the present case, there is nothing incoherent or implausible about Mr. Kengerski being fired for violating two written, zero tolerance policies, of which he was aware, and admitted that violation of these policies warranted discharge.  Consistent with the precedent of this Court, JNOV should be granted.

### c.  *Kengerski Has No Comparators to Show Pretext*

Yet another way Mr. Kengerski had available to him to establish pretext would have been if Mr. Kengerski had evidence of comparators.  This required Mr. Kengerski to have evidence that Warden Harper (the decision-maker) "treated other, similarly situated persons not of his protect class more favorably."  *[Robinson v. Giant](#)*

*Eagle*, --- F.4ᵗʰ ---, No. 23-1804, 2024 WL 747237, at *2 (3d Cir. Feb. 23, 2024). Whether a person is similarly situated is a legal determination made by the court not a jury. *E.g. Fitzgerald v. Nat'l R.R. Passenger Corp.*, No. 23-2340, 2024 WL 771711 (Feb. 26, 2024, 3d Cir.) (holding that the four co-workers offered by Robinson as comparators were not similarly situated as a matter of law.); *Manel v. M&Q Packaging Corp.*, 706 F.3d 157, 170 (3d Cir. 2013) (holding as a matter of law that a person who holds a different job and has a higher level of education than the plaintiff is not similarly situated). The court requires that the other employee must be, "similar in all relevant respects." *Opsatnick v. Norfolk S. Corp.*, 335 Fed. Appx. 220, 223 (3d Cir. 2009), *quoting Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

For someone to be "similarly situated involves considering factors such as the employees' job responsibilities, their supervisors, and the nature of the misconduct." *Fitzgerald*, 2024 WL 771711, *2. In *Fitzgerald*, employee Fitzgerald identified four comparators whom he claimed were similarly situated. This Court required that to be similarly situated the comparator must hold the same job. Where employee Fitzgerald was a "Building and Bridge Inspector" with Amtrak people holding positions of "Capital Construction Manager" and "Track Supervisor" could not be comparators as a matter of law (even if they had engaged in the same violations).

This Court also required that even if the purported comparator holds the same job, they must also have engaged in substantially the same misconduct and be

punished for violating the same rules. Employee Fitzgerald presented two other purported comparators. Both of whom held the same job as he did. However, this Court found they did not engage in substantially similar misconduct. Employee Fitzgerald had accepted gifts from Amtrak vendor "Mark 1", when he used the vendor's credit card to purchase a $900 furnace for his church and clothing valued at $420. This violation was discovered during a specific investigation launched by Amtrak.

The purported comparator also accepted gifts of clothing from an Amtrak vendor – but it was a different vendor than Mark 1, and this violation was discovered during a different Amtrak investigation. This Court ruled that these distinctions meant the proffered comparator was not similarly situated. As to the last proffered comparator, this Court found that person was not similarly situated because they had engaged in unprofessional conduct, discrimination/harassment, and workplace violence, which was a different policy violation than the one employee Fitzgerald violated. *Robinson*, 2024 WL 747237, at *2.

Like the plaintiff in *Robinson*, Mr. Kengerski has no similarly situated comparators. Mr. Kengerski violated Allegheny County Jail Policy 154 § N when he instructed two subordinate officers to provide false information. (App. 1229.) This policy was enacted March 15, 2015. *Id.* Mr. Kengerski can have no comparators for this violation because no officer had ever violated this policy before him.

The second policy Mr. Kengerski violated was the provision in Allegheny County's Anti-Discrimination, Harassment, and Retaliation policy, which required that employees keep sexual harassment investigations confidential. (App. 1207-1211.) Yet again, the record is devoid of evidence that any officer (other than Mr. Kengerski) ever improperly disclosed confidential investigative information.

As such, Mr. Kengerski failed to identify any comparators who were treated differently from him in the enforcement of the policy violations for which he was terminated. Thus, there was no record from which a reasonable jury could find pretext existed.

### d.  No Intervening Antagonism or Animosity by Harper

The *Fuentes, Daniels, and Farrell,* decisions of this Court also articulate a standard that causation can be established through a pattern of intervening antagonism, animosity that can be connected back to the protected activity, or discipline by the decision-maker or other evidence suggesting that the decision-maker had a retaliatory animus.[5]

By the very words in these cases this requires a 'pattern' and 'on-going' chain of actions by the decision-maker that began at the protected activity and connects to the adverse employment action. Moreover, there needs to be "animosity" that connects

---

[5] *Fuentes,* 32 F.3d at 765; *Daniels,* 776 F.3d at 196; *Farrell,* 206 F.3d at 281.

back to the protected activity. *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217 (3d Cir. 2007).

In *LeBoon*, employee LeBoon engaged in an activity protected by Title VII. Three months later she was fired. *LeBoon*, 503 F.3d at 221-22. LeBoon argued that the record had sufficient evidence of animus or antagonism to allow her case to proceed to a jury. The District Court granted summary judgment.

