No. 23-1926

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

---

COUNTY OF ALLEGHENY,

Appellant,

v.

JEFFREY KENGERSKI,

Appellee.

---

Appeal from the Memorandum Order entered on October 19, 2021 and from the
Amended Judgment entered on April 25, 2023 in The United States District Court
for the Western District of Pennsylvania
Civil Action No. 2:17-cv-01048

---

BRIEF OF APPELLEE

---

Margaret S. Coleman, Esquire
PA I.D. No. 200975

O'BRIEN COLEMAN & WRIGHT LLC
116 Boulevard of the Allies
Pittsburgh, PA  15222
(412) 232-4400

Attorney for Appellee

# TABLE OF CONTENTS

I)    **JURISDICTIONAL STATEMENT** ...................................................1

II)   **STATEMENT OF RELATED CASES AND PROCEEDINGS** ..............1

III)  **COUNTER-STATEMENT OF THE ISSUES** .............................1

IV)   **CONCISE STATEMENT OF THE CASE** ............................2

V)    **SUMMARY OF THE ARGUMENT** ......................................15

VI)   **COUNTER-STATEMENT OF THE STANDARD OF REVIEW** ..........16

VII)  **ARGUMENT** ...............................................................17

  a.  Sufficiency of the Evidence ...........................................17

    i.   *This Court lacks jurisdiction to hear the County's challenge to the sufficiency of the evidence.* ...............................................17

    ii.  *The County cannot appeal the Trial Court's denial of its Motion for Summary Judgment* ...............................................20

    iii. *The trial record supports the jury's verdict.* ...............................21

    iv.  *The Trial Court was not required to accept the County's proffered justification.* ...............................................30

  b.  Evidentiary Rulings ...............................................34

    i.   *Standard of review* ...............................................34

    ii.  *Comparator evidence* ...............................................35

      1.  The comparators ...............................................35

      2.  Legal standards ...............................................37

      3.  The Trial Court's ruling was correct ...............................39

      4.  Any potential error was harmless ...............................43

    iii. *Investigation procedures* ...............................................43

    iv.  *Evidence "not known" by the decision-maker* .........................46

    v.   *Evidence of "failure to promote" claim* ................................49

VIII) **CONCLUSION** ...............................................................51

**CERTIFICATE OF COMPLIANCE WITH RULE 32A** ...................................52

**CERTIFICATION OF BAR MEMBERSHIP**......................................................52

**CERTIFICATION OF TEXT OF E-BRIEF** .......................................................52

**CERTIFICATION OF VIRUS CHECK**..............................................................52

## <u>TABLE OF AUTHORITIES</u>

**Cases**

<u>Abrams v. Lightolier Inc.</u>, 50 F.3d 1204 (3d Cir. 1995) ............................ 21, 35, 43

<u>Aman v. Cort Furniture Rental Corp</u>, 85 F.3d 1074 (3d Cir. 1996) ................. 32, 33

<u>Andrews v. City of Philadelphia</u>, 895 F.2d 1469  (3d Cir.1990) ..................... 23, 32

<u>Andujar v. Gen. Nutrition Corp.</u>, 767 F. App'x 238 (3d Cir. 2019) ........................38

<u>Canada v. Samuel Grossi & Sons, Inc.</u>,
   49 F.4th 340 (3d Cir. 2022)........................................................ 31, 32, 33, 34, 44

<u>CGB Occup. Therapy, Inc. v. RHA Health Servs. Inc.</u>,
   357 F.3d 375 (3d Cir.2004).......................................................................21

<u>Cone v. West Virginia Pulp & Paper Co.</u>, 330 U.S. 212 (1947) .............................18

<u>Cooper v. Harris</u>, 581 U.S. 285 (2017) ........................................................22

<u>Cortes v. Cnty. of Santa Clara</u>, 630 F. App'x 731 (9th Cir. 2016)...........................38

<u>Daniels v. Sch. Dist. of Philadelphia</u>, 776 F.3d 181 (3d Cir. 2015).......................23

<u>Dupree v. Younger</u>, 598 U.S. 729 (2023)............................................... 19, 20

<u>Fuentes v. Perskie</u>, 32 F.3d at 765 (3d Cir. 1994) ....................................31

<u>Globe Liquor Co. v. San Roman</u>, 332 U.S. 571 (1948)...........................................18

<u>Graham v. Long Island R.R.</u>, 230 F.3d 34 (2d Cir. 2000)........................................38

<u>Hobgood v. Illinois Gaming Bd.</u>, 731 F.3d 635 (7th Cir. 2013) ..............................34

<u>Houston v. Easton Area Sch. Dist.</u>, 355 F. App'x 651 (3d Cir. 2009)... 37, 38, 40, 41

<u>J.C.C. v. L.C.</u>,
   No. 20-3289, 2022 WL 985873 (3d Cir. Mar. 31, 2022).................. 15, 17, 34, 42

<u>Johnson v. New York, N.H. & H.R. Co.</u>, 344 U.S. 48 (1952) .................................18

<u>Jones v. Evergreen Packaging, Inc.</u>, 536 F. App'x 661 (8th Cir. 2013) ...................38

<u>Kengerski v. Harper</u>, 6 F.4th 531 (3d Cir. 2021).......................................................23

<u>Marra v. Philadelphia Hous. Auth.</u>,
   497 F.3d 286 (3d Cir. 2007), as amd (Aug. 28, 2007)..... 16, 17, 21, 22, 23, 25, 30

<u>Miller-El v. Dretke</u>, 545 U.S. 231 (2005) .................................................41

<u>Moyer v. United Dominion Indus., Inc.</u>, 473 F.3d 532 (3d Cir.2007) ....................21

<u>Ohler v. United States</u>, 529 U.S. 753 (2000) ...........................................37

<u>Ortiz v. Jordan</u>, 562 U.S. 180 (2011) ....................................................... 18, 19, 20

<u>Ramirez v. The GEO Grp.</u>, Inc., 655 F. Supp. 2d 1170 (D. Colo. 2009)................38

<u>Riordan v. Kempiners</u>, 831 F.2d 690 (7th Cir.1987)...............................................32

Robinson v. Giant Eagle,
    No. 23-1804, 2024 WL 747237 (3d Cir. Feb. 23, 2024) ............................... 30, 31

Rotondo v. Keene Corp., 956 F.2d 436 (3d Cir.1992) .............................................21

Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379 (2008)....................... 38, 42

T. Levy Assocs., Inc. v. Kaplan, 755 F. App'x 116  (3d Cir. 2018).........................16

U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711 (1983)......................22

Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc., 546 U.S. 394 (2006)...... 18, 19, 22

Wallace v. Seton Fam. of Hosps., 777 F. App'x 83 (5th Cir. 2019) ........................38

Wheeler v. Georgetown Univ. Hosp., 812 F.3d 1109 (D.C. Cir. 2016) ..................38

Woodson v. Scott Paper Co., 109 F.3d 913  (3d Cir. 1997) ........................ 22, 23, 30

Zielinski v. SPS Techs. LLC,
    No. 10-CV-3106, 2011 WL 5902214 (E.D. Pa., Nov. 22, 2011)..........................25

## I) JURISDICTIONAL STATEMENT

The district court had jurisdiction over Appellee's claims of race discrimination under 42 U.S.C. § 1981 pursuant to 28 U.S.C. § 1331. This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291, as on May 19, 2023 the County of Allegheny appealed from an Order denying Defendant's Motion for Summary Judgment entered on October 19, 2021 and from the Court's Amended Judgment in a Civil Action entered on April 25, 2023.

## II) STATEMENT OF RELATED CASES AND PROCEEDINGS

None.

## III) COUNTER-STATEMENT OF THE ISSUES

a) Does this Court lack jurisdiction to review the County's challenge to the sufficiency of the evidence presented at trial?

b) If the County did preserve its challenge to the sufficiency of the evidence, does the record contain sufficient evidence to support the jury's verdict?

c) Did the Trial Court properly exercise its discretion by admitting evidence concerning Harper's treatment of similarly situated employees?

d) Did the Trial Court properly exercise its discretion by admitting evidence of information known to Wainwright, given that Mr. Kengerski laid a foundation that Wainwright reported this information to Harper?

e) Did the Trial Court properly exercise its discretion by admitting evidence regarding the standard investigatory procedures of the Allegheny County Jail and Allegheny County Internal Affairs?

      f)      Did the Trial Court properly exercise its discretion by admitting evidence regarding his applications for major before and after his protected activity.

## IV) CONCISE STATEMENT OF THE CASE

      a.      Relevant Facts

In May of 2015, Jeffery Kengerski, a captain at the Allegheny County Jail (ACJ), reported that Major Robin McCall had sent him several racist text messages and called his young biracial niece a "monkey." App. 1233-1232. At the time he made this complaint, Mr. Kengerski had worked at the ACJ for nearly 13 years. App. 0832-0833. In that time, he worked his way up from part-time corrections officer to captain. Id. He was stationed in the highest security units of the Jail and had no disciplinary record. App. 468-469. For the next six months, Warden Orlando Harper engaged in a pattern of retaliatory conduct toward Mr. Kengerski that included, *inter alia,* allowing his coworkers to harass, taunt and threaten him with impunity, ignoring his complaints and requests for meetings, and escalating specious and obviously retaliatory complaints about him. Ultimately, on November 30, 2015, in violation of the ACJ's standard investigatory and disciplinary procedures, Harper terminated Mr. Kengerski based on one of these complaints without even speaking to him. *See infra*; *See* App. 0872, 0901, 1254.

