# 23-1926

IN THE

# United States Court of Appeals

## FOR THE THIRD CIRCUIT

◆▬◆▬◆

COUNTY OF ALLEGHENY,

*Appellant,*

—against—

JEFFREY KENGERSKI,

*Appellee.*

———

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

---

### APPELLANT'S REPLY

## COUNTY OF ALLEGHENY

---

Virginia Spencer Scott
Assistant County Solicitor
Pa. I.D. #61647

Frances Liebenguth
Assistant County Solicitor
Pa. I.D. #314845

ALLEGHENY COUNTY LAW DEPARTMENT
300 Fort Pitt Commons
445 Fort Pitt Boulevard
Pittsburgh, PA 15219
Tel.: (412) 350-1173

*Counsel for Appellant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ……………………………………………………ii

ARGUMENT ............................................................................................................1

A.   THIS COURT HAS JURISDICTION TO HEAR JMOL ARGUMENTS ...............................1

  1.   *Summary Judgment is Reviewable* ....................................................................1

  2.   *This Appeal is Based on Purely Legal Issues not Superseded by Trial* .......................2

  3.   *JMOL Arguments Preserved through Rule 50a and Rule 59 Motions* ......................4

  4.   *Unclean Hands and Manifest Injustice* ...........................................................5

B.   KENGERSKI APPLIES THE WRONG LEGAL STANDARD TO THE ERROR OF LAW REVIEW .....................7

C.   ERROR OF LAW OCCURRED IN ALLOWING CASE TO PROCEED TO JURY .......................7

  1.   *Appellant's Assertion of Disputed Material Facts is Wrong* ................................7

  2.   *Kengerski's Assertion of Animus  By Warden Is Wrong as a Matter of Law* ..............9

D.   DISTRICT COURT ABUSED DISCRETION RE: COMPARATOR EVIDENCE .......................20

E.   DISTRICT COURT ABUSED DISCRETION RE: "PROCESS" OF NON-DECISIONMAKERS .....................22

F.   DISTRICT COURT ABUSED DISCRETION ADMITTING EVIDENCE NOT KNOWN BY DECISION-MAKER ...24

G.   DISTRICT COURT ABUSED DISCRETION RE: FAILURE TO PROMOTE CLAIM EVIDENCE ....................26

CONCLUSION ....................................................................................................27

CERTIFICATION OF COMPLIANCE TO RULE 32(A)(7).................................................29

CERTIFICATION OF SERVICE ...............................................................................30

# TABLE OF AUTHORITIES

**Cases**

*Abramson v. William Paterson Coll. of N.J.,* 260 F.3d 265 (3d Cir. 2001)...... 9, 20

*Brewer v. Quaker State Oil Ref. Corp.,* 72 F.3d 326 (3d Cir. 1995) ............... 9, 20

*Capps v. Mondelez Global, LLC,* 847 F.3d 114 (3d Cir. 2017) ..............................3

*Coons v. Industrial Knife Co., Inc.,* 620 F.3d 38 (1st Cir. 2010)............................4

*Cosgrove v. Bartolotta,* 150 F.3d 729 (7th Cir. 1998)...........................................4, 5

*Dupree v. Younger,* 598 U.S. 729, 143 S.Ct. 1382 (2023) .......................................1

*Elm Ridge Exploration Co. v. Engle,* 721 F.3d 1199 (10th Cir. 2013)...............4, 5

*Estate of Snyder v. Julian,* 789 F.3d 883 (8th Cir. 2015)..........................................4

*Fabri v. United Technologies Intern., Inc.,* 387 F.3d 109 (2d Cir. 2004)...............7

*Fedorczyk v. Caribbean Cruise Lines, Ltd.,* 82. F.3d 69 (3d Cir. 1996) ...............25

*Fitzgerald v. Nat'l R.R.,* 2024 WL 771711 (Feb. 26, 2024, 3d Cir.).....................20

*Geddis v. Univ. of Delaware,* 40 Fed.Appx. 650 (3d Cir. 2002) ............. 13, 16, 17

*Geddis v. Univ. of Delaware,* 2001 WL 34397969, Geddis Opening Brief ........18

*Kengerski v. Harper,* 6 F.4th 531 (3d Cir. 2021) ......................................................2

*Keystone Driller v. General Excavator,* 290 U.S. 240, 245 54 S.Ct. 146 (1933) .....5

*Manel v. M &Q Packaging Corp.,* 706 F.3d 157 (3d Cir. 2013)...........................20

*McDonnell Douglas v. Green,* 411 U.S. 792 (1973).................................................8

*Money v. Provident Mut. Life Ins. Co.*, 189 Fed.Appx. 114 (3d Cir. 2006)........10

*Moore v. Shineski*, 487 Fed. App'x 697 (3. Cir. 2012.............................................3

*Opsatnick v. Norfolk S. Corp.*, 335 Fed. Appx. 220, 223 (3d Cir. 2009) .............20

*Robertson v. Giant Eagle*, 2024 WL 747237 (3d Cir. Feb. 23, 2024) ....................3

*Rockport Pharmacy, Inc. v. Digital Simplistics, Inc.*, 53 F.3d 195 (8th Cir.1995) .5

*Stephenson v. Doe*, 332 F.3d 68 (2d Cir. 2003) ......................................................7

## Rules

FRE 401 ....................................................................................27

Fed.R.Civ.P. 50..........................................................................4

Fed.R.Civ.P. 59..........................................................................4

# ARGUMENT

## A.     This Court Has Jurisdiction to Hear JMOL Arguments

### 1. Summary Judgment is Reviewable

While factual issues addressed in summary judgment denials are unreviewable on appeal, the same is not true of purely legal issues, that is, issues that can be resolved without reference to any disputed facts; while trials wholly supplant pretrial factual findings, they leave pretrial legal rulings undisturbed. *Dupree v. Younger*, 598 U.S. 729, 143 S.Ct. 1382, 215 L.Ed.2d 636 (2023). Because a district court's purely legal conclusions at summary judgment are not superseded by later developments in the litigation, these rulings follow the general rule that they merge into the final judgment, at which point they are reviewable on appeal. *Dupree at 735, 143 S.Ct. 1382*. A district court's resolution of a pure question of law is unaffected by future developments, and from the reviewing court's perspective, there is no legal benefit to having a district court reexamine a purely legal issue after trial as nothing at trial will have given it any reason to question its prior analysis. *Dupree at 736, 143 S.Ct. 1382*. A post-trial motion under the rule governing judgment as a matter of law (JMOL) is not required to preserve for appellate review a purely legal issue resolved at summary judgment. *Dupree at 736, 143 S.Ct. 1382*.

2. This Appeal is Based on Purely Legal Issues not Superseded by Trial

After the close of discovery in this case, Allegheny County moved for Summary Judgment. Allegheny County filed an opening brief and reply brief. (Supp. App. 17-60; 110-135.) Mr. Kengerski filed a reply and sur-reply brief. (Supp. App. 61-87.) The District Court granted summary judgment to County of Allegheny on the basis that Mr. Kengerski did not engage in protected activity. (ECF #90; ECF #91.)

On appeal, the Third Circuit reversed that decision, concluding that Mr. Kengerski made the requisite showing. *Kengerski v. Harper*, 6 F.4th 531 (3d Cir. 2021). The Third Circuit then remanded the case for the District Court to consider the sole remaining issues left unresolved on summary judgment: (1) whether there was a causal connection between Mr. Kengerski's protected activity and his termination; and (2) if so, whether the County's reason for terminating Mr. Kengerski was legitimate or pretextual. (App. 2.) The Parties filed supplemental briefs to the District Court on the remaining issues. (App. 39; 46.) Oral argument was then held by the District Court on the Summary Judgment Motion. (Supp. App. 183-260.) The Court ultimately issued a Memorandum Order denying the County's Motion for Summary Judgment. (App. 2-8.) All briefs, supplements, and orders are available to the Court on the District Court's docket and in the supplemental appendix filed by Allegheny County.