On appeal, this Court reviewed the interactions between LeBoon and the employer's decision-maker during those three months. This Court found evidence of a "strained relationship" between LeBoon and the decision-maker. *LeBoon*, 503 F.3d at 233. This Court held simply having a "tense relationship" between the fired employee and the decision-maker was insufficient. LeBoon was required to also have some evidence that "sustain[s] the inference that it [the tense relationship] was caused by LeBoon's protected activity." *LeBoon*, 503 F.3d at 234.

This Court looked at the non-discriminatory reasons presented by the employer for LeBoon's discharge (her complaining to the board about the decision-maker and wanting to save money) and found there was evidence in the record to support this. That is, the full extent of the evidence necessary to eliminate a question

of fact for the jury was the existence of logical evidence to support the employer's reason for termination.[6] *LeBoon,* 503 F.3d at 234.

In Mr. Kengerski's case, there is no pattern of animus, hostility, or discipline by Warden Harper that creates any connection between Mr. Kengerski's April 2015 Letter and his discharge seven months later. The record established that Mr. Kengerski and Warden Harper had only one face-to-face interaction during this time, and that was at Mr. Kengerski's post-termination hearing. (App. 0718.) The record contains a grand total of five written interactions between Warden Harper and Mr. Kengerski. (App. 1235; 1239; 1240; 1245; 1254.) In all instances, Warden Harper did not say or act in a manner that displayed animus, hostility, or any negative attitude toward Mr. Kengerski – let alone one what connected back to the Letter. This is clear – as a matter of law – on the face of these documents.

The record is devoid of anything suggesting Warden Harper voiced animus toward Mr. Kengerski in the seven months after Mr. Kengerski sent his Letter. The

---

[6] LeBoon also argued there were inconsistencies in the employer's reason for discharge, which created a question of fact for the jury. This Court ruled otherwise. The employer said it discharged LeBoon for budgetary reason (in addition to her making negative reports to the company board about the decision-maker. LeBoon argued a question of fact existed as to whether the employer saved money in firing her given it later paid other people to do her work. This Court rejected that as evidence of pretext, saying that the record shows that these people were not immediately hired to do her work, and other evidence showed that the employer was having serious financial difficulties – even without direct evidence linking LeBoon's firing with cost-cutting. Thus, the employer's explanation was not "inconsistent or incongruous." No reasonable jury could find for the employee. *LeBoon,* 503 F.3d at 234.

record is further devoid of anyone accusing Warden Harper of animus toward Mr. Kengerski after Mr. Kengerski sent his Letter.  In fact, throughout seven months of conversations that Warden Harper had and seven months of emails and other communications that Warden Harper engaged in, there is not a single reference anywhere in the record of this case of this Letter ever being discussed again – by anyone.  Not Warden Harper.  Not Mr. Kengerski.  Not anyone else in the Allegheny County Jail.  There is not a scintilla of evidence that this Letter remained an issue for Warden Harper.  Thus, as a matter of law, there was no evidence or animus, antagonism, or hostility by Warden Harper at all (let alone that connects back to the Letter from April 2015) to allow this case to go to a jury.

### e.  A Single July 2015 Discipline Cannot Be Antagonism

Lastly, Mr. Kengerski was disciplined once between his protected report and his discharge; July 14, 2015.  (App. 0782; 0786-0787; 0950-0951.)  This single discipline – as a matter of law - cannot establish a "pattern of consistent or continuous discipline" or pattern of antagonism.  *Robinson v. SEPTA., 982 F.2d 892, 895 (3d Cir. 1993)* (finding a pattern of ongoing antagonism where plaintiff was subject to a "constant barrage of written and verbal warnings..., inaccurate point totaling, and disciplinary action, all of which occurred soon after plaintiff's initial complaints and continued until his discharge." *See also Young v. City of Phila. Police Dep't, 2016 WL 3101283 (3d Cir. June 3, 2016)* (finding a pattern of antagonism where after filing

a complaint on April 18, plaintiff Young, a female city police academy recruit, was reprimanded or received discipline on April 20, April 26, May 24, June 11, June 17, and July 22 for infractions such as congregating in the hall, being late to class, carrying a feminine-looking bag, and failing to shine her shoes). Moreover, given that "time" is always a factor in determining causation (*Miller v. Thomas Jefferson Univ. Hosp.*, *565 F. App'x 88, 91 (3d Cir. 2014)*), the fact that there is a gap of more than four months between this single discipline and Mr. Kengerski's firing, eliminates this discipline from being sufficient to create a question of fact that could go to a jury.

Even with this discipline, it was part of a Jail-wide investigation into Buddy-Day use by all Jail officers. A panel of officers reviewed Mr. Kengerski's Buddy Day abuse and determined his conduct warranted a five-day discipline. Warden Harper was not involved in that panel's decision-making or their review process. All Warden Harper did in connection with Mr. Kengerski's suspension is uphold it when it came to him for review. (App. 0695-696; 0788.)