In December 2014, four months before Mr. Kengerski made his complaint, Harper promoted Robyn McCall from captain to major. App. 0366. Robyn McCall was a "larger than life" figure at the jail and was highly influential among ACJ employees. App. 0595-0596. 0790, 0797, 0835. At the time of her promotion, the ACJ was divided into "factions," one of which was led by McCall. App. 0611, 0836, SAppx074-075. McCall showed favoritism toward employees in her faction and protected them from discipline. App. 0485-0486, 0836-0837. At the same time, she behaved abusively toward employees who were not in her faction. App. 0486, 0492-0494, 0837. Former ACJ Deputy Warden Joseph Demore, who worked with McCall for over 15 years, described McCall as "vindictive." App. 0485. Mr. Kengerski described her as a "schoolyard bully." App. 0836, 0841. When Harper promoted McCall, he was aware of numerous allegations against her including complaints of racial discrimination, favoritism, retaliation, harassment, fraternizing with inmates and interfering with an FBI investigation. App. 0486-0488, 0492-0496, 0596-0598, 0600-0602, 0731-0737, 0742-0743.

Four months after Harper promoted McCall, in April of 2015, Mr. Kengerski reported to then Major Simon Wainwright that McCall had called his young biracial niece and another officer's biracial child "monkeys." App. 0839-0842, 1212-1225, 1230. He also reported that she had sent him numerous racist text messages. Id. Wainwright did not act on this complaint. App. 0842. Kengerski then took his

3

concerns to Deputy Warden Demore, who reported them to Warden Harper.  App. 0496-0497, 0842-0843.  When Harper did not act, Mr. Kengerski went to the ACJ Internal Affairs Department ("IA").  App. 0843.  Shortly thereafter, Harper ordered Mr. Kengerski to file a report and to turn his phone over to an IA investigator who deleted the text messages. App. 0845, 1230-1233.[1]  The text messages depicted unflattering photographs of African Americans and Asians with captions comparing them to African American jail employees or repeating offensive stereotypes. App. 0763-0765, 1212-1225.  Mr. Kengerski submitted his report on April 29, 2015. App. 1232-1233.  In Harper's opinion, Mr. Kengerski's report constituted incontrovertible proof of McCall's misconduct which did not require further investigation. App. 0780.

Nevertheless, Harper did not place McCall on leave. App. 0776, 0811, 0847. He forwarded Mr. Kengerksi's complaint to the Allegheny County Law Department. App. 0766-0767, 0771, 0776, 0826.  He then allowed McCall to remain on duty - supervising Mr. Kengerski - for another three and a half weeks. App. 0776, 0811, 0847.

---

[1] Mr. Kengerski had taken screen shots of some of the messages, which were not deleted. See App. 0845, 1212-1225.

Immediately after Mr. Kengerski reported McCall, she and other officers began to retaliate against him. *See e.g.* App. 0610-0611, 0800-0801, 0848-0849, 0857-0861, 0862-0866, 0894-0895, 1241-1244, 1248. Although he had problems with McCall and members of her faction before, the harassment got "ten times worse" after he reported her. App. 0984-0986.

A few days after he submitted his report, McCall told Mr. Kengerski that she knew about the complaint and was going to "fix [his] ass." App. 0847-0848. Mr. Kengerski reported this to Deputy Warden of Operations Simon Wainwright. Id. Other officers also began to harass Mr. Kengerski by, for example, calling him on his work phone - making chimpanzee noises and calling him racist names like "chimp trainer," "monkey's uncle" and "n****r lover" - and then hanging up. App. 0858-0859, 0985. Mr. Kengerski also reported these hangup calls to Deputy Warden Wainwright. Id. Wainwright reported these events to Harper.[2] Harper did not act on these reports. Id.

---

[2] Harper never denied knowledge of Mr. Kengerski's complaints and Mr. Kengerski presented evidence that Wainwright reported them to him. Harper confirmed that Wainwright's job duties included meeting regularly with Harper and bringing issues like Mr. Kengerski's harassment complaints to his attention. App. 0685-0686 (Harper: "The deputy warden should keep the warden advised of everything"). See also App. 0791-0792 (Harper would "expect to be advised" if a captain was being harassed, receiving threats or being accused of misconduct.); App. 0741(Deputy Warden is responsible for reporting issues to the Warden.) Harper believed that Wainwright was performing his duties properly. App. 0686 ("Q. As far as you know

On May 13, 2015, Mr. Kengerski requested a meeting with Harper to discuss his complaint against McCall. App. 1235. At this meeting, he planned to discuss the retaliation by McCall and members of her faction. App. 0850. Although Harper testified that officers could make appointments to meet with him, he did not schedule a meeting with Mr. Kengerski. App. 0105. He told Mr. Kengerski that he was investigating the allegations and would inform Mr. Kengerski of the results. App. 1235. Harper never met with Mr. Kengerksi to discuss the allegations and never informed him of the results of the investigation. App. 0769-772.

Harper did not terminate McCall. Instead, he allowed her to keep working at the Jail until May 22, 2015, at which time he placed her on three months of paid administrative leave, after which she was allowed to voluntarily resign.[3] App. 0772-0774, 0810-0811, 1236.

---

Simon Wainwright did that. Right? A. Yes.") In addition, Wainwright and Harper had a close working relationship that dated back many years. App. 0487-0488, 0675-0677. Harper worked for Wainwright at the D.C. Department of Corrections where Wainwright promoted him to deputy warden. App. 0675. Wainwright left D.C. in the wake of sexual harassment allegations in 2012. App. 0676, SAppx034. In 2013, after Harper became Warden of the ACJ, Harper hired Wainwright as a captain. App. 0676. By 2015, Harper had promoted Wainwright multiple times to Deputy Warden of Operations. App. 0677.

[3] For the first time, at trial Harper asserted that he recommended that McCall be terminated but was overruled by the County Executive and the Law Department. App. 0773-0774. A jury could have disbelieved this testimony based on Harper's failure to recall this important fact during his deposition, his failure to document it

Members of McCall's faction continued to harass Mr. Kengerski after McCall's departure. For example, they tampered with and defaced Mr. Kengerski's locker. App 0604-0605, 0789-0790, 0859-0863, 1245. They left threatening letters inside and scratched it with images associated with McCall's faction. App. 0836, 0859-0861. Mr. Kengerski reported this to Wainwright, who reported it to Harper. App. 0861, *see also* n.2 *supra*.

Andrew Coulter, a known member of McCall's faction, whom she had previously protected from discipline, made physical threats against Mr. Kengerski and his family. App. 0485-0487, 0612, 0836, 0894-0895, 1238. SAppx077. For example, on July 14, 2015, Wainwright informed Mr. Kengerski that Coulter had threatened to kill him and instructed Mr. Kengerski to work in a different part of the jail that day so that he would not encounter Coulter. App. 0895.

Coulter also made numerous false allegations of misconduct against Mr. Kengerski. App. 0863-0865. Wainwright investigated these allegations and threatened Mr. Kengerski with discipline. App. 0866. Mr. Kengerski proved that every one of these allegations against him was unfounded. App. 0866. Wainwright reported these incidents to Harper. *See* n.2 *supra*. *See also* SAppx051 (Wainwright

---

anywhere, and his signature on McCall's separation agreement granting her a voluntary resignation and three months of paid leave. Id. *See also* App. 0775, 0814.

always informed Harper when he was investigating misconduct and reported back with his findings.)

It was well known at the ACJ that members of different factions would make unfounded complaints against one another. App. 0610-0611, 799; SAppx075, 076, 077, 086, 093. People from different factions were "constantly trying to get . . . each other in trouble" via anonymous complaints. SAppx075. *See also* App. 0799. Harper was aware that deputy wardens regularly received these anonymous complaints. App 0799. Palmer referred to this as "factionalized drama" in a memo to Harper. App. 0609, 0611, 0794, 1242-1243.

By August of 2015, the harassment had become so severe that Mr. Kengerski decided to request a demotion to sergeant so that he would have union protection. App. 0871-0872. 1240. On August 17, 2015, Mr. Kengerski asked Harper for a meeting to discuss returning to the rank of sergeant. Two minutes later Harper responded, "This request is denied." App. 0872, 1240.

In mid-August, Harper received an anonymous complaint, purportedly from an ACJ employee, that Mr. Kengerski had engaged in sexual misconduct at work. App. 0607, 1241. Harper forwarded this complaint to internal affairs for

investigation. App. 0606-0607, 0792.[4] Palmer conducted an extensive investigation which included interviews and video review.  App. 0608-0609, 1242-1244.  He concluded that the allegations were entirely false. Id.  On September 9, 2015, Palmer told Harper in a written report that these false allegations were probably retaliation against Mr. Kengerski because of his involvement in McCall's forced resignation. App. 0609-0611, 1242-1244.

On September 20, 2015, Mr. Kengerski sent an email to Harper with the subject "KENGERSKI'S LOCKERS TAMPERED WITH." App. 0861-0862, 1245. He attached copies of the threatening letters he had received. Id.  Harper did not investigate Mr. Kengerski's complaint or instruct anyone else to do so.  App. 0605-0606, 0789-0790.  Harper testified that he would not "get involved in lockers being tampered with" because Internal Affairs was involved. App. 0790.  Palmer testified that Harper never asked Internal Affairs to investigate Mr. Kengerki's complaint. App. 0605-0606.  Harper never followed up to find out whether Mr. Kengerski's complaint had been investigated. App. 0605-0606, 0789-0790.

---

[4] Harper testified that he could not recall whether he forwarded this complaint to Internal Affairs, or someone from the County Manger's department did so.  App. 0792.  The jury could have concluded that Harper forwarded it based on the fact that Palmer's investigative report was directed to Harper. App.1242.  In any event, Harper was clearly aware that Internal Affairs investigated such non-criminal matters upon request, a fact which he repeatedly denied on the stand, undermining his credibility with the jury. See App. 0706, 0707-0708, 0710.