Allegheny County argued at summary judgment and in its opening brief in this appeal that as a matter of law, the case is precluded from going to a jury. Allegheny

County raised and preserved the arguments made in its opening brief at Summary Judgment giving the District Court the opportunity to fully examine the issues. (Supp. App. 32-34; MSJ ECF #59 p. 13-18.)

The reasons for Mr. Kengerski's termination have remained consistent since November 24, 2015, and are coherent and plausible. (Supp. App. 36-38; 41-43; 190-198).  When an employer has a company policy that sets forth that an employee can be fired if the policy is violated, and the employer relies upon that policy to justify the employee's termination, this is sufficient to rule - as a matter of law - in favor of the employer.  *Robinson v. Giant Eagle*, No. 23-1804, 2024 WL 747237, *2 (3d Cir. Feb. 23, 2024).  *See also Capps v. Mondelez Global, LLC*, 847 F.3d 114, 152 (3d Cir. 2017)

As set forth in the Opening Brief, using substantially similar comparators is an accepted way to show pretext.  However,  Mr. Kengerski does not have any similarly situated comparators (people in substantially the same job who committed the same infraction) to use as comparators.[1]   (Supp. App. 133-134; 199-201; 241-245).   There is no ongoing pattern of hostility, animus, discipline between Warden Harper and Mr. Kengerski. (Supp. App. No. 119-121; 202-205.) Allegheny County relied upon undisputed facts that were unaffected by any future developments at trial.  *See* Addendum "A."

---

[1] Whether a comparator is similarly-situated to the plaintiff is an issue of law.  *Moore v. Shineski*, 487 Fed. App'x 697, 698 (3d. Cir. 2012).

Furthermore, Addendum A attached to this REPLY includes citations to the record at summary judgment (noted in yellow highlighting) and illustrates that the undisputed facts applying to these arguments remained consistent from summary judgment through trial.  Consistent with the precedent of this Court, this case should never have been allowed to go to a jury.  Allegheny County is entitled to JNOV.

3.  JMOL Arguments Preserved through Rule 50a and Rule 59 Motions

Even if this Court were to rule that Allegheny County's summary judgment denial is unreviewable, the JMOL arguments have been preserved through Allegheny County's presentation of a Rule (50) motion at the close of Plaintiff's case and at the close of evidence and through its Rule 59 motion filed following the jury's verdict. (App. 1005-013; 1058-062; Supp. App. 155-165.)  Several circuits have held that a motion filed under Rule 59 can be construed as a rule 50(b) renewal motion if it is made within the deadline for Rule 50(b) motions and challenges the sufficiency of the evidence to support the verdict. *Estate of Snyder v. Julian,* 789 F.3d 883, 886 (8th Cir. 2015); *Elm Ridge Exploration Co., LLC v. Engle,* 721 F.3d 1199, 1220, 85 Fed. R. Serv. 3d 1369 (10th Cir. 2013); *Coons v. Industrial Knife Co., Inc.,* 620 F.3d 38, 41 (1st Cir. 2010); *Cosgrove v. Bartolotta,* 150 F.3d 729, 732 (7th Cir. 1998).

Allegheny County filed its Rule 59 Renewed Motion for Mistrial and Memorandum on October 27, 2022, within the deadline for filing a Rule 50(b)

motion.[2] Allegheny County did make and preserve sufficiency of the evidence arguments both in its Rule 50(a) motion and post-verdict Rule 59 motion. (App. 1005-013; 1058-062; Supp. App. 155-165.) The trial court recognized that Allegheny County was bringing a Rule 59 motion) and that Defendant's allegations go to "disagreements with the jury's conclusions as a matter of the sufficiency of the evidence." (Supp. App. 177, 180.)  "Technical precision is not necessary in stating grounds for the motion so long as the trial court is aware of the movant's position," *Rockport Pharmacy, Inc. v. Digital Simplistics, Inc.,* 53 F.3d 195, 197 (8th Cir.1995) (internal quotation omitted), and "captions do not control" if the body of the motion or memorandum presents a claim. *Cosgrove v. Bartolotta,* 150 F.3d 729, 732 (7th Cir.1998); *see also Elm Ridge Exploration Co. v. Engle,* 721 F.3d 1199, 1220 (10th Cir.2013).  As such, Allegheny County should not be barred from raising sufficiency of the evidence arguments on appeal.

4.  Unclean Hands and Manifest Injustice

The equitable doctrine of unclean hands applies when a party seeking relief is asking for equity with respect to the litigation.  *Keystone Driller Co. v. General Excavator Co.,* 290 U.S. 240, 245 54 S.Ct. 146 (1933).  Mr. Kengerski, here is

---

[2] Fed. R. Civ. P. 50(b) requires the movant to file a JMOL no later than 28 days after the entry of judgement. Judgement in this matter was not entered until January 20, 2023. (ECF #241).

attempting to prevent Allegheny County from raising valid arguments on the basis of waiver. In an earlier appeal in this same matter this Honorable Court ruled that Mr. Kengerski had waived the associational theory of discrimination argument not raised by him in his opening brief.

> We ordinarily would not consider this argument, which was not raised explicitly by Kengerski in his opening brief, because an "amicus may not frame the issues for appeal." *DiBiase v. SmithKline Beecham Corp.*, 48 F.3d 719, 731 (3d Cir. 1995) (quoting *Swan v. Peterson*, 6 F.3d 1373, 1383 (9th Cir. 1993)). Nonetheless, we are convinced that "substantial public interests" justify departing from this general rule because this issue could affect the behavior of countless employers and employees in situations ranging from interracial marriage to intra-office friendships. *Id.*

No. 20-1307 Doc. 70-2 pg. 12.   Nevertheless, this Court gave Mr. Kengerski the benefit of reversal of a grant of summary judgment, not on the basis of his own argument but on the basis of "substantial public interest."  That same substantial public interest still exists.  The argument that Mr. Kengerski makes to this Court could affect the behavior of countless employers and employees.  It is substantially important to know whether an employee may use the argument that animus can exist by "process" of the employer's investigation, the "process" of the complaints of co-worker harassment, and other such business operations; where historically an employer's investigations, handling of complaints and business operations have been outside the purview of the court and juries as a basis to find animus.

Additionally, the Court is permitted to allow appellate review of the sufficiency of the evidence even in the absence of a 50(b) motion to prevent manifest injustice. *Fabri v. United Technologies Intern., Inc.,* 387 F.3d 109, 119, 59 Fed. R. Serv. 3d 1192 (2d Cir. 2004); *Stephenson v. Doe,* 332 F.3d 68, 76, 56 Fed. R. Serv. 3d 619 (2d Cir. 2003).

**B.    Kengerski Applies the Wrong Legal Standard to the Error of Law Review**

Allegheny County's Opening Brief cites the correct standard of review applicable to its error of law argument.  (Opening Brief, Section A.)  Mr. Kengerski acknowledges this at the beginning of his Counterstatement of the Standard of Review. But, in his Argument section, A(iii), he does not refer to the correct standard.  As such, this section of Mr. Kengerski's Argument should be ignored.

**C.    Error of Law Occurred in Allowing Case to Proceed to Jury**

1.    Appellant's Assertion of Disputed Material Facts is Wrong

At pages 29 to 35 of Mr. Kengerski's Response, he recites facts in the record to assert that there was sufficient evidence for a jury to find causation.  However, the actual facts (excluding the spin and liberties Mr. Kengerski sometimes takes with his re-statements) were never in dispute.  (Addendum A.)  Allegheny County's assertion throughout this case remains that following the precedent of this Court, these facts cannot be a basis to have allowed this case to proceed to a jury.