Kengerski appealed that suspension to the Allegheny County Personnel Board – an entity entirely separate and apart from the County (App. 0950) – with no knowledge of Mr. Kengerski's Letter from April 2015. The Personnel Board upheld Mr. Kengerski's suspension finding that he had violated Jail policies and the suspension was justified. (App. 0955.) Where this independent body said the suspension is justified, and that body cannot be charged with harboring animus toward

Mr. Kengerski, no reasonable jury could find that Warden Harper's doing the same thing as this independent body could be evidence of animus.

Instead, the record supported that Mr. Kengerski was fired for his extreme misconduct of violating two zero tolerance policies at the Allegheny County Jail. Mr. Kengerski, a high-ranking officer at the Jail, instructed two subordinate officers to put false information in their reports and told one that if asked something was to lie. Warden Harper's uncontradicted testimony was that when he reviewed the reports provided to him describing Mr. Kengerski's conduct, "I was totally disturbed with the contents that I saw. As an African American leader of (the) Allegheny County Jail I was appalled." (App. 0767.) Mr. Kengerski was fired for his appalling conduct in November of 2015. The record supports that.

Consistent with the precedent of this Court, this case should never have been allowed to go to a jury. Allegheny County is entitled to JNOV. Alternatively, the verdict cannot stand on the weight of the evidence, a new trial should be granted.

## B.    Error in Admitting Comparator Evidence

### 1.  Comparator Evidence

It is improper for the District Court to allow the introduction of comparator testimony where the persons -as a matter of law – cannot be comparators. *Fitzgerald v. Nat'l R.R. Passenger Corp.*, No. 23-2340, 2024 WL 771711 (Feb. 26, 2024, 3d Cir.) The District Court erroneously ruled that the issue of whether an individual qualifies

as a comparator is a fact issue to be decided by the jury in response to the County's objections. (App. 0459-0460.) This ruling resulted in the jury hearing cumulative and confusing evidence concerning individuals who, as a matter of law, did not qualify as comparators.

Whether a comparator is truly similarly-situated to the plaintiff is an issue of law. *Moore v. Shineski*, 487 Fed. App'x 697, 698 (3d. Cir. 2012). In response to a motion in limine a court can exclude comparator evidence where the individuals are not "similarly situated" and thus are either irrelevant or create a serious risk of confusing or misleading the jury. F.R.E. 401, 403; *see also Sprint/United Mgmt. Co. v. Mendelsohn*, 128 S.Ct. 1140, 1146 (2008) ("[Q]uestions of relevance and prejudice are for the District Court to determine in the first instance"). "Which factors are relevant is determined by the context of each case, but often includes a 'showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.' " *Opsatnik v. Norfolk S. Corp.*, 335 F. App'x 220, 223 (3d Cir. 2009); *see also Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 882 (3d Cir. 2011) (stating that the relevant inquiry includes "factors such as the employees' job responsibilities, the supervisors and decision-makers, and the nature of the misconduct engaged in."). Similarly situated does not mean identically situated. *Opsatnik,* 335 F. App'x at

222 – 23. Nonetheless, the plaintiff must be "similar in all relevant respects." *Id.*  In the discipline context, a plaintiff must show that the alleged comparator's acts "were of comparable seriousness to his own infraction, and that the [comparator] engaged in the same conduct without such differentiating or mitigating circumstances as would distinguish the [comparator's] conduct or the employer's resulting treatment of [him]." *Tyler v. SEPTA,* No. Civ. A. 99-4825, 2002 WL 31965896, at *3 (E.D.Pa. Nov. 8, 2002) (alterations in original), *aff'd,* 85 F. App'x 875 (3d Cir. 2003). Employees are not similarly situated where they "engaged in different misconduct and were punished for violating different rules." *Fitzgerald v. National Railroad Passenger Corporation,* (Amtrak), No. 23-2340, 2024 WL 771711 at *2 (3d Cir. February 26, 2024) quoting *Reives v. Ill. State Police,* 29 F.4th 887, 892 (7th Cir. 2022).

The County anticipated that Mr. Kengerski would attempt to use Robyn McCall, Robert Bytner, and Joseph Demore as comparators and specifically moved to exclude this evidence and other evidence of employees who were not similarly situated comparators because it is irrelevant and would also create a serious risk of confusing or misleading the jury under F.R.E. 401, 403.  (App. 0064-0070.) This Motion in Limine was denied by the District Court.  (App. 0222-0226.)

The County has been consistent throughout this litigation and at trial in stating that the reasons for Mr. Kengerski's termination was based upon coercing subordinate

officers to falsify official reports to the Allegheny County Jail and interfering with a sexual harassment investigation by giving the subject of the investigation advance warning of the investigation and allegations against him. (App. 1255; 0817.) No comparators offered by Mr. Kengerski engaged in substantially similar conduct. In addition to there not being substantially similar conduct, significant mitigating circumstances existed that distinguished their conduct and the County's treatment of each individual. At trial Mr. Kengerski was permitted to introduce evidence regarding, Robert Bytner, Robyn McCall, Joseph Demore, and Corrections Officer Hendrick who as a matter of law did not qualify as comparators.