Also in the fall of 2015, a female recruit reported that Major Robert Bytner was pressuring her to have sex with him. SAppx091; App. 0822, 0826-0827. When confronted, Bytner stated that the matter "was not Allegheny County's business" and he was "entitled to do" what he had done. SAppx130. Harper referred the allegations to Human Resources for investigation. App. 0826. He allowed Bytner to remain on duty. App. 0698, 0822, 0826; SAppx092. He did not take any precautions to ensure that Bytner did not encounter the recruit at work. SAppx092. In October, when the allegations were confirmed, Harper demoted Bytner to Captain. App. 0697-0699, 0822, 0826-0827, SAppx130.

In November of 2015, Harper received another anonymous complaint about Mr. Kengerski, this time accusing Mr. Kengerski of spying on him and burning videotape of him without permission. App. 0799-0801. Harper instructed Major Beasom to investigate the allegations. Id. On November 16, 2015, Beasom informed Harper that his investigation revealed that the allegations were unfounded. Id.

One week later, on November 24, 2015, Harper received yet another allegation about Mr. Kengerski. This time he was accused of 1) advising the perpetrator and victim of potential sexual harassment to put false information in reports, and 2) informing the alleged perpetrator of the pending investigation. App. 0801-0802, 1251-1253. These allegations were first brough to Harper's attention by

10

Wainwright who "overheard" officers discussing that Mr. Kengerski "may have" instructed Tucker and Brown to lie in reports. SAppx103-105. Wainwright could not recall where he was when he overheard this discussion, who the officers were, or even whether they were male or female. Id. Wainwright did not document this in a report. SAppx106. One of the officers accusing Mr. Kengerski of misconduct was Andrew Coulter. App. 0726, 1253; SAppx103.

Wainwright obtained reports from the officers who were accusing Mr. Kengerski of misconduct, including Coulter. App. 1251-1253. He did not speak with Mr. Kengerski or ask him to provide a report. SAppx121-122. There was no reason why he did not obtain a report from Mr. Kengerski. SAppx122. After he had obtained reports from all of the officers, he provided them to Warden Harper. Id. Harper did not ask him to get a report from Mr. Kengerski. SAppx122-123. Wainwright believed that Harper would refer the matter to Human Resources. Id.

Harper's standard practice was to refer allegations of employee misconduct out to other people or entities for investigation. *See* App. 0809 ("Q. . . .It was your standard practice to assign disciplinary. . . investigations and decisions to other people. Right? A. It -- yes, ma'am. Q. That's not what you did in this case. Right? A. That is not what I did in this case.") App. 0695-0697 (Harper referred all allegations of misconduct involving a captain to a "committee" for investigation and "would not be involved in the discipline until I get the recommendation from the panel."); *See*

*also* App. 0570-0571, 0598-0599, 0703, 0745, 0761, 0766-0767, 0772, 0776, 0779, 0780, 0794, 0799-0801, 0809, 0822, 0826, 0882, SAppx037, 039-040 (describing instances where Harper referred allegations of employee misconduct to Internal Affairs, his command staff, Human Resources, the Law Department and the County Mangers' Office.)

Nevertheless, Harper decided to investigate the allegations against Mr. Kengerski himself. App. 0802-0804.  Harper only spent a few minutes reviewing the reports. *See* App. 1243 (Brown report time stamped "1257hr"), App. 0901 (Kengerski removed from jail "around 1:00); *see also* App. 0724 (Harper unable to remember whether he spent five minutes or five hours reviewing the reports). Harper never spoke to Mr. Kengerski or asked him about the allegations. App. 0821. He did not ask Mr. Kengerski to provide a report about the alleged incident.  App. 0718, 0820-0822; SAppx122-123.  He did not interview any of the officers who accused Mr. Kengerski, or any of the witnesses identified in their reports. App. 0718-0720, 0723-0724-724, 0726-0727, 1251-1254.

Within minutes after he received the officers' reports, Harper ordered Wainwright to escort Mr. Kengerski from the jail during the middle of his shift, while his subordinates watched. App. 0873.  Wainwright told Mr. Kengerski that he was terminated but would not tell him why. Id.  One week later, on November 30, Harper sent Mr. Kengerski a one-line termination letter which stated, "This letter is written

to inform you that your employment with the Allegheny County Jail is terminated effective Monday November 30, 2015." App. 1254.

Harper scheduled a post-termination hearing only after the County's lawyers told him he had to. App. 0718. He scheduled the hearing for December 14, 2015. App. 1255. Mr. Kengerski received notice of the hearing an hour after it was supposed to begin. App. 0875. This was the first time he received any explanation for his termination. App. 0876-0877. He requested that the hearing be postponed to another day, but was told "it's now or never." App. 0875. Mr. Kengerski immediately drove to the ACJ but had no opportunity to prepare a defense to the allegations against him. Id. At the "hearing," which was just a meeting with Harper and a county lawyer, Harper told Mr. Kengerski that he had been terminated for failing to report a possible incident of sexual harassment. App. 0876-0878. Harper did not ask Mr. Kengerski any questions related to the allegation that he instructed officers to lie in reports or improperly disclosed a pending investigation. App. 0879. Mr. Kengerski never heard from the Allegheny County Jail about the results of the post-termination hearing. App. 0879. In fact, he never heard from the ACJ again. Id.

After a period of unemployment, Mr. Kengerski obtained a job as a part-time corrections officer at the Butler County Prison. App. 0831, 0880-0811. At the time of trial, he had attained the rank of captain at that facility. App. 0832, 0880-0881.

b. Relevant Procedural History

Appellee, Jeffery Kengerski, filed his Complaint on August 10, 2017. App. 0012. Following discovery, the Trial Court granted the County's motion for summary judgment. App. 0019. This Court reversed and remanded. App. 0020. On remand, the Trial Court denied the County's motion for summary judgment. App. 0021.

A five-day trial was held from October 3 through October 7, 2022. App. 0029-0030. At the close of plaintiff's case, the County presented an oral Rule 50(a) motion for judgment as a matter of law. App. 1005. The County renewed this motion at the close of the evidence. App. 1050. The Trial Court denied the motion without prejudice to re-raise it under Rule 50(b) after the verdict. App. 1012-1013, 1062. The County did not re-raise its Rule 50(a) motion via a post-verdict Rule 50(b) motion. *See* App. 0030-0038.

On April 25, 2023, the Trial Court entered judgment for Mr. Kengerski. App. 0035. On May 19, 2023, the County filed a Notice of Appeal, which listed the orders appealed from as: 1) the Trial Court's October 19, 2021 Order denying Defendant's Motion for Summary Judgment and 2) the Trial Court's April 25, 2023 Amended Judgment. App. 0001. The Notice of Appeal did not list the Court's denial of the County's Rule 50(a) motions.

## V)    SUMMARY OF THE ARGUMENT

The County's motion for JNOV or new trial based on the sufficiency of the evidence presented at trial should be denied.  Under clearly established Supreme Court precedent, the County waived its right to challenge the sufficiency of the evidence on appeal by failing to comply with Federal Rule of Civil Procedure 50(b), which requires that a party renew its Rule 50(a) motion after the verdict.  In addition, in its Notice of Appeal, the County listed only the Trial Court's Order denying its Motion for Summary Judgment, which was not an appealable order after the case was tried on the merits.  Finally, even if this Court considers the County's insufficiency argument, it should not disturb the verdict because the trial record contains more than sufficient evidence to support the jury's verdict.

The County's challenges to the Trial Court's evidentiary rulings should also be rejected because the County cannot show that these rulings were "'arbitrary, fanciful or clearly unreasonable' and that 'no reasonable person would adopt the district court's view.'" J.C.C. v. L.C., No. 20-3289, 2022 WL 985873, at *2 (3d Cir. Mar. 31, 2022).

The Trial Court properly admitted evidence of Harper's handling of allegations that other employees violated the same rules, because those employees were similarly situated to Mr. Kengerski in all relevant respects.  The Trial Court

properly admitted evidence of the standard investigatory procedures used by ACJ and Allegheny County's Internal Affairs, because Harper was aware of and deliberately bypassed these procedures in favor of his own sham "investigation." The Trial Court properly admitted evidence of harassment that was known to Wainwright because Mr. Kengerski presented evidence that Wainwright communicated this information to Harper. The Trial Court did not admit evidence related to a failure to promote claim. Harper's treatment of Mr. Kengerski's applications for major was relevant to his wrongful termination claim and the Trial Court addressed any potential juror confusion with a clearly worded instruction. Finally, even if one or more of the Trial Court's evidentiary rulings was improper, a new trial is not warranted because the record is replete with support for Mr. Kengerski's claims and any error was harmless.

## VI)    COUNTER-STATEMENT OF THE STANDARD OF REVIEW

Whether the County preserved its challenge to the sufficiency of the evidence at trial is a jurisdictional issue which this Court must decide *de novo*. *See* T. Levy Assocs., Inc. v. Kaplan, 755 F. App'x 116, 119 (3d Cir. 2018). Review of the Trial Court's denial of a motion for judgment as a matter of law is plenary and the Court of Appeals applies the same standard as did the district court. Marra v. Philadelphia Hous. Auth., 497 F.3d 286, 300 (3d Cir. 2007), *as amended* (Aug. 28, 2007).