The undisputed law on Title VII causation and pretext is found in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). *McDonnell Douglas* holds that Mr. Kengerski's burden of establishing pretext must be through "competent evidence that the presumptively valid reasons for [the adverse employment] were in fact a coverup" for retaliation. *Id.,* at 805. Yet, throughout Mr. Kengerski's Response he cannot find any facts that refute the reason for his discharge, and he cannot show that any of the myriad miscellaneous facts he raises either attack the underlying facts of what he did to warrant discharge or that Warden Harper actually harbored animus toward him in November 2015 for a letter he wrote seven months earlier.

Mr. Kengerski's Response and the record in general make it clear that the material facts presented at summary judgment were unchanged through trial:

1. Allegheny County had a zero-tolerance policy prohibiting the submission of false reports, which included instructing a subordinate to submit a false report. (Supp. Appendix 0012.)

2. Allegheny County had a policy which prohibited an employee's interfering with a harassment investigation, which included termination as a possible sanction. (Supp. Appendix 0011.)

3. Mr. Kengerski knew of these policies, knew he was required to follow them, and knew he could be fired if Allegheny County found he violated them. (Supp. Appendix 0012.)

4. In November 2015, Allegheny County received information that Mr. Kengerski violated these polices. (Supp. Appendix 0013-0014.)

5. Allegheny County fired Mr. Kengerski for the stated reason that he violated these polices. (Supp Appendix 0015.)

6. These policies are sound and logical. (Opening Brief, pg. 31-38.)

7. Mr. Kengerski did not present any similarly situated comparators who submitted a false report and interfered with an investigation and were not fired.[3]

As set forth in Allegheny County's Opening Brief (pages 25-45), Mr. Kengerski's failure to refute these facts means his case should never have gone to a jury. Allegheny County is entitled to judgment as a matter of law.

2. Kengerski's Assertion of Animus By Warden Is Wrong as a Matter of Law

The Third Circuit has been clear that as a matter of law an employee cannot establish pretext to create a jury question through a challenge to the manner and methods an employer uses to operate their business. *Abramson v. William Paterson Coll. of N.J.,* 260 F.3d 265, 283 (3d Cir. 2001); *Brewer v. Quaker State Oil Ref. Corp.,* 72 F.3d 326, 332 (3d Cir. 1995). Employers are permitted to be bad decision-makers, bad investigators, and bad bosses. They are permitted to make decisions that an arguably better businessperson would not make. *Id.*

Taking a clear-eyed view of the evidence Mr. Kengerski relies upon shows that he presents nothing more than a challenge to Warden Harper's business decisions, the manner Warden Harper conducted investigations, and how Warden Harper

---

[3] *See* Section D, *infra*, for Allegheny County's REPLY to Mr. Kengerski's comparator arguments.

operated his business – running the Allegheny County Jail. All of these facts have been rejected as a matter of law as a basis to support either animus or create a question of fact for a jury.    *See* Allegheny County Opening Brief at pg. 53-55.

Mr. Kengerski spends the majority of his argument attacking the "paltry" investigation Warden Harper oversaw. (Response pg. 31-35.)  Yet the precedent of this Court forecloses such an argument.  In the Title VII case of *Money v. Provident Mut. Life Ins. Co., 189 Fed.Appx. 114 (3d Cir. 2006),* the employee, Money, sought to establish pretext by pointing to the "deliberately insufficient" investigation conducted by the employer.  He offered evidence that the employer's Human Resources manager "lied" about the extent of the investigation, "in order to cover up the fact that the decision to fire [him] had nothing to do with [the claimed legitimate non-discriminatory reason]."  *Id.*, at 117.

This Honorable Court rejected this effort as a "naked credibility attack."  Id. Instead, this Court went back to the record and focused upon the same thing that should be done in any appellate review of a case such as this – the reason the employer gave for terminating the employee – to determine whether that reason was "reasonable."  *Id*, at 116.

Mr. Money had punched another employee in self-defense.  The employer had a policy against fighting.  Mr. Money countered – just as Mr. Kengerski does – that he had a previous good record as an employee, and this should have been considered.

(Mr. Kengerski even now relies upon his being a "long-standing jail employee," his not having "previous discipline," and his not "having done anything similar in the past." Response Brief pg. 34.) Money, like Mr. Kengerski now, attacked the motives of the decision-maker by pointing to the fact that his supervisor had recommended anger management classes rather than discharge, and the policy in question was not "zero tolerance" but instead provided for discipline "up to and including termination." *Id.*, pgs. 117-18.

This Honorable Court held that the employer's refusing to consider an employee's previous good record, a "deliberately insufficient" investigation, and a decision-maker's refusing lesser punishments despite the recommendation of the supervisor – as a matter of law – could not be evidence that the employer "harbored racial animus and that the termination decision itself is not so unreasonable as to assist Money in proving pretext." *Id.*, pg. 117. Instead, this Court followed the long-standing precedent of this Court that at most Money's arguments went to the employer's "decision was imprudent, unwise, and incompetent." *Id.* "A merely bad employment decision is not actionable under Title VII." *Id.*

Applying that law to this case, Mr. Kengerski's substantial expenditure of pages (Response pgs. 31-34) pointing to the inadequacy of the Jail's investigation before firing him, does nothing to move his case forward. Similarly, Mr. Kengerski's argument that the jury could consider it was "highly suspect" that the Warden would

11

fire Mr. Kengerski after he had "provided exemplary service to the ACJ [Allegheny County Jail] for nearly 13 years" is not founded in the law.

Mr. Kengerski also argues (Response pgs. 32-33) that the Warden's investigation into the complaints that resulted in Mr. Kengerski's firing "was an "exceedingly poor basis for terminating a captain who had worked at the ACJ for nearly 13 years.  (Response, pg. 33.)  This Court has never accepted an employee's years of employment as a factor to be considered in a causation analysis.  Moreover, there is no law that says that an employer should conduct a more thorough investigation into a complaint based upon how long an employee has worked for the employer.

Mr. Kengerski also argues animus can be inferred because the Warden "immediately ordered [Deputy] Wainwright to remove him [Kengerski] from the Jail" after reading the reports that stated Mr. Kengerski had instructed subordinates to provide false information in reports.   (Response, pg. 32.)  As a matter of law, no animus can be inferred from this because the Jail policy in existence at the time required that anyone accused of providing false information in a report was to be "immediately relieved of duty and sent home until his/her formal disciplinary hearing is conducted." (App. 1229.)  The fact that the Warden treated Mr. Kengerski in the manner set forth in the written policy cannot be evidence of animus.  Mr. Kengerski's argument that animus can be inferred because Mr. Kengerski had never "done

anything similar in the past" (Response, pg. 34.), is also barred by the law.    *Money*, *supra.*

Mr. Kengerski's argument that the Warden's animus can be inferred because he failed to follow established procedures, also is negated by this Court's precedent. *E.g. Geddis v. Univ. of Delaware*, 40 Fed.Appx. 650, 653 (3d Cir. 2002) holds that an employer's failure to follow its established policies or procedures, such as in the manner in which it conducted an investigation could not be evidence of animus.  *Id.*, at 653.   In *Geddis*, employee Geddis argued that his employer violated its own established policies and its standard procedure in the investigation it performed before firing Geddis.  This Court refused to entertain this argument, finding that failing to follow established polices or standard procedures with regard to the manner and method of an investigation falls within the purview of the business decisions of the employer, and did not move the needle on establishing animus.  *Id.*

Mr. Kengerski argues in his Response that the fact the Warden, "tellingly made no effort to investigate Mr. Kengerski's complaints [that his coworkers were harassing him]" somehow supports the existence of animus.   *Geddis* squarely rejects this assertion.  The same can be said for Mr. Kengerski's argument that the Warden's saying that officers were permitted to request to meet with him, and the Warden then "ignoring" an email from Mr. Kengerski that requested a meeting, which Mr.