### a. Robert Bytner

Robert Bytner was accused and terminated over allegations of sexual harassment, not for coercing subordinates to falsify a report or interfering with a sexual harassment investigation. (App. 0692-0693.)   Robert Bytner's sexual harassment allegations were referred to County human resources and the County law department for investigation.  (App. 0697-0698; 0822.)  Mr. Bytner received discipline as a result. After the initial allegation, Mr. Bytner was demoted from Major to Captain. (App. 0697-0698.)  The decision to demote was made after the HR investigation and in collaboration with the law department and the county manager's office. (App. 0699.) While Mr. Bytner was serving as a Captain he was accused of sexual harassment.  This was referred to human resources and the county law department for investigation.

(App. 0822.)  At the time Mr. Bytner was Captain, he was treated the same as Mr. Kengerski.  Mr. Bytner was terminated and received a post termination hearing. (App. 0692-0693.)

### b.  Robyn McCall

Robyn McCall is not similarly situated in all relevant respects to Mr. Kengerski. Robyn McCall held the rank of Major while Mr. Kengerski was a Captain. (App. 1236.) Robyn McCall's alleged misconduct set forth in Mr. Kengerski's April 29, 2015, letter included sending racial text messages and making a comment referring to Mr. Kengerski's grandniece as a "little monkey on your hip" is not substantially similar in nature to Mr. Kengerski's conduct of interfering with an ongoing investigation and coercing subordinates to falsify reports.  (App. 1232-1233.)  Furthermore, after this incident was reported, Robyn McCall did not remain employed with the County. Warden Harper testified at trial that he had recommended McCall be terminated. (App. 0773-0774; 814.) Robyn McCall was placed on leave based on direction from the County manager's office and the law department and ultimately resigned employment. (App. 0773; 1236.)

### c.  Joseph Demore

Joseph Demore was accused by corrections officer Hendrick of excessive use of force against an inmate - not for interfering with an investigation and coercing

subordinates to falsify reports. The excessive use of force allegation was reported to and investigated by the Allegheny County Police and the FBI – not internally by the jail. (App. 0823.) Accordingly, any comparison into the way in which Joseph Demore's alleged misconduct was investigated to Mr. Kengerski's is not relevant and serves only to confuse and mislead the jury.

Inspector Palmer was an Allegheny County police officer who worked on the investigation involving Joseph Demore and Officer Hendrick along with the FBI. (App. 0579; 0581.) Inspector Palmer testified that the allegations against Joseph Demore were that he used excessive force and that he wrote a report for [corrections officer Hendrick], not that the report was false. (App. 0580.) "[T]he officer...never said that [Demore] had put in there information or that anything in the report that Joe Demore wrote was any kind of falsehood." (App. 0580-0581.) Q. So would you agree then that Major Demore was not accused by Officer Hendrick of falsifying a report? A. That's correct. (App. 0623.) Joseph Demore testified that he never directed Officer Hendrick to put false information in the report, and he was found to have not typed the report in error. (App. 0498.) Joseph Demore also testified that the allegation against him was not a complaint that he had instructed subordinate officer to put false information in a report, or a complaint of interfering with a sexual harassment investigation. (App. 0505.) Warden Harper testified that Joseph Demore was not accused of falsifying a report. (App. 0824.) Furthermore, Joseph Demore did not

receive discipline because the excessive use of force allegation was deemed unfounded by the entities that investigated the allegation. (App. 0498-0499.) As such, there can be no comparison made between the investigation or the disciplinary process since the investigation was undertaken by separate entities and the report was unfounded.

Moreover, at trial counsel for Mr. Kengerski over the County's objection was permitted to mischaracterize the testimony and evidence that came in further prejudicing the County and confusing the jury as to what the actual issue is in this matter. Mr. Demore "ordered a subordinate to put false information in a report." (App. 0823.) "When you found out that there was a report that Demore had ordered a subordinate to file a report with false information in it." "The allegation was that Mr. Demore made his subordinate officer sign a report that had false information in it." (App. 0823-0824.)

### d. Corrections Officer Hendrick

Mr. Kengerski was permitted to submit comparator testimony of corrections officer Hendrick who reported Joseph Demore for a use of force incident. The County objected to the use of Hendrick as a comparator (App. 0447-0448; 0456-0460.) Officer Hendrick is not a comparator as a matter of law. Officer Hendrick did not hold the same position as Mr. Kengerski. Officer Hendrick was a corrections officer, the lowest rank within the jail, and in a union subject to a collective bargaining agreement. (App. 1226; 0555-0556.) Captains such as Mr. Kengerski are not in a

union.  (App. 0480.)  Mr. Kengerski was permitted to submit testimony attempting to compare reporting an unfounded use of force incident to coercing a subordinate to falsify a report. (App. 0590-0592.)  Much time had to be spent on attempting to unravel this misleading and confusing comparison being made. (App. 0620-0624.)  Corrections officer Hendrick did not engage in similar conduct and held an entirely different position within the Jail.  The submission of this testimony was not relevant and served only to confuse and mislead the jury.