This Court reviews a district court's decision to admit or exclude evidence for abuse of discretion.  <u>Marra v. Philadelphia Hous. Auth.</u>, 497 F.3d 286, 297 (3d Cir. 2007), as amended (Aug. 28, 2007). "A party arguing that a district court abused its discretion in connection with an evidentiary ruling must demonstrate that the District Court's decision was 'arbitrary, fanciful or clearly unreasonable' and that 'no reasonable person would adopt the district court's view.'" <u>J.C.C. v. L.C.</u>, No. 20-3289, 2022 WL 985873, at *2 (3d Cir. Mar. 31, 2022). Moreover, "under Federal Rule of Civil Procedure 61 errors in the admission or exclusion of evidence cannot be grounds for reversal or a new trial if they constitute harmless error." <u>Abrams v. Lightolier Inc.</u>, 50 F.3d 1204, 1213 (3d Cir. 1995).

**VII)  ARGUMENT**

    a.  Sufficiency of the Evidence

        *i.  This Court lacks jurisdiction to hear the County's challenge to the sufficiency of the evidence.*

Allegheny County requests JNOV or a new trial on the grounds that the evidence presented at trial was insufficient to sustain the jury's verdict.  *See, e.g.*, DOC # 26 at 8 (". . . there was not more than a scintilla of evidence to support Plaintiff/Appellee's McDonnell Douglas pretext argument?"); <u>Id</u>. at 24 ("A motion for judgment of law should be granted if . . .  there is insufficient evidence from which a reasonable jury could find liability.")  <u>Id</u>. at 23 ("As a matter of law, the

record is insufficient to sustain a verdict in favor of Appellee, Mr. Kengerski."). *See also* Id. at 25-46.

This Court is without power to grant the County's requested relief because the County failed to preserve this issue for appeal. The Supreme Court has repeatedly held that a party challenging the sufficiency of the evidence presented at trial must file a Rule 50(b) motion after the verdict. *See e.g.,* Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc., 546 U.S. 394, 400–01 (2006); Johnson v. New York, N.H. & H.R. Co., 344 U.S. 48, 52–54 (1952); Cone v. West Virginia Pulp & Paper Co., 330 U.S. 212, 218 (1947); Globe Liquor Co. v. San Roman, 332 U.S. 571, 68 S.Ct. 246, 92 L.Ed. 177 (1948); Ortiz v. Jordan, 562 U.S. 180, 189, (2011). The County did not do this.[5] This failure is fatal to its appeal of the sufficiency of the evidence. [6]

In Unitherm, the Court addressed exactly the situation presented here. There the "respondent filed a Rule 50(a) motion before the verdict, but did not file a Rule

---

[5] The County presented a rule 50(a) motion at the close of plaintiff's case and renewed it at the close of the evidence. App. 1005. The Trial Court denied the motion, "without prejudice to re-raising under 50 (b) after a verdict is in." App 1062. *See also* App. 1012-1013. The County did not re-raise its Rule 50(a) arguments in a post-verdict Rule 50(b) motion.

[6] The County filed a post-verdict "Renewed Motion for Mistrial" based exclusively on remarks by Mr. Kengerski's counsel during her opening statement. See App. 0310-0326. The Trial Court denied the motion. App. 0338-0343. The County did not appeal that denial or raise any issues related to Mr. Kengerski's opening statement in this appeal. *See* App. 0001 (County Notice of Appeal).

50(b) motion after the verdict." <u>Unitherm</u> at 396. The Court held that "since respondent failed to renew its preverdict motion as specified in Rule 50(b), there was no basis for review of respondent's sufficiency of the evidence challenge in the Court of Appeals." <u>Id</u>. at 407; *See also* <u>Ortiz</u> at 189, (2011)("Absent [a Rule 50(b) motion], we have repeatedly held, an appellate court is "powerless" to review the sufficiency of the evidence after trial.")

In <u>Unitherm</u>, the Court explained why a post-verdict Rule 50(b) motion is an important part of the appellate process:

> A postverdict motion is necessary because "[d]etermination of whether a new trial should be granted or a judgment entered under Rule 50(b) calls for the judgment in the first instance of the judge who saw and heard the witnesses and has the feel of the case which no appellate printed transcript can impart." Moreover, the "requirement of a timely application for judgment after verdict is not an idle motion" because it "is ... an essential part of the rule, firmly grounded in principles of fairness."
>
> <u>Unitherm</u> at 401 (*internal citations omitted*).

*See also* <u>Dupree v. Younger</u>, 598 U.S. 729, 735 (2023) ("The filing of a post-trial motion under Rule 50 allows the district court to take first crack at the question that the appellate court will ultimately face: Was there sufficient evidence in the trial record to support the jury's verdict?"). Because the County failed to comply with Federal Rule of Civil Procedure 50(b), this Court is "without power" to grant the County's request for JNOV or new trial.

    *ii.*    *The County cannot appeal the Trial Court's denial of its Motion for Summary Judgment*

In an effort to avoid this clear bar to its challenge to the sufficiency of the evidence presented at trial, the County lists the Trial Court's denial of its Motion for Summary Judgment as the "order appealed from" in its Notice of Appeal. *See* App. 0001. *See also* DOC# 26 at 21 (purporting to appeal denial of summary judgment.) A summary judgment denial is not appealable after trial. *See* Ortiz v. Jordan, 562 U.S. 180, 183–84 (2011) ("May a party. . .  appeal an order denying summary judgment after a full trial on the merits? Our answer is no.")  As the Supreme Court recently explained in Dupree v. Younger,

> Factual challenges depend on, well, the facts, which the parties develop and clarify as the case progresses from summary judgment to a jury verdict. Thus, "[o]nce the case proceeds to trial, the full record developed in court supersedes the record existing at the time of the summary-judgment motion." *So after trial, a district court's assessment of the facts based on the summary-judgment record becomes "ancient history and [is] not subject to appeal."*
>
> Dupree v. Younger, 598 U.S. at 734 (*internal citations omitted*)(*emphasis added*).[7]

---

[7] In Dupree the Court recognized a limited exception to this rule for summary judgment decisions that hinge on a purely legal issue.  That is not the case here.  At summary judgment the County argued that there was insufficient evidence of causation to submit the case to the jury.  The Trial Court disagreed.  Once the case was tried to verdict, the summary judgment record was supplanted by the trial record and became "ancient history" Dupree, *supra*.

Indeed, the County's brief focusses exclusively on the evidence presented at trial and does not even mention the Trial Court's assessment of the facts on summary judgment. The County, in truth, is attempting to appeal the denial of its Rule 50(a) motion for judgment as a matter of law, which, as explained *supra*, is not appealable absent a post-verdict Rule 50(b) motion.

### iii.   *The trial record supports the jury's verdict.*

Even if this Court were to consider the County's sufficiency of the evidence argument, it should not overturn the verdict because it is amply supported by the trial record. This Court has held that, "A jury verdict will not be overturned 'unless the record is critically deficient of that minimum quantum of evidence from which a jury might reasonably afford relief." Abrams v. Lightolier Inc., 50 F.3d 1204, 1218 (3d Cir. 1995) (*quoting* Rotondo v. Keene Corp., 956 F.2d 436, 438 (3d Cir.1992). "Entry of judgment as a matter of law is a 'sparingly' invoked remedy," which should be granted only if "viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." Marra v. Philadelphia Hous. Auth., 497 F.3d 286, 300 (3d Cir. 2007), as amended (Aug. 28, 2007)(*quoting* CGB Occup. Therapy, Inc. v. RHA Health Servs. Inc., 357 F.3d 375, 383 (3d Cir.2004) and Moyer v. United Dominion Indus., Inc., 473 F.3d 532, 545 n. 8 (3d Cir.2007)).

21

"In performing this narrow inquiry, [the Court] must refrain from weighing the evidence, determining the credibility of witnesses, or substituting [its] own version of the facts for that of the jury." Marra at 302.[8] *See also*, Id. at 302 ("where, as here, the retaliation claim has been tried to a verdict, we give deference to the jury's 'unique opportunity to judge the credibility and demeanor' of the witnesses who testified at the trial....'")(*quoting* Woodson v. Scott Paper Co., 109 F.3d 913, 923 at 921 (3d Cir. 1997); Cooper v. Harris, 581 U.S. 285, 309 (2017)(deferring to fact-finder's credibility determinations because "the various cues that 'bear so heavily on the listener's understanding of and belief in what is said' are lost on an appellate court later sifting through a paper record."); Unitherm, 546 U.S. at 401. (Post-trial JNOV motion necessary because determination "calls for the judgment in

---

[8] The County argues that Mr. Kengerski failed to establish a prima facie case of retaliation, arguing that, "even though this case has been tried to verdict, the entirety of the McDonnell Douglas analysis still applies to this Court's review." DOC #26 at 27.  In fact, once a case proceeds to trial, McDonnell Douglas burden shifting "drops from the case".  U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 714–15, (1983).  See also Marra v. Philadelphia Hous. Auth., 497 F.3d 286, 301 (3d Cir. 2007), as amended (Aug. 28, 2007) "We recognize that once a case has been tried to a jury on its merits, it is unnecessary for an appellate court to decide whether a plaintiff established a prima facie case of retaliation." Id. (Following a trial on the merits, "[the] inquiry is not whether the plaintiff has introduced sufficient evidence to establish a prima facie case of retaliation, but whether there is sufficient evidence to support the ultimate conclusion that the challenged employment decision was retaliatory in nature.")

the first instance of the judge who saw and heard the witnesses and has the feel of the case which no appellate printed transcript can impart.")