Kengerski argues is evidence of "retaliatory intent". (*See* Response, pg. 30)[4]  *Geddis* precludes this argument.

Moreover, Mr. Kengerski defeats the argument that the Warden ignored his emails, in the very next sentence by pointing to another occasion where the Warden responded to an email from Mr. Kengerski within two minutes. (*See* Response, pg. 30.) Here too, Mr. Kengerski takes liberties with the record by asserting that the Warden's email response was "terse" and could be evidence of "retaliatory intent." The email stated simply, "This request is denied." (App. 0235.) There was no testimony that the response was "terse", and any such interpretation is not in the record. Instead, the Warden's response is clear and direct. Exactly what would be expected by a commanding officer to a subordinate in a paramilitary organization. Additionally, Mr. Kengerski did not interpret the Warden's response as being retaliatory or imbued with animus:

> Q. [Kengerski's lawyer]: What did you think when you received that response from Mr. Harper?
>
> A. [Kengerski]: That he wasn't concerned about anything related to my request or wanted to hear anything I had so say with regards to why I wanted to return back to sergeant.

(App. 872.)

---

[4] In support of this "fact" Mr. Kengerski cites to "App. 235." However, nothing at that page supports this.

Mr. Kengerski also asks this Court to find animus where, he says, Warden Harper, "inexplicably had the offensive text messages [sent by Robyn McCall] deleted from Mr. Kengerski's phone." (Response, pg. 29.) This is a complete misstatement of the record. Instead, Mr. Kengerski gave his phone to internal affairs and internal affairs returned it to him. Warden Harper was not involved with the retrieval or deletion of any data on it. (App. 845.)

Mr. Kengerski consistently points to his coworkers engaging in a "pattern of harassment" such as calling him racist names, tampering with his locker, and making unfounded reports against him. (Response, pgs. 29-30.) Mr. Kengerski argues this is evidence of "retaliatory motive." *Id.* "Yet, [Warden Harper] tellingly made no effort to investigate Mr. Kengerski's complaints, let alone protect him from the harassment." Response. Pg. 30.[5] To begin with, Mr. Kengerski is wrong with the facts. As already set forth in the Opening Brief Section C, *Error In Admitting Evidence Not Known By Decisionmaker*, there is no evidence the Warden Harper was told about most of the things (the name calling, hang ups, and other things asserted to be harassment by colleagues), Mr. Kengerski now relies upon as evidence of animus. If Warden Harper did not know about it, it cannot be a basis for animus.

---

[5] *See also* Response pg. 30 ("Harper's refusal to address Mr. Kengerski's complaints of harassment raises an inference that he condoned it and is evidence of his own retaliatory motive.")

Additionally, Mr. Kengerski continues to misstate the record when he asserts that animus can be inferred because the Warden "failed to investigate Mr. Kengerski's complaints" concerning Mr. Kengerski's complaint that his locker was being tampered with. (Response. pg. 30.) The record actually reflects that Mr. Kengerski made a complaint to Internal Affairs, email to Detective William Palmer and Detective Jim Fitzgerald. (App. 604.) Warden Harper is cc'd on the email. Det. Fitzgerald conducted the investigation. He determined that it was "an act of criminal mischief. There's no real solvability factor. There are no cameras around the men's room or locker room, but it was documented as a police record." App. 604.)

Moreover, the fact that Mr. Kengerski had a troublesome relationship with co-workers, claimed "harassment" from them, and even as Det. Palmer said three months before Mr. Kengerski's discharge, that "retaliation was expected against [Kengerski and Deputy Demore] stemming from factionalized drama at the Allegheny County Jail." (App. 607.) is immaterial to any animus on the part of the Warden. Det. Palmer did not accuse the Warden of animus and nothing in the record shows any hostile act by the Warden toward Mr. Kengerski. Instead, the record only shows that certain colleagues had issues with Mr. Kengerski. This is not enough to allow this case to go to the jury. *Geddis v. Univ. of Delaware,* 40 Fed.Appx. 650, 653 (3d Cir. 2002).

In Geddis, as part of the decision-maker's investigation it accepted "false statements" from co-workers the decision-maker violated established policy and

standard procedures in how it conducted, what was, an inadequate investigation.  With This Court rejected these facts as a basis to allow the case to proceed to a jury.  *Geddis v. Univ. of Delaware*, 40 Fed.Appx. 650, 653 (3d Cir. 2002).[6]

*Geddis* is particularly instructive because it has such similarities to Mr. Kengerski's assertion in one very crucial regard.   In *Geddis*, there was extensive evidence that Geddis had co-workers who had significant animosity toward him, engaged in harassment of him, were out to get him and there were demonstrated acts of harassment and hostility toward Geddis before the event that was the argued "pretext" for his discharge.  Some of this evidence came from a subordinate who the employer knew had a "well known reputation of dislike for Geddis."  This employee, who wrote the complaint letter that served as the basis for firing Geddis, said he was, "going to get Al [Geddis]" and that he "would outlast Mr. Geddis."[7]  This employee's animosity toward Geddis was known by Geddis's employer and there was a documented history of "misunderstandings and friction" between Geddis and the subordinate.  This "tension" was well known among others in the department.  Geddis was referred to in "derogatory terms" and "obscene terms" in the workplace  He was

---

[6] This negates Mr. Kengerski's argument that "County policy required that violations of the anti-harassment policy be investigated by Human Resources... and that Internal Affairs had investigated a complaint about Mr. Kengerski only three months before." (Response pg. 33.)

[7] Compare with Mr. Kengerski's reliance on Robyn McCall threatening to "get his ass." (Response, pg. 24.)

accused of "incest, and other descriptions using sexual terms." Geddis's employer did not investigate this, and it did not consider this as a motive for the subordinate to lie when he authored his complaint against Geddis. 2001 WL 34397969, * 9, *Geddis v. Univ. of Delaware*, Geddis Opening Brief, *citations to Appendix omitted*.

In deciding to fire Geddis, his employer also relied upon a written complaint about Geddis from another subordinate, Magaw. The employer ignored that Magaw's complaint was submitted in a manner and method that violated established company policy.[8] Further, the employer chose to ignore that Magaw left out material information in the complaint that called into question the motive for the complaint. Such as, Magaw's complaint against Geddis omitted that the offending comment Geddis made was by phone, that no one else heard it, no one else knew of the comment, that Magaw was not embarrassed by the comment, that this one-time comment was an "aberration," that "Geddis immediately apologized" for making the comment, that Magaw had a problem accepting criticism, and that Magaw's overall working relationship with Geddis was improving and that Magaw still need to develop." *Id* at * 10.

---

[8] Compare with Mr. Kengerski relying upon Warden Harper's usually having complaints against captains referred to a committee with him reviewing thereafter, and here he had the Deputy Warden conduct the investigation and he reviewed the information himself. (Response, pg. 31.)

This Court in *Geddis* found these facts immaterial and ruled as a matter of law that the record lacked evidence that the employer harbored discriminatory animus. This is because hostility and harassment by co-workers is immaterial to the issue of whether an employer fired an employee for its proffered reason as opposed to a protected activity.  Similarly, in Mr. Kengerski's case, the fact that his co-workers disliked him and harassed him is irrelevant to the only issue in this case which is whether Warden Harper fired Mr. Kengerski for the reasons he said he did or whether it was because of the letter Mr. Kengerski wrote seven months earlier.[9]

The law in this Circuit is that neither the jury nor the court are permitted to question the business judgment of an employer.  An employer's business decisions may be harsh or unreasonable.  An employer may engage in questionable wisdom and unsound judgment and none of that can be a basis to impose liability.