### 2.  Investigation Process of Others

Throughout trial, Mr. Kengerski was permitted to elicit testimony from non-decisionmakers as to what their "process" is when investigating a complaint.  The County objected to the submission of this testimony on the basis that it was not relevant, unduly prejudicial, and confusing. Fed.R.Evid. 401, Fed.R.Evid. 403; (App. 0477-0478; 0563-0564; 0830.)

This testimony is not relevant because a challenge to the sufficiency or propriety of the investigation is inadequate to establish pretext. "It is not enough for a plaintiff to show that the employer's decision was wrong or mistaken, because the issue is whether the employer acted with discriminatory animus." *Abramson v. William Paterson Coll. of N.J.,* 260 F.3d 265, 283 (3d Cir. 2001); *Money v. Provident Mut. Life Ins. Co.,* 189 Fed.Appx. 114, 116–17 (3d Cir. 2006) (finding plaintiff's "naked credibility attack" on the adequacy of an investigation insufficient to establish

pretext); _Geddis v. Univ. of Delaware_, 40 Fed.Appx. 650, 653 (3d Cir. 2002) (finding that a lack of investigation is not sufficient to show an employer acted with discriminatory animus); _Brewer v. Quaker State Oil Ref. Corp._, 72 F.3d 326, 332 (3d Cir. 1995) ("We do not sit as a super-personnel department that reexamines an entity's business decisions.") The "critical inquiry in discrimination cases like this one is not whether the employee actually engaged in the conduct for which he was terminated, but whether the employer in good faith believed that the employee was guilty of the conduct justifying discharge." _Capps v. Mondelez Glob., LLC_, 847 F.3d 144, 155 (3d Cir. 2017) _quoting Scruggs v. Carrier Corp._, 688 F.3d 821, 1002 (7th Cir. 2012). Nevertheless, Mr. Kengerski was permitted to compare Warden Harper's investigation method with Inspector Palmer's and Joseph Demore's methods. This information is not relevant and even if so, any probative value was far outweighed by prejudice and jury confusion.

Inspector Palmer was not a County Jail employee. Inspector Palmer was an Allegheny County police officer stationed in the jail. He did not report to Warden Harper or jail administration. He reported to the superintendent of police. (App. 0569; 0624.) As a sworn police officer, inspector Palmer would be called upon to investigate complaints usually involving a criminal aspect. (App. 0615.) The findings of Inspector Palmer's investigations could potentially lead to criminal charges against an individual. (App. 0624.) Inspector Palmer did not expect the Warden of the jail to

42

conduct the same type of investigation as he did as a police officer. (App. 0624.) The jail administration would not conduct criminal investigations. (App. 0625.) Inspector Palmer also testified that he did not know whether Warden Harper was aware of the Inspector's standard investigation procedure. (App. 0576.) Yet, Inspector Palmer was questioned for pages on his investigation techniques and strategies. (App. 0572-0575.)

The County objected to Joseph Demore testifying about his investigation techniques because he was never the Warden at the jail and the issue in this case is the Warden's process and whether the Warden had retaliatory animus, not how Joseph Demore conducted investigations. (App. 0477.) The Court overruled this objection and Joseph Demore testified about his own investigations he conducted at the jail. (App. 0477-0479.)

### C.    Error In Admitting Evidence Not Known By the Decision-Maker

It is an error of law for the District Court to allow the introduction of facts not known to the decision-maker, Warden Harper. It is a fundamental requirement of Title VII, that the decisionmaker can only be held responsible for those facts the decisionmaker actually knew. *Ambrose v. Township of Robinson*, 303 F.3d 488, 496 (3d Cir. 2002). In *Ambrose*, the Third Circuit considered a case where the district court denied a motion for summary judgment filed by the employer in a First Amendment Retaliation case. The case proceeded to verdict in the employee's favor.

On appeal, the employer argued that there was insufficient evidence to sustain the jury's verdict because the employee lacked direct evidence that the decisionmakers knew of the employee's alleged protected activity. *Ambrose,* 303 F.3d at 491-92. The Third Circuit agreed.

The evidence presented at trial was that the decisionmakers testified they did not know about an affidavit written by the employee. The employee had no direct evidence to contradict the decisionmakers' testimony. The employee argued that this was not dispositive and that a jury could still impute knowledge to the decisionmakers. The Third Circuit ruled otherwise and held – as a matter of law - that the decisionmaker had to have knowledge. *Ambrose,* 303 F.3d at 493. The Third Circuit held it was error for the district court not to grant the employer judgment as a matter of law and remanded the case for entry of judgment in the employer's favor. *Id.* at 496.