The County claims, incorrectly, that Mr. Kengerski failed to present evidence of a causal connection between his complaint about McCall's racist conduct and his termination seven months later. *See* DOC# 23, 26-30. In rejecting the same argument in Marra, this Court emphasized that "a plaintiff may rely on a 'broad array of evidence' to demonstrate a causal link between his protected activity and the adverse action taken against him." Marra at 302. *See also* Kengerski v. Harper, 6 F.4th 531, 542 n9 (3d Cir. 2021) (In the absence of temporal proximity, court considers "the circumstances as a whole, including any intervening antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and *any other evidence* suggesting that the employer had a retaliatory animus when taking the adverse action.") (*emphasis added*); *See also* Woodson 109 F.3d 913 at 921; Daniels v. Sch. Dist. of Philadelphia, 776 F.3d 181, 196 (3d Cir. 2015).[9]

---

[9] See also Marra at 303 ("[I]t matters not . . . whether each piece of evidence of antagonistic conduct is alone sufficient to support an inference of causation, so long as the evidence permits such an inference when considered collectively." (*quoting* Woodson, 109 F.3d 913 at 921.); Id. ("Thus, while we will discuss each piece of evidence, and [PHA's] objections to them, in turn, we must determine whether the evidence is sufficient based on the whole picture."); Andrews v. City of Philadelphia, 895 F.2d 1469, 1484 (3d Cir.1990) ("A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario.").

Here, the record contained more than sufficient evidence for the jury to conclude that Harper fired Mr. Kengerski because of his protected conduct. Harper initially ignored Mr. Kengerski's attempts to report McCall's racist behavior. App. 0496-0497, 0842-0843. He responded only after Mr. Kengerski reported the conduct to Internal Affairs, at which point Harper inexplicably had the offensive text messages deleted from Mr. Kengerski's phone. App. 0845, 1230-1233  He then allowed McCall to remain on duty, supervising Mr. Kengerski, even after he knew that she had threatened to "get his ass." App. 0776, 0811, 0847-0848.

In the months immediately following his report, Harper was informed that Mr. Kengerski's coworkers subjected him to repeated racist hangup calls (calling him names like "chimp trainer," "monkey's uncle" and "n****r lover"), threatened him both verbally and in writing, tampered with and defaced his locker, and lodged numerous unfounded reports of misconduct against him. App. 0485-0487, 0604-0605, 0612, 0789-0790, 0799-0801, 0836, 0858-0866, 0894-0895, 0985, 1238, 1245, SAppx077. Harper was fully aware of this pattern of harassment and knew that Mr. Kengerksi's protected conduct was the cause. *See* Id*.; supra* at n.2; *infra* "Evidence not known by the decisionmaker"; App. 1244 (Palmer informing Harper that false allegations of sexual misconduct were likely expected "retaliation . . . against [Kengerski] stemming from factionalized drama . . . that included the end of Major McCall's employment . . . "; Id. at 0862, 1245 (email from Kengerski to

24

Harper with subject "KENGERSKI'S LOCKERS TAMPERED WITH" and attaching copies of harassing threatening notes)   Yet he tellingly made no effort to investigate Mr. Kengerski's complaints, let alone protect him from the harassment. *See* e.g.  0605-0606, 0769-772, 0789-0790, 0872, 1235, 1240.

Harper's refusal to address Mr. Kengerski's complaints of harassment raises an inference that he condoned it and is evidence of his own retaliatory motive. Zielinski v. SPS Techs. LLC, No. 10-CV-3106, 2011 WL 5902214 (E.D. Pa., Nov. 22, 2011)(jury "was permitted to further infer that SPS's failure to thoroughly investigate [plaintiff's] complaints of discrimination and to discipline the alleged offenders was indicative of its unlawful motives."); *See also* Marra, at 304-305 (PTA's failure to adequately investigate vandalism to Marra's computer supported inference of causation).

Given Harper's knowledge of this ongoing harassment, the jury could also have inferred retaliatory intent from Harper's refusal to meet with Mr. Kengerski. Harper testified that officers could request meetings with him.  However, when Mr. Kengerski asked for a meeting to discuss his complaint shortly after McCall threatened him, Harper ignored the request. App. 0235. Similarly, when Mr. Kengerski asked to discuss returning to a position with union protection after months of harassment, Harper tersely responded two minutes later stating, "This request is denied." App. 0872, 1240.

The jury likewise could have inferred retaliatory intent from Harper's repeated escalation of specious complaints about Mr. Kengerski, after he knew that these complaints were retaliatory.   On September 9, 2015, Internal Affairs Inspector Palmer sent Harper a memo informing him that a sexual misconduct allegation against Mr. Kengerski was false and was likely made by members of McCall's faction in retaliation for Mr. Kengerski's role in her forced resignation.  App. 0609-0611, 1242-1244. In early November of 2015, Harper instructed Major Beasom to investigate an allegation that Mr. Kengerski was spying on him. On November 16, Beasom told him that the allegation was false. App. 0799-0801. *Less than 10 days later,* on November 24, Harper received the allegation that he used to justify terminating Mr. Kengerski.  App. 0801-0802, 1251-1253.

Given this background, retaliatory intent could also have been inferred from Harper's handling of the November 24 allegations. Harper's standard procedure was to refer allegations against captains to a committee which investigated and made disciplinary recommendations. App. 0809.  His only involvement in this process was approving the committee's recommendations.   Id. Yet, when he received the November 24 allegations, Harper inexplicably abandoned this procedure and decided to investigate and discipline Mr. Kengerski himself. App. 0695-0697, *See also* App. 0809 ("Q. . . .It was your standard practice to assign disciplinary. . . investigations and decisions to other people. Right? A. It -- yes, ma'am. Q. That's not

what you did in this case. Right? A. That is not what I did in this case.") The County provided no evidence that Harper had ever followed a similar process for any other employee.

Harper never explained why he deviated from the ACJ's standard investigatory and disciplinary procedures in Mr. Kengerski's case. However, the jury could have rejected any suggestion that Harper believed the allegations required an especially searching review. According to Harper, his own "investigation" consisted of briefly reviewing the accusing officers' reports - which the jury could have concluded he spent less than five minutes doing, if he did it at all. *See* App. 1243 (Brown "report" time stamped "1257hr"), App. 0901 (Kengerski removed from jail "around 1:00"); *see also* App. 0724 (Harper unable to remember whether he spent five minutes or five hours reviewing the reports). Harper did not conduct any interviews. App. 0718-0720, 0723-0724-724, 0726-0727, 1251-1254.   Without speaking with Mr. Kengerski or requesting a report from him, Harper concluded that Mr. Kengerski "wasn't credible" and immediately ordered Wainwright to remove him from the Jail. App. 0718-0720, 0723-0724, 0726-0727, 0820-0822, 1251-1254,

SAppx122-123. [10] The jury could have concluded that this was an exceedingly poor basis for terminating captain who had worked at the ACJ for nearly 13 years.

Moreover, Harper chose to forgo multiple well-established investigatory options in favor of his own paltry review.  Harper could, and regularly did, ask Internal Affairs, Human Resources, the Law Department or a member of his command staff to investigate specific allegations of officer misconduct.[11] County policy required that violations of the anti-harassment policy be investigated by Human Resources (App. 0629-0630), and Internal Affairs had investigated a complaint about Mr. Kengerski only three months before (App. 1242-1244).  Harper knew that these entities conducted thorough investigations which included interviewing the accused officer and witnesses, reviewing relevant video, documenting their findings, and providing Harper with a report. App. 0704, 0713-0715, 0761, 0780-0781. Notably, *every time a third party investigated allegations against Mr. Kengerski, he was cleared of wrongdoing.* App 0608, 0795, 0800-0801,

---

[10] Harper claimed at trial that he reviewed video as part of his investigation.  App. 0808.  However, he never explained what the video revealed or presented any documentation.  The jury could have rejected this testimony based the lack of evidence to support it and the fact that his "investigation" lasted only a few minutes. App. 0724, 0901, 1243.

[11] App. 0570-0571, 0598-0599, 0780 (Internal Affairs); App. 0766-0767, 0776, 0779, 0882, 0826 (the Law Department); App. 0703, 0767, 0822, 0826; SAppx039-040 (Human Resources); App. 0745, 0761, 0800-801, 0809 SAppx037 (command staff).

0803, 0866, 1214-1244; SAppx084.  The jury could have inferred from Harper's actions that he chose to personally handle the November 24 allegations so that he could ensure that they were sustained, and he could justify terminating Mr. Kengerski.

Harper's decision to immediately place Mr. Kengerski on unpaid leave and terminate him a week later, further supports this inference. At the time of the November 24 allegations, Harper knew that Mr. Kengerski was a long-standing jail employee who had been assigned to responsible positions. App. 0805-0806.  He was not aware of any previous discipline against Mr. Kengerski, or of Mr. Kengerski having done anything similar in the past.  Id. 0806. He also knew that Mr. Kengerski had been the subject of multiple false allegations of misconduct following his complaint about McCall. *See supra.* Nevertheless, Harper testified that he needed to immediately remove Mr. Kengerski from the jail because of the "seriousness of [Mr. Kengerski's] infraction."  App. 0828.

The jury could have considered this a "highly suspect" justification for removing and terminating captain who had provided exemplary service to the ACJ for nearly 13 years. See App. 0467-0470. The jury also could have doubted Harper's explanation based on evidence that numerous other employees were accused of similar misconduct during Harper's tenure (much of it objectively more serious) and were allowed to continue working.  *See e.g.* App. 0839-0842, 1212-1225, 1230.

(McCall sending racist text messages and using racial epithets); SAppx091; App. 0822, 0826-0827 (Bytner pressuring new recruit to have sex with him); Appx. 0497-498, 0633-0634, 0824. (Demore abusing an inmate and ordering subordinate to file a false report) Id. (Hendrick making false report to FBI that Demore abused an inmate). *See* Marra at 307 ("jury could have reasonably believed that the rationale underlying [the adverse employment decision] was highly suspect.")