"It is not enough for a plaintiff to show that the employer's decision was wrong or mistaken" because bad business decisions are not evidence of animus and employment statutes are not about holding business liable just because they make questionable business decisions.  *Abramson v. William Paterson Coll. of N.J., 260*

---

[9] Mr. Kengerski states in his Response pg. 29 that his coworker's harassment of him was caused by his protected conduct.  Mr. Kengerski did not bring hostile work environment or harassment claims in this lawsuit.  Further, he elected not to pursue a "Cat's Paw" theory of liability which could have implicated the motivations of employees other than the decision-maker. As such, any "coworker" harassment or failure to investigate it falls within the area of how Jail operated as a business, which is immaterial to disposition of this appeal.

F.3d 265, 283 (3d Cir. 2001); *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 332 (3d Cir. 1995) ("We do not sit as a super-personnel department that reexamines an entity's business decisions.")

Consistent with the above, the record does not present disputed questions of fact from which a reasonable jury could find causation.  Allegheny County is entitled to judgment as a matter of law.

**D.    District Court Abused Discretion Re: Comparator Evidence**[10]

Mr. Kengerski continues to ignore the law that who is a valid comparator in an employment case is a question of law that must be made by the court.  To be a valid comparator the employee must be similarly situated in all relevant respects including job responsibilities and supervisors.  Moreover, the wrongdoing must be the same. *E.g. Fitzgerald v. Nat'l R.R. Passenger Corp.*, No. 23-2340, 2024 WL 771711 (Feb. 26, 2024, 3d Cir.); *Manel v. M&Q Packaging Corp.*, 706 F.3d 157, 170 (3d Cir. 2013); *Opsatnick v. Norfolk S. Corp.*, 335 Fed. Appx. 220, 223 (3d Cir. 2009).

The District Court erred in ruling that, [w]hether proffered comparators are similarly situated to the plaintiff is a question of fact for the jury." (App. 224.)  This is not the law in this Circuit.  Mr. Kengerski tacitly acknowledges there were errors at

---

[10] Mr. Kengerski has a section A(iv) in his Response, that relates to Allegheny County's legitimate non-discriminatory reason.  Allegheny County's Opening Brief and the previous section of this Reply speak to this point.

the District Court regarding comparators, because unlike at trial, Mr. Kengerski does not make an argument that corrections officer Hendrick is a comparator.  In fact, Mr. Kengerski tries to minimize   impact the testimony concerning corrections officer Hendrick by stating in a footnote that the only evidence he presented about Hendrick was two questions.  (Response, fn. 12 & 13.)  But, at trial, Mr. Kengerski's counsel made much of officer Hendrick and in closing specifically drew out officer Hendrick as a comparator.  **"And the last set of comparators that we talked to you about was Joe Demore and CO Hendrick."**  (App. 1118-1119.)  Mr. Kengerski's counsel further said, "CO Hendrick made a false allegation to the FBI about Warden Demore, he [Warden Harper] didn't do anything about it.  The guy [CO Hendrick] kept working there."  (App. 1119.)  "[H]e [Warden Harper] didn't do anything about a CO making false reports to the FBI about one of his majors.  **So those are the comparators.**" (App. 1119-1120, *emphasis added.*)

The District Court abused its discretion in allowing a corrections officer to be a comparator to Mr. Kengerski.  This error not only is contrary to appellate jurisprudence, but it also resulted in irreparable harm.  Mr. Kengerski's counsel's closing argument establishes this point.

Because of this improper evidence, Mr. Kengerski presented to the jury that in an instance where an officer made false reports to the FBI the Warden turned a blind eye, in stark contrast to how the Warden addressed Mr. Kengerski's making false

reports and being immediately removed from the building and shortly thereafter fired. Such testimony was sufficient to improperly sway this jury.

Allegheny County has already explained in its Opening Brief how the other three proffered comparators, Major Bytner, Major McCall, and Deputy Warden Demore could not be valid comparators. Mr. Kengerski's counsel also exploited their improper admission in her closing. (App. 1114 – 1120.) Yet again, the damage was irreparable harm. Mr. Kengerski was permitted to paint Mr. Bytner and Ms. McCall as the worst of kind of actors (Bytner being a repeat sex offender, and McCall being an open and notorious racist). Mr. Kengerski's counsel went on at length comparing how despite their reprehensible conduct they were permitted to remain at work while, Mr. Kengerski was immediately walked from the Jail and soon after fired. The result was a verdict based upon bias, prejudice, and improper comparisons, rather than one premised on the law. A new trial is warranted with the exclusion of Officer Hendrick, Major Bytner, Major McCall, and Deputy Warden Demore as comparators.[11]

### E.    District Court Abused Discretion Re: "Process" of Non-Decisionmakers

The District Court improperly allowed into the evidence the "process" that people other than Warden Harper's (the decision-maker) used as they handled

---

[11] Allegheny County relies upon its Opening Brief for the remainder of its "comparator" arguments.

investigations they performed as part of their work.  This testimony is irrelevant as a matter of law.  [FRE 401](#).  It is irrelevant because it is not a fact of "consequence in determining the action" how anyone other than the actual decisionmaker - particularly a police officer who is trained on investigating criminal matters – decides how they will handle an investigation.  Also, the "process" that anyone else used to conduct investigations as a part of their job responsibilities does not have any "tendency to make a fact more or less probable than it would without the evidence" as to whether Warden Harper had retaliatory animus because of Mr. Kengerski's April 2015 Letter. *Id.*

To allow into evidence how the police and others handled investigations was substantially prejudicial to the defense of the case.  It was devastating to the defense of this case that the jury was permitted to believe that an investigative process used by a police officer – who operates under rules and standards established by a different department under a criminal justice system – was a valid comparison to how a jail warden would investigate an employment disciplinary matter.

The same is true with the District Court's allowing in testimony how Mr. Demore conducted investigations.   Mr. Demore does not set a standard for how to conduct employee disciplinary investigations.  He was not an expert.  He was not Warden Harper's superior, and he did not set the rules for how Warden Harper could decide to investigate employment matters in his own Jail.  The fact that Mr.

Demore said he would handle an investigation a certain way does not make it "more or less probable" that the Warden acted with retaliatory animus toward Mr. Kengerski when he made the decision to fire him.

Each separate comparison the District Court allowed Mr. Kengerski to make, along with the cumulative impact of all the comparisons that were permitted, rendered it impossible for the jury to render a fair and impartial verdict. A new trial is warranted, with the exclusion of this comparison testimony.

## F.    District Court Abused Discretion Admitting Evidence Not Known By Decision-Maker

The District Court allowed Mr. Kengerski to present extensive testimony that Mr. Kengerski was harassed by co-workers despite this harassment not being known by the decision-maker, Warden Harper.  Mr. Kengerski acknowledges that the law requires that for this evidence to have been properly admitted it had to have been known by Warden Harper.  The testimony in question included that Mr. Kengerski was subjected to death threats, harassing phone calls, and being called racist names. Allegheny County objected to this admission because there was no testimony that Warden Harper knew of these events.[12]  The District Court admitted this evidence anyway.

---

[12] Objections were made at motions in limine, during testimony, and in the Motion for Mistrial.