The trial in this matter was to be narrowly focused. It is a single count of Title VII retaliation with Warden Harper as the solo decisionmaker. Mr. Kengerski recognized this and filed a successful Motion in Limine to preclude Allegheny County from presenting any testimony unless it was expressly known by Warden Harper at when he made the decision to fire Mr. Kengerski. This included Mr. Kengerski's Motion in Limine to prevent the testimony of the officers who authored the reports

that were the basis of Warden Harper's reasons for firing Mr. Kengerski. (App. 0060; 0061.)

In making the arguments that prevailed in this Motion, Mr. Kengerski stated, "only the facts Harper knew, and therefore could have relied upon... this is the only information that is relevant to whether his decision was pretextual." (App. 0062.) Mr. Kengerski continued that about any evidence that was not known by Warden Harper, "[n]ot only does this evidence lack probative value, the danger of unfair prejudice by its admission is high. It may cause a jury to base its decision on something other than the established propositions in the case. Accordingly, Defendant should be precluded from offering the testimony of facts which Harper did not know when he made the termination decision." (App. 0062.) The District Court granted Mr. Kengerski's Motion.

The County in recognizing the narrow focus of the issue filed a Motion in Limine precluding Mr. Kengerski from offering evidence of retaliation without first laying a foundation that the actor had knowledge of Mr. Kengerski's protected activity. (App. 0071.) The District Court ruled that:

> Any "retaliation" suffered by Plaintiff at the hands of Officers Coulter, Tucker, and Brown is not relevant to establish any sort of adverse action, given these officers' lack of knowledge of Plaintiff's involvement in Ms. McCall's termination. Plaintiff though seeks to proffer this evidence to show that Plaintiff complained about this harassment **to Warden Harper**, and **Warden Harper** treated these complaints less seriously than the complaint made by

Plaintiff about Ms. McCall. For this limited purpose, the
Court finds this evidence to be relevant.

(App. 0225-0226.)

Notwithstanding this, and over Allegheny County's objections under
Fed.R.Evid. 401 and Fed. R. Evid. 403, at trial Mr. Kengerski was permitted to present
misleading evidence concerning events that were not known by the decisionmaker,
Warden Harper, and were carried out by alleged individuals who had no knowledge
of Mr. Kengerski's protected activity. In allowing this evidence the District Court acted
in contravention of its own pretrial order. Each one of these instances taken alone
would prejudicially impact the outcome of this case. The cumulative nature of this
improper testimony and evidence exponentially added to the prejudicial effect and
probability that the verdict was influenced. "When evidence is charged to have been
improperly admitted, any error is more likely to be found harmful, and thus reversible,
if the evidence is substantively important, inflammatory, repeated, emphasized, or
unfairly self-serving." *Hirst v. Inverness Hotel Corp.,* 544 F.3d 221, 228 n. 10 (3d Cir.
2008) *quoting* Doty v. Sewall, 908 F.2d 1053, 1057 (1st Cir.1990). The following
evidence was erroneously admitted at trial.

### 1. Issues with Andrew Coulter

The District Court specifically ruled that any "retaliation" suffered by Mr.
Kengerski at the hands of Andrew Coulter is not relevant to establish any sort of

adverse action given Andrew Coulter was unaware of Mr. Kengerski's protected activity. (App. 0225-0226.)    The District Court ruled that testimony regarding harassment by Andrew Coulter was only relevant if Mr. Kengerski "complained about this harassment to Warden Harper." (App. 0225-0226.) Notwithstanding this ruling and over the County's objections, Mr. Kengerski was permitted to present pages of testimony on animus harbored by Andrew Coulter after Mr. Kengerski submitted his report of protected activity.  (App. 0863-0866; 0448-0449.)

Mr. Kengerski testified that Andrew Coulter routinely submitted complaints to Deputy Warden Wainwright stating he was doing illegal investigations.  Mr. Kengerski testified that this was only reported to Deputy Warden Wainwright and did not lay a foundation that Warden Harper was aware of any of the reports or of Deputy Warden Wainwright's response.    (App.  0863-0866.)    This  information  was  extremely prejudicial and offered no probative value even according to the District Court's own rulings.  It served to further confuse the jury as to the actual issue in this trial.

Furthermore, Mr. Kengerski was permitted to testify over the County's objections that Andrew Coulter made a statement that "if [Andrew Coulter] saw me, he was going to kill me." (App. 0894.)  The County objected to this testimony because Mr. Kengerski had not laid a foundation of Warden Harper's knowledge of this "death threat" pursuant to the ruling on the County's Motion in Limine. (App. 0895; 0225-0226.)  The County also objected to the presentation of this evidence earlier in

the trial because of the Warden's lack of knowledge and the extremely prejudicial and inflammatory nature of the testimony. (App. 0416-0418.) Mr. Kengerski testified that he only spoke with Deputy Simon Wainwright and Major Bytner about the "death threat." (App. 0894-0895.) Moreover, Mr. Kengerski testified that the report he claimed to have generated in response to learning of the alleged "death threat" is not an actual report of death threats received from Andrew Coulter. (App. 1238; 0959-0961.)