As in Marra, the "evidence as a whole is clearly sufficient to support a causal link between [Mr. Kengerski's protected activity] and his subsequent termination, 'particularly when we consider, as we must, that the verdict may have been based in part on the jurors' evaluation of each witness' credibility and demeanor." Marra at 305 (*quoting* Woodson at 924), as amended (Aug. 28, 2007)

>    iv.    *The Trial Court was not required to accept the County's proffered justification.*

The County argues that the Trial Court was obligated to ignore this plethora of evidence of retaliatory motive and find in its favor as a matter of law because its asserted justification was, supposedly, "consistent, coherent and plausible." [12] *See*

---

[12] To support this theory, the County relies heavily on Robinson v. Giant Eagle, No. 23-1804, 2024 WL 747237 (3d Cir. Feb. 23, 2024). The County suggests that this unpublished summary judgment affirmation established new binding Third Circuit precedent for evaluating pretext claims. However, even Robinson does not support the County's position. In Robinson, the Court acknowledged that, "The question before us is . . . whether the evidence would allow a reasonable jury to 'disbelieve

*e.g.* DOC 26. at 42 ("The existence of logical evidence to support the employer's reason for termination – is all the evidence necessary – as a matter of law – to find for the employer."), Id. at 37 ("Providing a plausible explanation for the decision-maker's action is all that is required for the employer to prevail – as a matter of law.") Id. at 31 ("When an employer has a company policy that sets forth that an employee can be fired if the policy is violated, and the employer relies upon that policy to justify the employee's termination, this is sufficient to rule - as a matter of law - in favor of the employer.")

Essentially, the County asks this Court to adopt an unprecedented rule that an employer's proffered justification must be accepted if there is *any* evidence to support it, even in the face of overwhelming evidence that the real motivation was retaliation. This is the opposite of clearly established law related to pretext claims. A plaintiff may prove pretext by showing, based on the *totality of the circumstances* surrounding the employment decision, that the employer's proffered justification is "unworthy of credence". *See* Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994); Canada v. Samuel Grossi & Sons, Inc., 49 F.4th 340 (3d Cir. 2022) at 347–48

---

[Giant Eagle's] articulated legitimate reasons' or 'believe that an invidious discriminatory reason was more likely than not a ... determinative cause of [Giant Eagle's] actions.'" Id. at *3.  In Robinson, the Court found no such evidence.  That is not the case here, as set forth above - and as determined by the Trial Court and the jury.

(*quoting* <u>Aman v. Cort Furniture Rental Corp</u>, 85 F.3d 1074 (3d Cir. 1996). *See also*

<u>Aman</u> at 1082 ("Courts today must be increasingly vigilant in their efforts to ensure

that prohibited discrimination is not approved under the auspices of legitimate

conduct, and '*a plaintiff's ability to prove discrimination indirectly, circumstantially,*

*must not be crippled, because of crabbed notions of relevance or excessive mistrust*

*of juries.*'") (*quoting* <u>Riordan v. Kempiners</u>, 831 F.2d 690, 697 (7th

Cir.1987)(*emphasis added*); <u>Andrews v. City of Philadelphia</u>, 895 F.2d 1469, 1484

(3d Cir.1990) ("A play cannot be understood on the basis of some of its scenes but

only on its entire performance, and similarly, a discrimination analysis must

concentrate not on individual incidents, but on the overall scenario.").

Recently, in a similar factual scenario, this Court reiterated the need to look

beyond the employer's explanation to the surrounding circumstances. In <u>Canada v.</u>

<u>Samuel Grossi & Sons, Inc.</u> the employer claimed it terminated the employee

because it found text messages on his cell phone which violated company policy.

<u>Canada</u> at 340 (3d Cir. 2022).  The employee claimed this justification was

pretextual, citing evidence that the employer's explanation for searching his phone

was "unbelievable." <u>Id</u>. at 347.  The district court granted the employer's request for

summary judgment, finding that the employee's argument related to the propriety of

the search and not whether the employee was terminated for the proffered reason.

Id.   This Court reversed, holding that an employee can prove pretext through evidence that the employer's investigation was retaliatory.

> We look at the totality of the circumstances to determine whether an employer's proffered nondiscriminatory reason is pretext for a discriminatory motive. We explained the necessity for this in Aman v. Cort Furniture Rental Corp.[46] There, we described how "[d]efendants of even minimal sophistication will neither admit discriminatory animus or [sic] leave a paper trail demonstrating it." This is no less true for employers who retaliate against employees who have filed complaints of discrimination or accused an employer of racial bias. *Indeed, a contrary rule would not only immunize employers who retaliate against employees only after they stumble upon something that would justify their termination; it would also incentivize such retaliatory forays.*
>
> Canada at 347–48 (*quoting* Aman v. Cort Furniture Rental Corp, 85 F.3d 1074 (3d Cir. 1996) (*emphasis added*).

Here, consistent with Canada, the Trial Court instructed the jury to consider "how Warden Harper considered the allegations about Mr. Kengerski and the process by which he decided to terminate Mr. Kengerski and whether that process reflected any sort of retaliatory animus." App 0830.[13]  Mr. Kengerski presented evidence that Harper's investigation was retaliatory.   He showed that Harper deliberately and suspiciously deviated from established investigatory procedures to conduct his own

---

[13] Even though Mr. Kengerski has consistently denied the allegations against him, the County presented those allegations to the jury as if they were factually true. To avoid confusion, the Trial Court gave the jury this special instruction, to which the County did not object. *See* App. 640-651.

"investigation," which was calculated to ensure that no exculpatory information would be uncovered, and the allegations could be sustained. This, along with other evidence suggesting a retaliatory motive, created a "'convincing mosaic' of circumstantial evidence,' which. . . could support a finding that [Harper's investigation] itself was retaliatory." Canada at 349 (3d Cir. 2022)(*quoting* Hobgood v. Illinois Gaming Bd., 731 F.3d 635, 643 (7th Cir. 2013). Thus, Mr. Kengerski presented sufficient evidence to sustain the jury's verdict in his favor.

Because the County waived its right to appeal the sufficiency of the evidence and because the jury's verdict was supported by evidence in the record, this Court should not disturb the verdict.

b. Evidentiary Rulings

i.  *Standard of review*

This Court reviews a trial court's evidentiary rulings for "abuse of discretion." J.C.C. v. L.C., No. 20-3289, 2022 WL 985873, at *2 (3d Cir. Mar. 31, 2022). "A party arguing that a district court abused its discretion in connection with an evidentiary ruling must demonstrate that the District Court's decision was 'arbitrary, fanciful or clearly unreasonable' and that 'no reasonable person would adopt the district court's view.'" Id.  Moreover, "under Federal Rule of Civil Procedure 61 errors in the admission or exclusion of evidence cannot be grounds for reversal or a

new trial if they constitute harmless error." Abrams v. Lightolier Inc., 50 F.3d 1204, 1213 (3d Cir. 1995). An evidentiary error is harmless if the evidence presented at trial would be sufficient to sustain the verdict even without the improvidently admitted evidence. *See* Id. at 1207.

### ii. *Comparator evidence*

The County claims that the Trial Court improperly permitted Mr. Kengerski to present evidence of comparators who were not "similarly situated" to him. See DOC# 26 at 46-55. The County made this argument prior to trial, via a *motion in limine*. App. 0064. The Trial Court disagreed, finding that the proffered comparators were "sufficiently similarly situated to Plaintiff for the jury to decide this issue." App. 0224. Because the comparators were similarly situated to Mr. Kengerski in all *relevant* respects, and the County has not identified any differences which could have confused or mislead the jury, the Trial Court did not abuse its discretion.

### 1. The comparators

Robert Bytner was a Major at the ACJ in the fall of 2015, when a recruit accused him of propositioning her for sex. SAppx091; App. 0822, 0826-0827. When confronted, Bytner admitted to the alleged misconduct stating that the matter "was not Allegheny County's business" and he was "entitled to do" what he had done. SAppx130. Harper, nevertheless, referred these allegations to the County's Human

35

Resources Department for investigation. App. 0826.  He allowed Bytner to remain on duty during this investigation.  App. 0698, 0822, 0826; SAppx092.  When Human Resources confirmed the allegations, Harper demoted Bytner one rank, to captain. App. 0697-0699, 0822, 0826-0827, SAppx130.

Robyn McCall was a Major at the ACJ in the spring of 2015, when Mr. Kengerski informed Harper that she was sending him racist text messages and had called his biracial niece a "monkey." App. 0839-0842, 1212-1225, 1230.  Harper referred these allegations to the County Law Department.  Harper believed the text messages were clear evidence of misconduct which required no further investigation. App. 0780. Nevertheless, he allowed McCall to remain on duty, supervising Mr. Kengerski, for approximately four weeks. App. 0776, 0811, 0847. He then placed McCall on paid administrative leave for three months, after which he allowed her to voluntarily resign. App. 0772-0774, 0810-0811, 1236.

Joseph Demore was a captain at the ACJ in 2012, when Corrections Officer Hendrick told the FBI that Demore had beaten an inmate and then ordered him to submit a false report about the incident. [14] App. 0497-498, 0633-0634, 0824. Harper

_____

[14] The County claims that Demore *was not* accused of ordering a subordinate to submit a false report.  Demore testified otherwise. *See* App. 0497 ("Q. Are you aware of any situation at the Allegheny County Jail, other than Jeffrey Kengerski's, in which a subordinate accused one of their superiors of ordering them to file a false report? A. Yes. Q. Who was the accused officer? A. Unfortunately, it was me.") App.

did not know if the allegations were true or false until he received the results of the investigation. App. 0824.    Nevertheless, Harper allowed Demore to continue working at the ACJ - supervising Hendrick – for months while the FBI and Internal Affairs investigated. App. 0498, 505, 0824-0825.  The allegations were determined to be false.  App, 0498-0499.  Harper took no action against Hendrick for reporting false information to the FBI. App, 0499. [15]

### 2.  Legal standards

In a Title VII claim, a plaintiff proffering comparator evidence must show that "he and the employee are similarly situated in all *relevant* respects." Houston v. Easton Area Sch. Dist., 355 F. App'x 651, 654 (3d Cir. 2009)(*emphasis in original)*. "The question of whether employees are similarly situated in order to show pretext 'ordinarily presents a question of fact for the jury.'" Wheeler v. Georgetown Univ.