On appeal, Mr. Kengerski cannot point to any citation in the record that says Warden Harper knew of these things.  This Court need look no further than Mr. Kengerski's Response where he attempts to turn the rules of evidence upside down by claiming that the absence of a denial in the record somehow can be the equivalent of an admission.  (*See* Response pg. 52, "Importantly, Harper never denied that he knew that Mr. Kengerski was being harassed.")  In reality though, it is only "important" that there is no testimony that Warden Harper knew Mr. Kengerski received death threats or any of the harassment referred to here. No jury verdict can be based upon speculation or conjecture.  *Fedorczyk v. Caribbean Cruise Lines, Ltd.*, 82. F.3d 69, 75 (3d Cir. 1996).  Instead, a jury's verdict must be founded upon the facts of the case. Mr. Kengerski cannot establish the Warden Harper had knowledge of the host of events he claimed occurred to him.

The District Court's improper admission of this evidence allowed Mr. Kengerski to paint himself as a man being targeted with death threats, harassment, and hostile working conditions from his co-workers on a daily basis.  It set the stage for Mr. Kengerski's lawyer to argue in closing how Allegheny County made a promise to Mr. Kengerski "that it's going to protect him," that Mr. Kengerski "did not get the protection that he was entitled to" and to end with telling the jury, "We've got to protect employees like Mr. Kengerski when they make those complaints."  (App. 1123.)

The admission of this evidence was wrong under the law and resulted in substantial and extreme prejudice to Allegheny County. It affected the outcome of the trial. Allegheny County is entitled to a new trial with this evidence excluded.

## G.    District Court Abused Discretion Re: Failure to Promote Claim Evidence

The District Court committed legal error and abused its discretion when it admitted evidence regarding Mr. Kengerski's not being promoted to Major. This error occurred in the original rulings made by the District Court and is preserved at the time. Thus, Mr. Kengerski's reliance on the District Court saying something in its Charge and the County's not objecting at that time, is meaningless to this appeal. There is nothing in the rules of evidence or civil procedure that requires that once a party objected to the court's ruling that it must then revisit it at every point in the court's jury instructions. To require so would mean that almost every point in the court's instruction would be objected to given that by the time a case gets to jury instructions almost every substantive ruling on the case has already been made.

Even here, the District Court stated that the jury was to consider the failure to promote evidence in the context of the "process used by Warden Harper in connection with Mr. Kengerski's third application for major reflected any retaliatory animus by Warden Harper." (App. 1039.) However, the record established that Warden Harper was not involved in this "process." Instead, the testimony was that

all Warden Harper did was review the recommendations made by the application panel. It was the application panel that made the decision to recommend others for the position rather than Mr. Kengerski. (App. 744.)

Given Warden Harper's undisputed non-involvement in this process of deciding if Mr. Kengerski would be selected for promotion, the admission of this evidence violated FRE 401. Its admission caused confusion to the jury, which would logically conclude that given the evidence was admitted it bore weight and importance for a matter they needed to decide. It was yet another piece of the story that Mr. Kengerski was permitted to weave of the Warden's treatment of him, when in fact, the law did not permit such information to be a factor in the jury's consideration. As such a new trial is warranted with the exclusion of this evidence.

## CONCLUSION

Therefore, Appellant respectfully request that the entry of judgment by the District Court be REVERSED and JNOV be entered in Appellant's favor. In the alternative, a new trial with corrections to the errors in admission of evidence be ordered.

Respectfully submitted,

*/s/ Virginia Spencer Scott*
Virginia Spencer Scott
Assistant County Solicitor
Pa. I.D. #61647

*/s/ Frances Liebenguth*
Frances Liebenguth
Assistant County Solicitor
Pa. I.D. #314845

ALLEGHENY COUNTY LAW DEPARTMENT
Firm #057
445 Fort Pitt Boulevard, Suite 300
Pittsburgh, PA 15219
(412) 350-1173

virginia.scott@alleghenycounty.us
frances.liebenguth@alleghenycounty.us

Counsel for Appellant

## CERTIFICATION OF COMPLIANCE TO RULE 32(A)(7)

I, Virginia Spencer Scott, Esquire, hereby certify that this REPLY complies with the type-volume requirements set forth in Federal Rules of Appellate Procedure Rule 32(a)(7)(B). This BRIEF contains 6,489 words and is 27 pages, from the Argument to the Conclusion, as determined by Microsoft Word 2016 - word count processing program, with 14-point Baskerville Old Face. The hard copy and the electronic copy of this REPLY are identical. The electronic copy of this REPLY has been virus scanned using System Center Endpoint Protection.

*/s/ Virginia Spencer Scott*
Virginia Spencer Scott
Assistant County Solicitor
Pa. I.D. #61647

ALLEGHENY COUNTY LAW DEPARTMENT
Firm #057
445 Fort Pitt Boulevard, Suite 300
Pittsburgh, PA 15219
(412) 350-1173
(412)-350-1108

vscott@alleghenycounty.us

Counsel for Appellant

## CERTIFICATION OF SERVICE

I, Virginia Spencer Scott, Esquire, an attorney duly admitted to the bar of this Court, hereby certify that on this 24th day of June 2024, I electronically filed the foregoing REPLY with the Clerk using the CM/ECF system of the Third Circuit.  I further certify that on this 24th day of June 2024, I electronically filed the SUPPLEMENTAL APPENDIX with the Clerk using the CM/ECF system of the Third Circuit.

I also certify that simultaneous service of REPLY is made on the following counsel of record using the CM/ECF system of the Third Circuit. I further certify that simultaneous service of the SUPPLEMENTAL APPENDIX is made on the following counsel of record using the CM/ECF system of the Third Circuit.

maggie@ocwjustice.com
Margaret S. Coleman, Esq.
O'Brien Coleman & Wright
116 Boulevard of the Allies
Pittsburgh, PA 15222
(*Counsel for Appellee*)

I also certify that on June 26, 2024, I will cause to be sent via overnight mail (Federal Express) in a properly addressed wrapper, to the following person at her last known address listed below:

Patricia S. Dodszuweit, Clerk
UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT
Office of the Clerk
601 Market Street, Room 21400

Philadelphia, PA 19106-1790

(An original and six (6) hard copies of REPLY and four (4) hard copies of its SUPPLEMENTAL APPENDIX.

Respectfully submitted,

*/s/ Virginia Spencer Scott*
Virginia Spencer Scott
Assistant County Solicitor
Pa. I.D. #61647

ALLEGHENY COUNTY LAW DEPARTMENT
Firm #057
445 Fort Pitt Boulevard, Suite 300
Pittsburgh, PA 15219
(412) 350-1173
vscott@alleghenycounty.us

Counsel for Allegheny County

# ADDENDUM

# TO REPLY

STATEMENT OF THE FACTS –
<mark>WITH REFERENCES TO WHERE PRESENTED AT MOTION FOR
SUMMARY JUDGMENT IN YELLOW</mark>

**H.    Allegheny County Jail Policy 154 – Code of Ethics**

Allegheny County Jail Policy No. 154, CODE OF ETHICS/CONDUCT REQUIRED
OF ALL ACJ [ALLEGHENY COUNTY JAIL] EMPLOYEES, was issued by Allegheny
County Jail Warden Orlando Harper on March 15, 2015.  (Appx. 1227; <mark>ECF# 72-4</mark>.)
Relevant to this lawsuit, this Policy provides:

> **POLICY**
> It is the policy of the Allegheny County Bureau of
> Corrections to hold all employees... accountable for
> compliance with both the Allegheny County and Allegheny
> County Bureau of Corrections code of ethics.   Violations
> of either code of ethics will result in disciplinary action up
> to and including termination.

(Policy § 1.)   (Appx. 1227; <mark>ECF #72-4.</mark>)   The Policy continues that a, "The listed
requirements in this directive... issued to all employees of ACJ are to be strictly
followed.  Violation of these requirements will result in **severe disciplinary action or
possible employment termination."**  (Policy §2.) (Appx. 1227, emphasis added; <mark>ECF
#72-4</mark>.)