### 2. Statement from Robyn McCall

Mr. Kengerski was permitted to testify over the County's objection that Robyn McCall said to him "I know about the complaint. I'm going to fix your ass." (App. 0847.) When the County objected to this testimony, Mr. Kengerski's counsel argued that the statement was offered not for the truth, but for the fact it was said, and that Mr. Kengerski reported it. (App. 0847.) Mr. Kengerski went on to testify that he had only reported this statement to Major Bytner and Wainwright – not to Warden Harper. (App. 0848.) This alleged statement made by Robyn McCall had no relevance to this matter. Robyn McCall was not the decisionmaker and Warden Harper was not aware of this comment. The admission of this statement served nothing more than to unduly prejudice the County and confuse the jury.

### 3. Problems with Other Officers

Again Mr. Kengerski was permitted to testify over the County's objection about alleged problems with anonymous officers at the jail where no foundation was laid that

those anonymous individuals knew of Mr. Kengerski's protected activity and no foundation was laid that Mr. Kengerski reported these instances to Warden Harper. (App. 0385-0387; 0857-0859.)   Mr. Kengerski testified that he received hang-up phone calls from unknown officers at the jail.   Mr. Kengerski testified that the anonymous callers would make chimpanzee noises and call him names such as "chimp trainer, monkey's uncle, and n***** lover." (App. 0385-0387; 0857-0859.) The testimony was not admissible, extremely inflammatory, unduly prejudicial, and had no relevance to the Title VII retaliation issue that was being tried.

### D.    Error in Admitting Evidence Re: Failure to Promote Claim

The District Court erred as a matter of law in permitting Mr. Kengerski to present evidence of his dismissed failure to promote claim. Mr. Kengerski originally included a failure to promote claim in his First Amended Complaint. (ECF #16, ¶ 25, *1st Amended Complaint*). When faced with a motion to dismiss the Title VII failure to promote claim because it was time barred, Plaintiff stipulated that the claim was dismissed. The District Court issued an order dismissing with prejudice all Title VII claims that might have accrued before October 6, 2015 – this included the failure to promote claim. (ECF # 27, ¶ 1, *Order on Motion to Dismiss*.)

The County filed a Motion in Limine to preclude evidence and testimony at trial relating to the dismissed failure to promote claim because it was not relevant and

any possible probative value would be substantially outweighed by unfair prejudice and confusion pursuant to Fed.R.Evid. 401, Fed.R.Evid. 403. (App. 0076-0078; 0079-0096.)  The County argued in its motion and brief that the uncontested facts were that Warden Harper was not involved in the interview process and that a panel of two deputy wardens, Monica Long and LaToya Warren, conducted the interviews. (App. 0079-0096.)  The County also argued that it was uncontested that Warden Harper would accept and promote the individual that was recommended by the panel. (App. 0079-0096.)

The District Court ruled that:

> evidence that Plaintiff was treated differently by Warden Harper and other relevant decisionmakers in the interview and application process for the rank of Major is relevant to a course of retaliatory conduct. See *Gipson v. Dep't of Rehab. & Corr.*, No. 2:18-CV-315, 2020 WL 1233638, at *11 (S.D. Ohio Mar. 13, 2020) (inference of causal connection between adverse employment action and protected activity "may arise from evidence of defendant's different treatment of the plaintiff before and after she engaged in protected activity or a close proximity in time between the protected activity and the adverse employment action" (cleaned up)). **Plaintiff may not introduce evidence as to the actual hiring/promotion decision, which concerns the dismissed failure-to-promote claim.**

(App. 0214, *emphasis added*.)

The application process would only be relevant to the extent Warden Harper, the ultimate decisionmaker, was involved in that process.  He was not.  The County objected to this information being presented at trial. (App. 0748-0753; 0897; 0077-

0078; 0079-0096.)  The testimony at trial was consistent with the facts presented in the County's Motion in Limine.  Warden Harper repeatedly testified that he was not involved in the interview process, and he always accepts the recommendation of the interview panel comprised of deputy wardens. (App. 0744-0745.)

Notwithstanding the District Court's ruling on the Motion in Limine, and Warden Harper's uncontested testimony at trial, Mr. Kengerski was permitted to put on extensive testimony not only surrounding the interview process that had no relation back to the Warden – but was also permitted to introduce evidence as to the ultimate hiring and promotion decisions.  (App. 0470; 0742-0744; 0746; 0896-0897.)    The jury was permitted to hear that Robert Bytner and Robyn McCall, two key individuals in this case received promotions to the position of Major over Mr. Kengerski. To add to the confusion and prejudicial impact of this evidence, these particular promotions took place **before** Mr. Kengerski engaged in the protected activity.  (App. 0896-0897.) Moreover, Warden Harper was questioned on his decision making in promoting Bytner and McCall even though this occurred prior to Mr. Kengerski's protected activity; Warden Harper was not part of the panel that interviewed and made the recommendation, and this information was already ruled to be irrelevant by the District Court. (App. 0742-0744, 0746.)  The evidence not admissible.  It had no probative value. Its admission was unduly prejudicial.  It served only to mislead and confuse the jury and the prejudicial impact influenced the outcome of this case.