---

0498 ("So [Hendrick] went to the county police and the FBI, claiming that I made him write a false report . . ."). The Trial Court did not abuse its discretion by permitting the jury to resolve this factual dispute.

[15]   The only evidence Mr. Kengerski introduced regarding Harper's treatment of Hendrick consisted of two questions to Demore. App. 0499 ("Q. Was anything . . . done to the corrections officer who made that report against you? A. No. Q. Did he still work there when you left the institution? A. Yes, he did.") The County did not object to these questions.  Id.  The County then cross-examined Demore at length about Harper's failure to discipline Hendrick, including repeatedly referencing testimony from Demore's deposition that he found this failure "pathetic." App 0500-0502. The County cannot object to the admission of evidence that it introduced. Ohler v. United States, 529 U.S. 753, 755, (2000). Moreover, any prejudice to the County from Demore's testimony regarding Hendrick was of its own making.

Hosp., 812 F.3d 1109, 1115 (D.C. Cir. 2016); Andujar v. Gen. Nutrition Corp., 767

F. App'x 238, 241 (3d Cir. 2019)(district court did not abuse its discretion by

submitting comparator evidence to the jury);  Graham v. Long Island R.R., 230 F.3d

34, 43 (2d Cir. 2000)("Whether these employees were similarly situated presented a

material question of fact."); Cortes v. Cnty. of Santa Clara, 630 F. App'x 731, 732

(9th Cir. 2016); Jones v. Evergreen Packaging, Inc., 536 F. App'x 661, 662 (8th Cir.

2013); Ramirez v. The GEO Grp., Inc., 655 F. Supp. 2d 1170, 1176 (D. Colo. 2009);

Wallace v. Seton Fam. of Hosps., 777 F. App'x 83, 88–89 (5th Cir. 2019).

Nevertheless, the trial court may exclude proffered comparator evidence

pursuant to Federal Rules of Evidence 401 and 403 where it "lack[s] sufficient

probative value . . . to be relevant or outweigh prejudice and delay." Sprint/United

Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 386 (2008).  This analysis is a "fact-

intensive, context-specific inquiry" which "depends on many factors, including how

closely related the evidence is to the plaintiff's circumstances and theory of the case."

Id. at 388. *See also* Houston at 654. ("[W]hether a factor is relevant for purposes of

a similarly situated analysis must be determined by the context of each case.") Such

"questions of relevance and prejudice are for the District Court to determine in the

first instance." Id. at 387. On review, appellate courts should defer to the trial court's

"familiarity with the details of the case" and "greater experience in evidentiary

matters" and should uphold the trial court's rulings unless the trial court has abused its discretion.  Id. at 384.

### 3.  The Trial Court's ruling was correct

Here, the Trial Court did not abuse its discretion by concluding that the proffered comparators were sufficiently similarly situated to Mr. Kengerski to submit the question to the jury.  Harper claimed that he felt compelled to immediately remove Mr. Kengerski from the jail because of the seriousness of the allegations against him. App. 0828.  Mr. Kengerski proffered comparators to show that Harper did not immediately remove other employees who were accused of violating the same policies or engaging in similar misconduct.  The comparators were all ACJ employees who were accused of violating the County's anti-harassment policy or making false reports. [16]

The County argues that the Trial Court should have excluded the comparator evidence because the comparators are different, without explaining why these differences are relevant, or how it was prejudiced by them. [17]  For example, the

---

[16] The County does not contest that Harper had authority to remove these employees them from the Jail based on allegations of misconduct.

[17] The County's claims of prejudice are undermined by its choice not to provide the jury with *any* explanation for Harper's disparate treatment of Mr. Kengerski and his proffered comparators. See App. 1017-1019 (County choosing not to ask Harper *any substantive questions* on direct examination).

County argues that Bytner and McCall were not similarly situated to Mr. Kengerski because they were not accused of identical misconduct. But it does not explain why Bytner's and McCall's conduct, which violated the same policy but was arguably more reprehensible, justified Harper in treating them more leniently. Nor does it explain how the jury was confused or misled by hearing evidence of this disparate treatment. *See* Houston v. Easton Area Sch. Dist., 355 F. App'x 651, 654 (3d Cir. 2009)(comparator conduct is similar when it does not have "such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.")

Similarly, the County points to the fact that McCall and Bytner were majors when they were accused of violating the anti-harassment policy, while Mr. Kengerski was a captain when he was accused of violating the same policy. But it does not explain why this difference mattered to Harper's decisions. DOC# 26 at 48-49. The anti-harassment policy was universal (App. 0702) and the County does not describe any differences between the positions that accounts for Harper's decision to allow McCall and Bytner to continue working after he knew they had violated it.

Finally, County argues that Demore is not comparable because the policy Mr. Kengerski was accused of violating did not exist in 2012, when Demore was accused of misconduct - bizarrely suggesting that Harper did not prohibit captains from

ordering subordinates to submit false reports prior to 2015.[18]  To the contrary, the previous policy, which was in place when Demore was accused of misconduct, prohibited the same conduct. *See* App. 1196, 1205 ("Any employee found to have falsified information on reports, will be subject to severe disciplinary action inclusive of termination . . .")

Under the County's logic, comparator evidence must be excluded if the objecting party can identify *any* differences between the plaintiff and the comparators, regardless of whether these differences are relevant to the comparison at issue. This is not the law. *See* Houston v. Easton Area Sch. Dist., 355 F. App'x 651, 654 (3d Cir. 2009)(plaintiff must show that he and the employee are similarly situated in all *relevant* respects.)(*emphasis in original*)  Id. at 655. ("The plaintiff is not required to show that he is identical to the comparator in each relevant factor . . . )  In Miller-El v. Dretke, 545 U.S. 231, 247 (2005), the Supreme Court has explained why identicality between comparators is not required in discrimination claims: "[A] rule that no comparison is probative unless the situation of the individuals compared is identical in all respects" would make discrimination claims "inoperable" because people "are not products of a set of cookie cutters."  Since Mr.

---

[18] The county never argued this as a basis for excluding the evidence before the Trial Court.  See App. 066-0068. The Trial Court could not have abused its discretion by not considering an argument that the County did not make.

Kengerski need only prove that his comparators are alike in *relevant* respects, it follows that irrelevant differences cannot be a basis to exclude otherwise valid comparator evidence.

Moreover, by arguing that certain differences *require* exclusion of comparators, without explaining why those differences were confusing, misleading or prejudicial *in this case*, the County asks this Court to adopt the type of *per se* admissibility rules that the Supreme Court expressly rejected in <u>Mendelsohn</u>. *See* <u>Mendelsohn</u>, 552 U.S. at 387 ("Relevance and prejudice under Rules 401 and 403 are determined *in the context of the facts and arguments in a particular case*, and thus are generally not amenable to broad *per se* rules.")(*emphasis added*).

The Trial Court complied with the Supreme Court's guidance in <u>Mendelsohn</u> when it concluded that Mr. Kengerski's proffered comparators "are sufficiently similarly situated to Plaintiff for the jury to decide this issue" and that the County's claimed differences "go more to disputes of fact, which is why we have a jury here." App. 0224, 1012. The County has not established that this conclusion was "'arbitrary, fanciful or clearly unreasonable' and that 'no reasonable person would adopt [its] view.'" <u>J.C.C. v. L.C.</u>, No. 20-3289, 2022 WL 985873, at *2 (3d Cir. Mar. 31, 2022). Thus, as the Supreme Court counseled in <u>Mendelsohn</u>, this Court should "defer" to the Trial Court's "familiarity with the details of the case" and uphold its evidentiary ruling. <u>Id</u>. at 384.

4. Any potential error was harmless

Even if the Trial Court abused its discretion in admitting the comparator evidence, this error was harmless. <u>Abrams v. Lightolier Inc.</u>, 50 F.3d 1204, 1213 (3d Cir. 1995)("[U]nder Federal Rule of Civil Procedure 61 errors in the admission or exclusion of evidence cannot be grounds for reversal or a new trial if they constitute harmless error.")  Even without the comparators, the record contained more than sufficient evidence for the jury to conclude that Harper retaliated against Mr. Kengerski by departing from established ACJ investigatory procedures in order to terminate him based on allegations which Harper knew were false and retaliatory. *See* sufficiency of the evidence argument, *supra*; *See also* <u>Abrams</u> at 1218 ("the record would support the jury's conclusion that age was a determinative factor in the decision to terminate Abrams even if some of the objectionable evidentiary rulings had been otherwise.")

*iii.   Investigation procedures*

The County argues that the Trial Court should not have permitted Palmer and Demore to testify about their investigatory procedures at the ACJ. See DOC# 53-55. In making this argument, the County misrepresents the law regarding pretext, the facts in the trial record and the purpose of this evidence.

First, the County incorrectly states that, "as a matter of law - a challenge to the sufficiency or propriety of the employer's investigation before imposing discipline is inadequate to establish pretext."   DOC 26 at 53. This is directly contradicted by this Court's holding in <u>Canada</u> that irregularities in an employer's investigation process can establish pretext.  It is also inconsistent with the Trial Court's instruction to the jury to consider "the process by which [Harper] decided to terminate Mr. Kengerski and whether that process reflected any sort of retaliatory animus." App 0830.