Jail Policy No. 154 then provides a list of prohibited conduct (beginning at "A"
and ending at "R").  An Infraction denoted with an asterisk is "No Tolerance Policy."
(App. 1229; <mark>ECF #72-4.</mark>)No tolerance was defined as, **"ANY VIOLATION OF
THESE POLICIES WILL RESULT IN SEVERE DISCIPLINARY ACTION UP**

TO EMPLOYMENT TERMINATION."  Such policy violators do not fall within the perimeters of progressive discipline.  (App. 1229, emphasis original; ECF #72-4.)

Section N is a No Tolerance policy.  It reads:

> N.*Submitting and/or Falsifying Reports.  (Any Employee who knowingly or willfully submits a report containing false statements shall be immediately relieved of duty and sent home until his/her formal disciplinary hearing is conducted....

(App. 1229; ECF #72-4)

## I.     Allegheny County Anti-Discrimination & Harassment Policy

Allegheny County has an "Anti-Discrimination-Harassment-Retaliation Policy and Complaint and Report Procedure." (Appx. 1207-1211; ECF #57-11; Supp. App. 11.)  Relevant to this lawsuit, this policy provides that, "[a]ll reports of harassment, discrimination, and retaliation made pursuant to the policy will be investigated promptly." (Appx. 1210; ECF #57-11.)  Furthermore, all investigations done pursuant to this policy, "are to be conducted by or under the direction of the Director, Allegheny County Department of Human Resources." *Id.*  Violations of this policy are not to be investigated at the departmental level. *Id.*  "All such investigations will be conducted in as confidential a manner as is consistent with a proper investigation and to the extent practical under the circumstances." *Id.*

The policy contains mandatory reporting requirements of any possible violation. (App. 1209; ECF #57-11.) Management employees with Allegheny County are given heightened responsibilities under this policy:

### D. MANAGEMENT RESPONSIBILITIES

**Management must comply with and enforce all aspects of this policy and must cooperate fully in the County's investigative, remedial and corrective actions. Management is required to act on all reports of harassment even when a request is made by the employee that no action be taken. Management must not interfere or attempt to interfere with or prevent any employee's effort to make a complaint or report under this policy. Failure by any management to comply with these responsibilities is a violation of this policy and will result in disciplinary action, up to and including discharge, without other warning.** A supervisor who violates this policy also may be held personally liable for money damages.

(App. 1210, emphasis added; ECF #57-11.) As a Captain, Mr. Kengerski was a part of management. (App. 1226; ECF #57-1.)

### J.    Allegheny County Jail Policy No. 124 – Code of Ethics

The Allegheny County Jail also has Code of Ethics Policy #124, which was implemented on February 20, 2008, but a previous Warden, Ramon C. Rustin. (App. 1196 – 1206; ECF #57-8; Supp. App. 12.) This policy outlines the Chain of Command at the Jail:

### 4.8 CHAIN OF COMMAND
The jail management is reflective of the chain of command. Each employee reports to a superior in their department,

> or shift, who in turn reports to a division head (business, security, treatment), who report to the Warden.  The chain of command permits effective management and should be utilized.  While all employees are encouraged to process matters through the chain of command, openly and fairly, they are also encouraged to effectively communicate to their supervisors, directly as well as indirectly.

(Appx. 1198-199; ECF #57-8.)  The Jail's chain of command policy requires subordinates to follow a superior's orders.   (App. 0910; 1201; Supp. App. 12-13.)   The sergeants and corrections officers were subordinate to Mr. Kengerski. (App. 1226; ECF #57-1.)

## K.   Mr. Kengerski's Knowledge of These Policies

Mr. Kengerski was a training officer at the Allegheny County Jail, and he trained others on Allegheny County policies.  (App. 0805-0806[13]; 0833; ECF #68-1; Supp. App. 88.)  Mr. Kengerski knew Jail Policy 154 including § N.  (App. 0911 – 917; Supp. App. 12.) Mr. Kengerski knew that placing false or inaccurate information in a report, or ordering a subordinate to falsify a report, is a zero-tolerance policy violation.  (App. 0912-0913; 1229; ECF #72-4; Supp. App. 12.) Mr. Kengerski knew he had to follow policy § N and knew that violation of Policy § N could result in termination.  (App. 0911-0912; 1229; ECF #72-4; Supp. App. 12.) Mr. Kengerski admitted that Policy § N required that the alleged perpetrator be immediately

---

[13] Throughout this BRIEF, all citations to the Appendix are hyperlinked to the Third Circuit docket.

removed from the building and that no other policy violation required this. (App. 0912-0918; 1229; ECF #72-4; Supp. App. 12.)

Mr. Kengerski was also familiar with and trained others on Allegheny County's Anti-Harassment Policy. (App. 0906-0907; Supp. App. 11-12.)  Mr. Kengerski knew that discrimination and harassment were prohibited, and that he had to report possible violations "right away."  (App. 0931-0932; 1207-1211; ECF #57-11; Supp. App. 11, 13.) Mr. Kengerski agreed that he knew this policy, he was charged with violating this policy, and knew that violation was subject to immediate termination, "without other warning."  (App. 0929-0931; Supp. App. 11.)

## L.    Mr. Kengerski's Termination

In the fall of 2015, Cadet Alyssia Tucker reported to then Captain Kengerski that she was being sexually harassed by a Sgt. Michael Brown. (App. 0956; 1246, Supp. App. 13; ECF#57-15.)  Mr. Kengerski knew that this report was a protected confidential report of sexual harassment covered by Allegheny County's Anti-Harassment policy.  (App. 0925-0928; Supp. App. 11.)  However, he did not act upon this report as required by the policy.  (App. 0956-0958; Supp. App. 13; ECF#68-4.) On November 20, 2015 (at an HR training seminar), Mr. Kengerski disclosed for the first time that months before an unidentified officer reported to him sexual harassment that possibly violated the County's Anti-Harassment policy.  (App. 1246; ECF#57-15.)

After this seminar, Deputy Warden Simon Wainwright approached Captain Kengerski in a very annoyed manner and asked why he did not act timely on this report. It was clear that the Deputy Warden found Mr. Kengerski's failure to follow the reporting rules of the policy very disturbing. (App. 0956-0958; ECF#68-4.)

Mr. Kengerski contacted Cadet Tucker. He told her that Deputy Warden Wainwright would contact her to file a report about the sexual harassment. Mr. Kengerski then told Cadet Tucker to include false information in her report, namely Mr. Kengerski told her to include in her report that she had spoken with Maj. Bytner via the jail phone. (App, 1251; ECF #57-4.) Cadet Tucket said in response that this did not happen. (App. 1251; ECF #57-4.) Next Mr. Kengerski approached Sgt. Brown and told him that he was letting him know about a sexual harassment allegation that was brought against him, because "he didn't want me to be blind-sided when administration calls [me] over about this." (App. 1253; ECF #57-17.)

Both Cadet Tucker and Sgt. Brown sought guidance from Sgt. Andrew Coulter (he was the training officer for Cadets and was Sgt. Brown's union steward). (App. 0903; 1253; Supp. App. 12-13.) Sgt. Coulter advised them that they were not ever to put false information in a report. (App. 1252; ECF#57-13.) Cadet Tucker and Sgt. Brown both submitted reports. Cadet Tucker followed up with a second report the next day. (App. 1249-1250; ECF#57-12.) Both Cadet Tucker and Sgt. Brown reported that Mr. Kengerski had told them to provide false information in a report (in

Sgt. Brown's case it was that if asked about the conversation Sgt. Brown and Mr. Kengerski had, he was to lie about it.) (App. 1251; 1253; ECF#57-14; ECF#57-17.)