51

## CONCLUSION

For the foregoing reasons, Appellant respectfully request that the entry of judgment by the District Court should be **REVERSED**, and the case remanded to the District Court for entry of Judgment.   Alternatively, the entry of judgment by the District Court should be **REVERSED** the case should be remanded for a new trial.

Respectfully submitted,

*/s/ Virginia Spencer Scott*
Virginia Spencer Scott
Assistant County Solicitor
Pa. I.D. #61647

*/s/ Frances Liebenguth*
Frances Liebenguth
Assistant County Solicitor
Pa. I.D. #314845

ALLEGHENY COUNTY LAW DEPARTMENT
Firm #057
445 Fort Pitt Boulevard, Suite 300
Pittsburgh, PA 15219
(412) 350-1173

vscott@alleghenycounty.us
frances.liebenguth@alleghenycounty.us

Counsel for Appellant

## CERTIFICATION OF BAR MEMBERSHIP

I, Virginia Spencer Scott, Esquire, hereby certify that I have been admitted before the bar of the United States Court of Appeals for the Third Circuit and that I am a member of good standing of the Court.

I, Frances Marie Liebenguth, Esquire, hereby certify that I have been admitted before the bar of the United States Court of Appeals for the Third Circuit and that I am a member of good standing of the Court.

Respectfully submitted,

*/s/ Virginia Spencer Scott*
Virginia Spencer Scott
Assistant County Solicitor
Pa. I.D. #61647

*/s/ Frances Liebenguth*
Frances Liebenguth
Assistant County Solicitor
Pa. I.D. #314845

ALLEGHENY COUNTY LAW DEPARTMENT
Firm #057
445 Fort Pitt Boulevard, Suite 300
Pittsburgh, PA 15219
(412) 350-1173
(412)-350-1108

virginia.scott@alleghenycounty.us
frances.liebenguth@alleghenycounty.us

Counsel for Appellant

53

## CERTIFICATION OF COMPLIANCE TO RULE 32(A)(7)

I, Virginia Spencer Scott, Esquire, hereby certify that this BRIEF complies with the type-volume requirements set forth in Federal Rules of Appellate Procedure Rule 32(a)(7)(B). This BRIEF contains 11,628 words and is 52 pages, from the Statement of Jurisdiction through the Conclusion, as determined by Microsoft Word, Update 2404, 3/4/24 - word count processing program, with 14-point Baskerville Old Face. The hard copy and the electronic copy of this BRIEF are identical. The electronic copy of this BRIEF has been virus scanned using System Center Endpoint Protection.

*/s/ Virginia Spencer Scott*
Virginia Spencer Scott
Assistant County Solicitor
Pa. I.D. #61647

ALLEGHENY COUNTY LAW DEPARTMENT
Firm #057
445 Fort Pitt Boulevard, Suite 300
Pittsburgh, PA 15219
(412) 350-1173
virginia.scott@alleghenycounty.us

Counsel for Appellant

## CERTIFICATION OF SERVICE

I, Virginia Spencer Scott, Esquire, an attorney duly admitted to the bar of this Court, hereby certify that on this 25th day of March 2024, I electronically filed APPELLANT'S BRIEF with the Clerk using the CM/ECF system of the Third Circuit.

I also certify that on this 22nd day of March 2024, I electronically filed APPELLANT'S BRIEF APPENDICES with the Clerk using the same CM/ECF system.

I also certify that simultaneous service of APPELLANT'S BRIEF and BRIEF APPENDICES were made on the below-named counsel of record using the CM/ECF system of the Third Circuit.

Margaret S. Coleman, Esquire
PA I.D. #200975
116 Boulevard of the Allies
Pittsburgh, PA 15222
(412) 232-4400
(*Counsel for Appellee*)

I also certify that on March 22, 2024, I caused APPELLANT'S BRIEF APPENDICES to be sent by two-day Mail (UPS) in a properly addressed wrapper, to the address listed below.

I also certify that on March 27, 2024, I will cause APPELLANT'S BRIEF to be sent by two-day Mail (UPS) in a properly addressed wrapper, to the address listed on the following page.

Office of the Clerk
UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT
Office of the Clerk
601 Market Street, Room 21400
Philadelphia, PA 19106-1790
(Seven hard copies of Appellant's BRIEF)

Respectfully submitted,

*/s/ Virginia Spencer Scott*
Virginia Spencer Scott
Assistant County Solicitor

Counsel for Appellant