Next, The County misrepresents the facts in the trial record. Regarding Palmer, the County asserts that 1) Palmer was not an ACJ employee, 2) Palmer only investigated criminal matters and 3) Harper was not aware of Palmer's standard investigatory procedures.  The trial record reflects that Palmer was a Detective employed by the Allegheny Police who was assigned to the ACJ from 2013 through 2016. App 569. Palmer regularly investigated non-criminal matters involving ACJ employees, often at Harper's request. App. 0570, 0615-0616, *See also e.g.* App. 0571, 0598-0599, 0632 (employee investigated for "spreading gossip" after reporting McCall for fraternization); App. 0571 (ACJ employees investigated for consensual relationship); App. 0794 (Kengerski investigated for non-criminal sexual harassment).  Finally, Harper himself testified that he was familiar with Palmer's

investigatory process. App. 0714 He believed that Palmer did thorough investigations and would "get to the bottom of what happened." Id.

Regarding Demore, the County incorrectly asserts that he testified about his own personal investigatory techniques.  In fact, Demore testified about the ACJ's standard investigatory procedures. He testified that he worked at the ACJ for fourteen and a half years. App. 0466. During the last four years he was responsible for handling disciplinary actions for officers ranked captain and below. App. 0475. He left the ACJ in April of 2015, approximately seven months before Mr. Kengerski's termination. App 0512.  He testified that he regularly investigated allegations of employee misconduct and that he followed ACJ's standard procedures for doing so. App. 476. ACJ's standard procedure was to interview the accused officer, interview witnesses and provide a hearing before issuing discipline. App.0476, 478-480.

Finally, the County misrepresents the purpose of the evidence, suggesting that it was a "naked credibility attack" on Harper's investigation.  To the contrary, the purpose of this evidence was not to attack Harper's methods or prove that he should have investigated differently.  The purpose was to show that Harper ignored the ACJ's standard procedures and deliberately bypassed trained investigators in order to investigate Mr. Kengerski himself, in a manner which was clearly calculated to

*not* "get to the bottom of what happened." The Court did not abuse its discretion by admitting Demore's testimony for this purpose.

Finally, even if the Court erred in admitting this evidence, the County was not prejudiced because Harper admitted to the essential facts outlined above. *See* App. 0706-0707, 0710, 0794 (Harper referred non-criminal investigations to Palmer); App. 0714 (Harper was aware of Palmer's investigative methods and believed his methods were thorough); App. 0695-0697, 0718-0720, 0723-0724-724, 0726-0727, 1251-1254 (Harper did not follow ACJ's standard investigatory and disciplinary policies when he terminated Kengerski); App. 0745, 0761, 0800-801, 0809 SAppx037 (Harper referred allegations of misconduct against captains to majors who conducted thorough investigations.)

### iv.   Evidence "not known" by the decision-maker

The County claims the Trial Court should not have allowed Mr. Kengerski to testify about harassment he suffered following his complaint unless he personally communicated the information to Harper. See DOC# 26 at 53-55. However, the Trial Court properly this evidence because Mr. Kengerski showed that Harper learned about the harassment through Wainwright.

First, the County does not contest that Wainwright was aware of the Harassment. At trial, Harper confirmed that Wainwright's job duties included

informing him of issues like a captain being harassed, receiving threats or being accused of misconduct. See Id. App. 0791-0792; (Harper would "expect to be advised" of these matters). *See also* App. 0685-0686 (Harper: "The deputy warden should keep the warden advised of everything").[19] Harper also testified that he believes Wainwright did, in fact, keep him advised of everything going on in the jail. App. 0686. ("A. If you expected [Demore to keep you advised of everything], you also expected that of Wainwright, correct. A. Yes. Q. As far as you know Simon Wainwright did that. Right? A. Yes."). See also App. 471. [20]

Importantly, Harper never denied that he knew that Mr. Kengerski was being harassed. The County's only basis for claiming that Harper lacked knowledge is that Mr. Kengerski did not "relay" the incidents directly to him after Wainwright failed to address them. *See* DOC# 26 at 59. However, when asked whether a lower ranked

---

[19] Demore confirmed that when he held the Deputy Warden of Operations position, immediately before Wainwright, he met with the Warden daily and informed him of things that were going on in the institution including harassment or misconduct involving a captain. App. 0143-0144.

[20] The jury could have concluded that Wainwright regularly met with Harper and advised him of matters withing the jail due to their close working relationship that dated back many years. App. 0487-0488, 0675-0677. Harper worked for Wainwright at the D.C. Department of Corrections where Wainwright promoted him to deputy warden. App. 0675. Wainwright left D.C. in the wake of sexual harassment allegations in 2012. App. 0676. SAppx034. In 2013, after Harper became Warden of the ACJ, Harper hired Wainwright as a captain. App. 0676. By 2015, Harper had promoted Wainwright multiple times to Deputy Warden of Operations. App. 0677.

officer should bring a matter directly to his attention if the deputy warden had not handled it appropriately, Harper stated:

> *Absolutely not.* We are a chain of command organization. I supervise deputy wardens. Deputy wardens supervise majors. *Once the major gives it a deputy warden, it's the deputy warden's responsibility to give it to me. The major should not come back, no. The deputy warden is responsible.*
>
> *See* App. 0741.

Thus, under Harper's leadership, Mr. Kengerski was not permitted to bring incidents directly to Harper's attention and he reasonably expected Wainwright to report them up the chain of command. Because Harper believed that Wainwright was performing this duty properly, the jury could have concluded that Harper was aware of the harassment. The Trial Court did not abuse its discretion in admitting this evidence.

Finally, even if Wainwright did not report every incident to Harper, Harper was unquestionably aware of key incidents which put him on notice that Mr. Kengerski was being harassed because of his protected activity, and that the November 24 allegations against him were likely false. *See supra*. This was sufficient for the jury to draw an inference that his handling of those allegations was retaliatory. A new trial is not warranted.

*v.    Evidence of "failure to promote" claim*

The County complains that Mr. Kengerski was permitted to introduce evidence surrounding his applications for a position as major, arguing that this evidence related to a "failure to promote" claim which was dismissed prior to summary judgment. See DOC# 26 at 61-64.  To the contrary, Mr. Kengerski did not assert a failure to promote claim at trial and the Trial Court did not admit evidence pertaining to a failure to promote claim. Mr. Kengerski's applications for major, and Harper's response to them, was independently relevant to Mr. Kengerksi's wrongful termination claim.

Mr. Kengerski testified that he applied for major three times. App. 0896-0897. His first two applications were before he reported McCall.  Id. He was interviewed both times. Id.  The third application was after he reported McCall.  He was not interviewed for that position. Id. Mr. Kengerski presented this testimony as additional circumstantial evidence of a pattern of antagonistic conduct from Harper which began after his protected activity.

The County points to a pretrial ruling excluding evidence concerning a failure to promote claim. See DOC# 26 at 62.  However, during trial the Trial Court explained that its original concerns about juror confusion did not materialize. App. 0899 ("I think my concern with the original issue was I did not want to get into a failure to promote type of claim.  And I don't think we've really gotten into it.").

49

Nevertheless, the Court gave a specific instruction to the jury to address the County's concerns. [21]  Immediately following the instruction on "materially adverse action" the Trial Court stated:

> You have heard testimony that Mr. Kengerski applied for, and was denied a promotion to the position of major at the Allegheny County Jail on three occasions. However, this case does not involve a claim of retaliation based on any failure to promote. So that is not an issue in this case. You are instructed that you cannot consider Mr. Kengerski's failure to be promoted to be an adverse event, nor may you consider who was promoted to major over Mr. Kengerski, which is not relevant. There is a limited purpose for certain of this testimony, which I will instruct on momentarily.

> App. 1042

The Court returned to the issue during its instruction on causation:

> Regarding the testimony about Mr. Kengerski not being promoted to major, you may among all the other circumstances that I've just described consider whether the process used by Warden Harper in connection with Mr. Kengerski's third application for major reflected any retaliatory animus by Warden Harper.

> App. 1043.

Finally, as with the other alleged evidentiary errors, even without evidence regarding Mr. Kengerski's applications for major, the record contained sufficient evidence to support the jury's conclusion that Harper terminated Mr. Kengerski in

---

[21] The County did not object to this instruction.

retaliation for his protected activity.  Therefore, any potential error was harmless, and a new trial is not warranted.

## VIII) CONCLUSION

For all of the foregoing reasons, this Honorable Court should uphold the jury's verdict and the Trial Court's evidentiary rulings.

## CERTIFICATE OF COMPLIANCE WITH RULE 32A

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 11,927 words excluding the parts of the brief exempted by Fed. R. App. P.32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P.32(a)(5) and the type style requirements of Fed. R. App. P.32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft® Word for Microsoft 365 MSO (Version 2303) in font size 14, font style Times New Roman.

## CERTIFICATION OF BAR MEMBERSHIP

I certify that I am a member in good standing of the bar of the U.S-. Court of Appeals for the Third Circuit.

## CERTIFICATION OF TEXT OF E-BRIEF

I certify that the text of the E-Brief and the text of the hard copies of appellee's brief are identical.

## CERTIFICATION OF VIRUS CHECK

I certify that a virus check was performed on the .PDF file of appellant's brief. The virus software used was McAfee LiveSafe Virus Scan.

Dated:  May 13, 2024          /s/Margaret S. Coleman
                              Pa. ID No. 200975
                              O'BRIEN COLEMAN & WRIGHT LLC
                              116 Boulevard of the Allies
                              Pittsburgh, PA  15222
                              (412) 232-4400

                              Attorney for Appellee