On November 24, 2015, Warden Harper instructed Deputy Warden Wainwright to immediately relieve Mr. Kengerski from duty [as set forth in Policy 154 § N] and escort him from the Jail. (App. 0872-0873; Supp. App. 96.) Warden Harper was the sole person who made the decision to fire Mr. Kengerski. Before making this decision, he reviewed the reports submitted in connection to Mr. Kengerski's policy violations. (App. 0821-0822; 0827; Supp. App. 14.) He viewed video for corroborating or refuting information. (App. 0808; 0827; Supp. App. 14-15; Supp. App. 140.) The reports stated that Mr. Kengerski had told the officers to provide false information in reports (or in Sgt. Brown's case, to lie if asked). (App. 1253; ECF#57-17.)

Additionally, Sgt. Brown reported that Mr. Kengerski disclosed to him that Sgt. Brown was the subject of a sexual harassment investigation. (App. 1253; ECF#57-17.) Warden Harper also reviewed the report of another sergeant (Coulter) that corroborated what Cadet Tucker and Sgt. Brown told him. (App. 1252; ECF#57-13.)

Upon consideration of the reports and evidence, Warden Harper made a credibility determination. (App. 0719; 0821; Supp. App. 14.) The Warden found officers Tucker and Brown to be more credible than Mr. Kengerski because they had no identifiable motive to lie. (App. 0720; Supp. App. 14.) The Warden found Officer

Alyssia Tucker to be more credible because she was an at-will brand new probationary officer with no union representation. (App. 0719; 0807-0808; Supp. App 14; Supp. App. 140.)  She was so new at the Jail she did not know the dynamics in the Jail to any degree to get involved for or against anyone.  Warden Harper found that she had no motive to lie about a senior captain giving her directions to put false information in a report.  (App. 0719; Supp. App. 14.) Warden Harper found that Mr. Kengerski did have motive to lie and cover up because he knew he would be facing discipline for not making a timely report of sexual harassment. (App. 0720; 0808; Supp. App. 14.)

Warden Harper fired Mr. Kengerski in consultation with the Law Department and the County Manager. (App. 0727-0728; Supp. App. 14.) The Warden fired him because he told two subordinate officers to provide false information in reports, and for disclosing to Sgt. Brown that he was the subject of a sexual harassment investigation. (App. 1246; 1249; 1251; 1252; 1253; 1255; ECF#57-15; ECF#57-12; ECF#57-14; ECF#57-13; ECF#57-17; ECF#57-9.)

Mr. Kengerski participated in a post-termination hearing where he was given the opportunity to respond to the allegations against him. (App. 0718; Supp. App. 140.)  The Law Department, Deputy County Manager, and Warden Harper determined that Mr. Kengerski did not provide information at the post-termination hearing to overturn the termination decision.  (App. 0720-0721; Supp. App. 140-141.)

### M.    Buddy Day Suspension

In July of 2015 Mr. Kengerski received a five-day suspension for failure to work in exchange for buddy days for which he had already received pay.  (App. 1237.) The buddy day system at the Jail allows for officers to trade shifts with each other. (App. 0481.) Officer A works for officer B in exchange for officer B agreeing that they will work for officer A within four months. (App. 0508-0509.) Officer A would still be paid on the day they do not work, because of the promise that their "buddy" is going to work for them later. (App. 0509.)  As such, the buddy day system falls apart if the officers do not work those days within the four- month window. (App. 0509.) Only corrections officers, in accordance with their collective bargaining agreement, had a written buddy day policy in place.   (App. 0783.) The entire Jail was audited to determine violations of the buddy day system.  (App. 0788.) Mr. Kengerski was found to be the most egregious violator with eleven days he did not work and did not pay back. (App. 0787-0788.) Other captains and sergeants were suspended for buddy day violations because of the audit. (App. 0788.)

Buddy days were tracked through the deputy wardens, not Warden Harper. (App. 0787; 0857.) Warden Harper was not involved in the disciplinary process concerning Mr. Kengerski's buddy day violation.  Warden Harper did not attend the hearing held for Mr. Kengerski on the buddy day violation. (App. 0786; 0788.) There was a panel that interviewed Mr. Kengerski pertaining to the buddy days that Warden

Harper was not a part of.  (App. 0786-0788.) The panel decided to suspend Mr. Kengerski for his buddy day violations.  (App. 0786-0788; Supp. App. 248.) Warden Harper's only involvement was in approving the panel's recommendation. (App. 0788.)

## N.    Robyn McCall

Robyn McCall was a Major while Mr. Kengerski was a Captain. (App. 1236; ECF#68-9.) In an April 29, 2015, letter to Warden Harper, Mr. Kengerski reported conduct by Maj. McCall that violated Allegheny County's Anti-Harassment Policy. (App. 1232-1233; ECF#72-11.)  After this report, Maj. McCall did not remain employed with the County. (App. 0773; 1236; ECF#68-9.)  Warden Harper recommended Maj. McCall be terminated. (App. 0773-0774; 0814.) Instead, at the direction of the Allegheny County Manager's Office and the Allegheny County Law Department, Maj. McCall was put on paid leave for three months after which she resigned.  (App. 0773; 1236; ECF#68-9.)

## O.    Robert Bytner

Robert Bytner was a Major at the Jail.  Claims of sexual harassment were made against him and he was first demoted to Captain. (App. 0697-0698; ECF#68-8.) Additional sexual harassment claims were made while he was a Captain, and he was fired and given a post-termination hearing.  (App. 0822; 0692-0693; ECF#68-4.) Pursuant to Allegheny County's Anti-Harassment policy, all the sexual harassment

claims against Mr. Bytner were referred to County Human Resources and the County Law Department.  (App. 0697-0698; 0822; ECF#57-11.)  When Mr. Bytner was fired, he was a Captain, and he received the same post termination hearing as Mr. Kengerski did. (App. 0692-0693; ECF#68-14.)

**P.    Joseph Demore**

In 2012, Mr. Joseph Demore was a Captain the Jail.  At that time, Corrections Officer Hendrick made a complaint regarding Mr. Demore to the FBI and Allegheny County Police.  Mr. Demore was "exonerated."  (App. 0498-0499; Supp. App. 85; Supp. App. 106.)

Allegheny County Police Officer Inspector William Palmer worked with the FBI on this investigation. (App. 0579; 0581; ECF#68-5.) The allegations were that Mr. Demore used excessive force on an inmate and that he wrote a report for [Corrections Officer Hendrick], not that the report was false. (App. 0497-498; 0823; 0580; ECF#68-5.) "[T]he officer...never said that [Demore] had put in the information or that anything in the report that Joe Demore wrote was any kind of falsehood." (App. 0580-0581; ECF#68-5.)

> Q. So would you agree then that Major Demore was not accused by Officer Hendrick of falsifying a report?
>
> A. That's correct.

(App. 0623, Testimony of Police Inspector Palmer.)

Mr. Demore never directed Officer Hendrick to put false information in the report, and he was found to be accurate. (App. 0498.)  Mr. Demore testified that the allegation against him was not a complaint that he had instructed a subordinate officer to put false information in a report, or a complaint of interfering with a sexual harassment investigation. (App. 0505.) Mr. Demore was not accused of falsifying a report.  (App. 0824.)  Mr. Demore did not receive discipline because the excessive use of force allegation was deemed unfounded by the entities panel that investigated the allegation. (App. 0498-0499.)

## Q.    The Protected Activity – April 29, 2015

On April 29, 2015, seven months before to his termination, Mr. Kengerski submitted a letter to Warden Harper that reported Maj. McCall for  harassment and inappropriate racial text messages recounting events over a year before. (App. 1232-1233; ECF#72-11.) The Third Circuit has already ruled that this letter was an activity protected by Title VII.